

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

APR 1 8 2005

APR 18 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | No. 03 CR 978 |
| v. ) | |
| ) | Judge Amy J. St. Eve |
| ) | |
| MOUSA MOHAMMED ) | |
| MARZOOK, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MUHAMMAD SALAH'S MEMORANDUM IN SUPPORT OF HIS REQUESTS FOR DISCOVERY

**GIVEN THE BREADTH AND COMPLEXITY OF THIS INDICTMENT, THIS COURT SHOULD BROADLY EXERCISE ITS "INHERENT AUTHORITY TO PROMOTE THE PROPER ADMINISTRATION OF CRIMINAL JUSTICE" AND GRANT MR. SALAH'S DISCOVERY REQUESTS.**

The indictment against Mr. Salah and Dr. Ashqar is sweeping in scope and remarkable in political content. It covers almost two decades of events in foreign lands directly related to the on-going Israeli-Palestinian conflict in the Middle East and charges a vast conspiracy involving numerous co-conspirators and thousands of documents and recorded conversations, many of which are in Hebrew and Arabic.

To further complicate this prosecution, the government bases much of its case against Mr. Salah on statements that were forcibly extracted from him by the Israeli General Security

Services (GSS), the elite interrogators of Palestinian detainees, who routinely engaged in systematic torture. The GSS interrogators subjected Mr. Salah to extreme psychological and physical coercion designed to break his spirit and free will, including prolonged interrogations, sleep deprivation, forced painful and unnatural body positions for long periods, and physical brutality.

Further, the delay in bringing these charges against Mr. Salah is extraordinary. Almost all the alleged acts upon which the charges against Mr. Salah are based occurred in 1993,[1] over 11 years prior to this indictment and prior to the designation of Hamas as a foreign terrorist organization. Moreover, these acts are alleged to have occurred during a period in which the United States and the State of Israel had on-going relations with persons affiliated with Hamas. The delay in bringing these charges raises a serious Fifth Amendment, due process violation and makes the government's motivation- strategic and tactical - for such delay directly relevant.[2]

In such a complex, unprecedented case, with such far reaching consequences for the defendants, this Court must exercise its "inherent power" and sense of justice in ruling upon Mr. Salah's discovery requests. In this case, to ensure fairness and to promote the "proper administration of criminal justice," this Court should order that the defense receive all documents and other discovery "which are material to the preparation" of the defendant's constitutional claims and factual defenses. *See United States v. Jackson*, 508 F. 2d 1001, 1007 (7th Cir. 1975)

---

[1] While the indictment does make allegations of Mr. Salah's indirect involvement with Hamas in 1999, and his denial in 2001 of involvement with Hamas in an answer to an interrogatory in a civil case, these insignificant claims are mere pretext calculated to create the appearance of more recent criminal activity.

[2] Mr. Salah intends to make a motion to dismiss for pre-accusatory delay at the appropriate time.

2

(upholding district court's order that government to produce list of witnesses.)

## I. List of Witnesses, Grand Jury Testimony, and Jencks Material.

Mr. Salah has requested a list of government witnesses, their grand jury testimony and other *Jencks* material. *See* Request No.1[3] The breath and complexity of this indictment calls for the production of these items at the earliest possible stage of this litigation.

The indictment covers a period from 1988 to 2004, and accuses Mr. Salah of conspiring with a "racketeering" enterprise. In fact, Hamas is a foreign-based movement with tens of thousands of followers and supporters involved in hundreds of daily activities in the West Bank and Gaza Strip. The indictment covers 43 pages of allegations and charges, including first degree murder, conspiracy to commit first degree murder, and solicitation of first degree murder charges under Illinois law. In addition it charges federal conspiracy to kill, kidnap and maim, money laundering, obstruction of justice, material support for terrorism, hostage taking, forgery and travel in aid of racketeering charges.

The indictment names two co-defendants, one alleged to be in Syria, and sixteen (16) unindicted co-conspirators - six named and ten unnamed - most of whom are believed to be somewhere in the Middle East and to speak little or no English. It charges that conspirators worked with six other Palestinian organizations "to achieve the goals of the enterprise," (para. 13), and that Hamas "infiltrated various universities and other academic and social institutions in the West Bank and Gaza Strip," (para. 12), implicating hundreds of Palestinian, political, educational and social institutions.

---

[3] All request numbers refer to the enumerated requests contained in the Motion for Discovery.

The discovery already produced encompasses hundreds of hours of recorded conversations in Arabic and thousands of documents, many of which are in Hebrew or Arabic. Many other documents produced concern political events spanning over 50 years of the Israeli-Palestinian conflict. For every document produced on these issues, there are thousands more covering the same subject matter. In addition, there are hundreds of complex financial documents which have yet to be produced, documents yet to be declassified, and documents the disclosure of which, according to the prosecuting attorneys, is subject to the approval of the State of Israel.

In such an extraordinary case, which goes back many years and is steeped in foreign languages and political events, the defense is at an incredible disadvantage, and this Court must attempt to level the playing field by exercising its "inherent power to promote the proper administration of criminal justice." *See United States v. Jackson*, 508 F. 2d at 1007. By ordering the government to provide a list of witnesses, their grand jury testimony and other *Jencks* material now, rather than on the eve of trial, the defense can at least begin to investigate and prepare a defense to this open-ended, massive indictment.

Similarly, critical to its preparation for trial, the defense is entitled to the names and present addresses of the unnamed, A-J, co-conspirators and the unnamed individual "A" (*see* indictment, paragraphs OO-AAA), who provides the only basis in the indictment for any claims of post 1993 Hamas activities by Mr. Salah. (Request No. 2). Without production of this information, Mr. Salah is deprived of his fundamental right to meaningful notice of the conspiracy charged against him and the identity of those with whom he has allegedly conspired.

4

## II. Documents Relevant to Suppression of Statements at a Pre-Trial Hearing, and if Necessary, to Challenge the Reliability of Such Statements at Trial.

### A. Documents Concerning GSS Interrogation Methods.

Mr. Salah has requested:

All protocols, directives and guidelines written by the Israeli General Security Service (GSS) or other branches of the Israeli government which document the methods and practices in the relevant period, which were sanctioned for use in interrogations of Palestinian security detainees by GSS agents, including but not limited to directives from the "Special Ministerial Committee on GSS Interrogations;" Part II or the Annex to the Commission of Inquiry into the Methods of Investigation Regarding Hostile Terrorist Activity," (The Landau Commission Report); the affidavit filed with the Israeli High Court dated 4/25/93 by the GSS concerning their procedures for interrogating security detainees.

(Request No. 3 a)

The identity and all written documentation of all other Palestinian detainees who made confessions to the GSS in the occupied territories during the period in which physical and psychological coercion/torture was the *defacto* or *dejure* practice and policy of the State of Israel

(Request No. 3 b)

In 1987, after it was publicly exposed that the Israeli General Security Services (GSS) had used force and psychological coercion in interrogation of Palestinian detainees, a commission of inquiry was established and chaired by former Israel Supreme Court president Moshe Landau (hereinafter the Landau Commission, attached as Exhibit A).

The Commission issued a two part report. In the first part the commission concluded that there was widespread perjury in judicial proceedings by GSS agents denying the use of physical and psychological coercion in their interrogations of Palestinians. (*See* Landau Report at 159). This part of the Commission report also concluded that the use of physical and psychological

5

pressure through "vigorous and extensive interrogation"was permissible in interrogations of Palestinian suspects. (*See* Landau Report at 184-85)

In Annex II, the second part of its report- a classified document - the Commission formulated a code of specific methods and guidelines for GSS interrogations and directed that these guidelines be annually reviewed and modified by a small ministerial committee. (*See* Landau Report at 185).

In 1999, the Israeli Supreme Court ruled that the coercive methods used by the GSS following the Landau Commission guidelines were illegal. Specifically the methods violated the international prohibitions against torture and cruel, degrading and inhuman treatment, as well as Israeli law, which holds that interrogations must be fair and reasonable:

> First a reasonable investigation is necessarily one free of torture, free of cruel, inhuman treatment of the subject and free of any degrading handling whatsoever . . . . This conclusion is in perfect accord with (various) International Law treaties–to which Israel is a signatory– which prohibit the use of torture, 'cruel, inhuman treatment' and 'degrading treatment' . . . These prohibitions are 'absolute.' There are no exceptions to them and there is no room for balancing. Indeed, violence directed at a suspects body or spirit does not constitute a reasonable investigation practice.

*H.C. 5100/94 Public Committee Against Torture in Israel and Others v. The State of Israel, The General Security Services and Others*, 53(4) PD 817 (1999) (*See* Attached Opinion, Exhibit B at page 16).

Although the High Court of Israel in 1999 condemned the GSS practices of interrogation, including prolonged sleep deprivation, the "Shabach" position, (a painful position of being handcuffed while seated on a small chair tilted forward towards the ground), and the use of physical force and intimidation, these methods and others were sanctioned and in use at the time

6

Mr. Salah was interrogated in 1993. Mr. Salah asserts that these and other practices in use in 1993 were employed against him, and he is entitled to demonstrate to any fact finder what procedures were sanctioned and routinely used by the GSS at the time of his interrogation.

While the government recognizes that there are a serious issues as to the admissibility of Mr. Salah's alleged statements to the Israeli Special Security police (GSS) and claims to be working closely with the Israelis to obtain their cooperation for a suppression hearing, it has declined to request from Israel documents that would establish the specific interrogation methods and practices in use at the time of Mr. Salah's interrogation.[4]

Rather, the government suggests that the defense get these documents about GSS interrogation methods from the Israeli government on their own, a time consuming and highly unlikely prospect. The government has an obligation to obtain and produce these documents under *Brady* and *Giglio*. Such documents are also discoverable under Rule 16, as they are essential to a fair suppression hearing and relevant to issues before the jury. The government ought not to be allowed to use its special relationship with the Israeli government to pick and choose which relevant documents to request.

Similarly, the defense is entitled to be provided with the identities of other Palestinian detainees who have been subjected to the same interrogation policies and practices of torture and coercion. Such information is discoverable under *Brady*, *Giglio* and 404 (B). The testimony of other Palestinian detainees who were victims of GSS torture methods during the same time period is highly relevant to establish the policy and practices of Mr. Salah's GSS interrogators.

---

[4] The prosecution has represented that it has requested from Israel the names of the GSS interrogators, any reports authored by them and any prior accusations against these interrogators for abuse.

This Court should order the U.S. government to obtain this information and documents from the State of Israel and provide them to the defense.

## B. Names of the Police, Prison Guards and Palestinians Who were Involved with the GSS in the Interrogation of Mr. Salah.

Mr. Salah has requested:

The names and addresses and of all police, prison guards and Palestinians (or other) collaborators who worked with the Israeli authorities in the interrogation of the defendant, and all documents memorializing their involvement.

(Request No. 3 c)

The physical abuse and threats carried out against Mr. Salah were committed not only by his GSS interrogators, but by Israeli police and prison guards working with the GSS at the prison where he was interrogated. Mr. Salah is entitled to have the names of these police and guards, their whereabouts, and any documents memorializing their involvement.

In addition, it is undisputed that one of the interrogation methods employed by the GSS in 1993 was the use of Palestinian collaborators, referred to as "birds," who posed as prisoners to assist the GSS in a detainee's interrogation and to extract information from the detainee. This method was used in the interrogation of Mr. Salah. During his interrogation Mr. Salah was placed in a cell with other Palestinians who claimed to be activists in the struggle against occupation and demanded that he prove to them that he was not a collaborator. Mr. Salah was threatened with death if he did not prove in writing that he was not a collaborator. Parts of these writings were then used by the GSS interrogators to continue his interrogation.

These Palestinians working with the GSS interrogators were an integral part of the illegal coercive interrogation of Mr. Salah and the defendant is entitled to know their identity, an address

8

to contact them, to be provided with any documents memorializing their involvement in Mr. Salah's interrogation and to have such collaborators produced for a hearing. The government has a working relationship with the Israelis and has the burden of showing that Mr. Salah's statements are admissible. See e.g., *Lego v. Twomey*, 404 U.S. 489 (1976). Therefore the prosecution should be required to obtained this discovery from the government of Israel.

## C. Documents Relevant to the Claim that Mr. Salah's Arrest, Search and Interrogation was the Product of a U.S.-Israeli Joint Venture

The law allows for the suppression of statements made to foreign agents, or the fruits of arrest or search by foreign agents, when the methods used are shocking to the judicial conscience or when the interrogations, arrest or search are the product of a U.S. joint venture with the foreign government agents. See *United States v. Yousef*, 327 F. 3d 56, 146 (2d. Cir. 2003); *United States v. Heller*, 625 F.2d 594, 599 (5th Cir. 1980); *United States v. Lopez-Imitola*, 2004 U.S. Dist. Lexis 226434 (U.S. Dist. S.D. N.Y.); *United States v. Usama Bin Laden*, 132 F. Supp. 2d 168, 187 (S.D. N.Y. 2001); *United States v. Fernandez-Caro*, 677 F. Supp. 893, 895 (S.D. Tex. 1987); *United States v. Molina-Chacon*, 627 F. Supp. 1253, 1262 (E.D .N.Y.1986).

Here, Mr. Salah requests:

All communications between Israeli government agents and agents of the U.S. government concerning the arrest, search, and interrogation of the defendant in Israel. And any documents prior to 1994 which indicate a joint involvement between agents of the United States and agents of the State of Israel in the investigation and sharing of information concerning the activities of Hamas or other Palestinian resistence group.

(Request No. 3 d)

These documents are relevant to Mr. Salah's claim that his arrest, search, and interrogation

was the product of a "joint venture" between agents of the government of Israel and agents of the United States government and are necessary to his challenge to the admissibility of these statements or the fruits of an illegal arrest or search.

## III.   Disclosure of Electronic and Other Surveillance.

Mr. Salah seeks:

> All applications, affidavits, memoranda or other papers submitted in support of applications for executive, administrative or judicial approval of surveillance and all opinions responsive or related thereto, and the recordings, logs, minimization records, and all other records of physical surveillance of any kind of the defendant, his co-defendant or alleged co- conspirator, indicted or unindicted, and any recording of the defendant's conversations to which a party to the conversation allegedly consented.
>
> (Request No. 4)

The government has informed Mr. Salah, through counsel, that there are electronic overhears of Mr. Salah, but the production of these recordings is awaiting security clearance. The defense awaits the production of these materials, including the applications, approvals, logs, and minimization records before determining if any follow-up requests are necessary.

Mr. Salah also seeks the logs, notes or other writings memorializing non-electronic, physical surveillance of himself and his family from 1993 to the present. This physical surveillance, which the defendant upon information and belief claims to have been intensive and systematic, will provide evidence that neither the defendant nor his family were involved in any illegal activities and should be produced under *Brady v. Maryland.*

Mr. Salah also seeks disclosure of any wire or oral communication to which a party to

10

that conversation allegedly consented. The consent signifies that the person was working with the government, and therefore, such communications are statements to government agents and are discoverable.

## IV. Administrative Record of the Designations of Hamas and of Mr. Salah.

Mr Salah has requested:

> The complete administrative record of the Department of the Treasury, Office of Foreign Assets Control which was the basis of the designation in January, 1995 of Hamas as a "Specially Designated Terrorist Organization" and the complete administrative record which was the basis of the October 1997 designation by the Secretary of State designating Hamas as a "foreign terrorist organization and any subsequent record of designation.

(Request No. 3 e)

> The complete administrative record of the Department of the Treasury (OFAC) which was the basis for designating Mr. Salah as a specially designated terrorist

(Request No. 3 f)

Mr. Salah is entitled to have access to the administrative records which were the basis for the designations of Hamas as a foreign terrorist organization and now which is the predicate finding in this case for the "material support" charge. The record which is the basis for these *ex parte* designations of Hamas, and which the government claims is now binding on the defendant should be available to the defense. The contents of the record will be important in supporting a due process challenge to the admission of this prior designation[5] and for the preparation of the defense case at trial.

Mr. Salah also seeks the OFAC administrative record of his designation as a "specially

---

[5] The defense at the appropriate time will be presenting a due process and fair trial challenge to the indictments reliance on these *ex-parte* designations.

11

designated terrorist." This record is directly relevant to the criminal charges now pending against the defendant and includes the government's prior version of the case against Mr. Salah. The designation record should be produced to the defense under *Brady* and as a document necessary to assist in the preparation of his defense.

## V. Documents Which are Necessary to Defendant's Claim of Pre-Accusation Delay.

Mr. Salah has requested:

> All written communications by agents and agencies of the U.S. government concerning decisions pertaining to the indictment of the defendant in the pending case including any prior communications reflecting an earlier determination not to indict and/or reflecting the determination to file the 1998 asset forfeiture case rather than a criminal indictment. This request includes any and all documentation regarding the decision of the U. S. government, as to whether or not to seek an indictment in 1997 or any time thereafter, including up to 2004.
>
> (Request No. 3 g)
>
> All written communications between the Anti-Defamation League (ADL), lawyer Nathan Lewin,, American-Israel Public Affairs Committee (AIPAC), or any other pro-Israel U.S. groups and the U.S. Department of Justice pressing for indictments against alleged funders of Palestinian resistence organizations or providing any other information concerning the bringing of charges against the defendant or his co-defendants or other Palestinians.
>
> (Request No. 3 h)
>
> All press releases, press statement, radio and televison interviews of John Ashcroft or other Justice Department officials concerning the above-entitled indictment or related investigations.
>
> (Request No. 3 i)

The delay in bringing the charges contained in this indictment, the bulk of which are based on allegations known to the government in 1993, raises a serious issue of pre-accusatory delay in violation of Mr. Salah's Fifth Amendment due process rights. To prevail on this claim, a

12

defendant must show either that he has suffered prejudice from the delay, or that the prosecution intentionally or recklessly delayed the indictment for strategic advantage. *See,* e.g., *U.S. v. Lovasco,* 431 U.S. 783, 788-790 (1977); *United States. v. Marion,* 404 U.S. 307, 325-26 (1971); *U.S. v. Loud Hawk,* 816 F.2d 1323, 1324 (9th Cir. 1987).

Mr. Salah seeks the above requested discovery in order to show that the delay here was intentional and motivated by improper political reasons and to gain a strategic advantage. The government was aware of the actions of Mr. Salah as early as his arrest and trial in Israel in 1993. Upon his completion of his Israel sentence and his return to the United States in 1997, the government declared Mr. Salah a "specially designated terrorist" and relying on the substantially the same allegations that are now contained in this indictment, brought a civil asset forfeiture case in 1998.

After years of litigating the forfeiture case, even to the point in which the government had entered into negotiations to settle the case and allow Mr. Salah to resume a normal life, the government suddenly changed its strategy. 9-11 occurred, and for improper political reasons, including pressure from the pro-Israel lobby, the government changed course, and returned this indictment. The announcement of this indictment was politically timed, at the height of the presidential election race, and accompanied by a national press conference held by the Attorney General Ashcroft and attended by the pro-Israel supporters who had been involved in the efforts to force an indictment.

There was no legitimate reason for the inordinate delay in bringing this indictment. The delay here was intentional for politically motivated strategic reasons and the documents sought by the defense are directly relevant to establishing this constitutional violation.

## VI. Documents Necessary to Support Mr. Salah's Claims of Selective Prosecution and Enforcement of the Law.

Mr Salah has requested:

All documents reflecting the U.S. governments knowledge of financial and other support by United States citizens for the illegal activities of "Kach" and "Kahane Chai" or other violent Israeli groups against Palestinians in the occupied territories. All documents which reflect the government's decisions not to indict these individuals, groups or organizations who provide material support for these violent anti-Palestinian groups.

(Request No. 3 j)

This case also presents a claim of government selective prosecution and enforcement of the laws in violation of the guarantees of the Equal Protection of the law. The U.S. government has chosen to exercise its prosecutorial power against one-side of the Israeli-Palestinian conflict in the Middle East. Despite its knowledge of the funding and support by individuals and organizations in the United States for violent Israeli "settler" terrorist groups including "Kach" and "Kahane Chai," who target and kill innocent Palestinian civilians, it is only those supporting the Palestinians who have been indicted. The defense is not aware of even one case brought by the Justice Department charging people in the United States with supplying money and other support for violent Israeli groups.

Likewise, the designation of Hamas, a diverse movement, engaged in a broad range of non-violent, social-welfare activities, as well as militant acts, and which has electoral and popular support of hundreds of thousands of Palestinians, as a *"racketerring enterprise"* under United States RICO law, is a selective and politically charged accusation.

Mr. Salah asserts that the indictment brought against him is the product of the selective

14

prosecution and enforcement of the laws in violation of the equal protection clause. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886 ); *see also United States v. Falk*, 479 F. 2d 616, 620-21 (7th Cir. 1973); *United States v. Kerly*, 787 F. 2d 1147 (7th Cir. 1986). To prevail on such a claim the defendant must show : (1) that other persons similarly situated are not being prosecuted; and (2) that the prosecution is based on an impermissible motive. See, *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996).

The defense asserts that the U.S. government is intentionally ignoring the actions of similarly situated U.S. citizens, who are providing money and other support for the violent and illegal acts against Palestinian civilians by armed Israeli settler terrorist groups like "Kach" and "Kahane Chai" in the West Bank and Gaza. As early as 1996, the United States Department of State designated these two settler groups as "terrorists groups," and noted that they "receive support from sympathizers in the United States and Europe." (*See* U.S. State Department website at: www.state.gov/global/terrorism/1996Report/appb.html).

Second, the defendant claims that the government is prosecuting only Palestinians and refusing to prosecute the supporters and facilitators of Israeli acts of violence against Palestinians. To pick and choose enforcement of the law based on the nationality and politics of the alleged perpetrator and the foreign policy of the United States is an improper basis for disparate treatment.

Even though Mr. Salah has not yet filed his selective enforcement motion, the allegations made here are nonetheless sufficient to entitle him to the documents requested. To obtain documents in discovery on a selective enforcement claim, a defendant is faced with "a relatively low burden" of showing a "colorable basis" for his claim since the "government holds most of the relevant evidence." *See United States v. Utecht*, 238 F. 3d 882, 888-89 (7th Cir. 2001); *see also*

15

*United States v. Heidecke*, 900 F.2d 1155, 1158-59 (7th Cir. 1990).

The government holds the evidence of its motivation in not prosecuting the funders and supporters of Israeli terror. The defense seeks the documents showing that the government has information about similar situated financial supporters of Israeli illegal activities against the Palestinians in the West Bank and the Gaza Strip, and the documents showing the basis of their refusal to enforce the laws against these supporters of Israel. The defendant has presented a colorable claim and is entitled to this discovery.

### VII. Other Documents Requested.

Mr Salah has requested:

All documents evidencing contacts with Hamas or any person believed to be associated with Hamas, or any of its social-welfare affiliates, by any agency of the United States Government or any agency of the State of Israel. And any documents evidencing monetary and/or other support for Hamas or any of its members or associates, either by the government of Israel or the United States.

(Request No. 3 k)

Mr. Salah is seeking documents which support his claim that the State of Israel and the U.S. government were in contact and knowingly providing support for Hamas during some of the time period alleged in the indictment. These documents will provide relevant evidence of how the United States treated Hamas during the period in which Mr. Salah is charged with conspiring with Hamas and supporting terrorism. Evidence that Israel and/or the United States were supporting Hamas or having some dealings with known associates of Hamas is relevant and exculpatory under *Brady* of the charges that Mr. Salah's alleged support for Hamas was with criminal intent.

16

## VIII.   Documents Under *Brady v. Maryland*.

This is a unique case which presents several interrelated constitutional and factual

defenses. Such a case demands full application of the principles of *Brady v. Maryland*. Given the

politically-charged and sweeping indictment that the government has chosen to bring, the burden

is on the government to produce any document or other information that can tend to exculpate Mr.

Salah or will provide support for his constitutional challenges as set out above.

As part of his request under *Brady*, Mr Salah seeks:

Any document or other information which in anyway tends to exculpate the
defendant, including impeachment or is favorable to his defense or undermines or
contradicts the prosecution's case or provides support for his constitutional
challenges to this indictment. Included in this request, but not limited to it, is any
evidence which shows that Hamas was involved in lawful activities and was
supported by people who had no intent to promote violence.

(Request No. 4 a)

The testimony or statements of any witness, either before the grand jury, or in an interview
with the government, who fails to provide any inculpatory evidence against Mr. Salah,
whether or not the prosecution intends to call such person as a witness at trial or in an
evidentiary hearing in this case.

(Request No. 4 b)

Any information provided to the government by any witness which the government intends
to call at trial who provided false testimony at any point to the grand jury or any
government agent or at any other tome, along with full disclosure of the circumstances of
the false statement or testimony.

(Request No. 4 c)

Given the facts and arguments presented in this memorandum, the government is now on

notice of the nature and scope of Mr. Salah's constitutional claims, and it should be ordered to use

these claims as a guidepost in complying with its *Brady* obligations.

For all the above stated reasons, Mr. Salah urges this Court to grant his discovery requests.

Dated: April 18, 2005

Respectfully submitted,

*Michael E. Deutsch*

Michael E, Deutsch
People's Law Office
1180 N. Milwaukee Ave
Chicago, Ill 60622
773-235-0070

Robert Bloom
3355 Richmond Boulevard
Oakland, CA 94611

Attorneys for Muhammad Salah

18

# Exhibit A

# COMMISSION OF INQUIRY INTO THE METHODS OF INVESTIGATION OF THE GENERAL SECURITY SERVICE REGARDING HOSTILE TERRORIST ACTIVITY*

## Chapter One: Introduction

1.1   On 31 May 1987, The Government of Israel resolved:

"That the matter of the GSS methods of interrogation regarding Hostile Terrorist Activity (HTA) is – in the wake of Criminal Appeal 124/87 (Nafsu)[1] – a subject of vital public importance at this time which requires elucidation."

Therefore the Government decided:

"To establish a Commission of Inquiry, in accordance with Sec. 1 of the Commissions of Inquiry Law, 1968,[2] regarding the investigation methods and procedures of the GSS on HTA, and the giving of testimony in court in connection with these investigations.
"The Commission will make recommendations and proposals, as it sees fit, also regarding the appropriate methods and procedures concerning these investigations in the future, while taking into account the unique needs of the struggle against Hostile Terrorist Activity."

* Following are excerpts from the English translation published by the Government Press Office in October, 1987 of Part I of the Commission Report. Technical alterations have been made in the translation, and footnotes have been rearranged completely, with additions and omissions. Page numbers from the authorized translation are indicated at the end of each original page in square brackets. Abbreviations used in the Report – GSS for the General Security Service, and HTA for Hostile Terrorist Activity – are used throughout the issue. The Report, when referred to in the issue, will be cited as R., followed by the page number of the authorized translation.

1   Nafsu v. Chief Military Prosecutor (1987) 41(ii) P.D. 631, 7 S.J. 263.

2   23 L.S.I. 32.

The Government also decided that:

"Because the subjects on the investigation obligate secrecy, to apply to the Commission Sec. 23 of the Commissions of Inquiry Law, with the exception of subsections (1) and (6) ... The Commission of Inquiry shall decide regarding publication of its report according to Sec. 20 of the Commissions of Inquiry Law."[3]

On 1 June 1987 the Knesset's Defence and Foreign Affairs Committee confirmed, in accordance with Sec. 23 of the law, "that the subject of the inquiry and the deliberations of the Commission of Inquiry require secrecy."

On 2 June 1987 the President of the Supreme Court, in accordance with Sec. 4(a) of the Law, appointed the undersigned, Justice (retired) Moshe Landau as Chairman of the Commission, and Judge (retired) Ya'akov Malz (currently the State Comptroller) and Major General (res.) Yitzhak Hofi as the members of the Commission. The Commission appointed Judge Alon Gillon as coordinator.[1]

. . .

1.6   Its Letter of Appointment required the Commission to deal with two subjects: the investigation methods and procedures of the GSS on Hostile Terrorist Activity, and the giving of testimony in Court regarding these

3   Sec. 23 of the Commissions of Inquiry Law, 1968 (ibid., at 36) provides:
"Where the Government, with the approval of the Foreign Affairs and Security Committee of the Knesset, determines that the subject-matter of the inquiry, or the proceedings of the commission, requires or require secrecy, the following provisions shall apply, unless the Government, with approval as aforesaid, decides to deviate from all or part of them:
1) A notice of the setting-up of the commission of inquiry shall not be published;
2) the provisions of section 38 of the Penal Law (State Security, Foreign Relations and Official Secrets) Law, 5717–1957, shall apply mutatis mutandis;
3) a person who attends before the commission under section 15 shall only be represented by an advocate authorised to act as defence counsel under section 18 of the Military Justice Law, 5715–1955;
4) the proceedings of the commission shall be held in camera;
5) the commission shall submit its report also to the Foreign Affairs and Security Committee of the Knesset;
6) the commission shall not publish its report or the minutes of its proceedings".

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 20 of 70 PageID #:557

investigations. As the ground for the appointment of the Commission, the Letter of Appointment cited the *Nafsu* case which was heard by the Supreme Court in Criminal Appeal 124/87. The exposure of the facts regarding the GSS methods of interrogation in the Supreme Court's judgment in the *Nafsu* case severely undermined the public's confidence in the GSS, and in parallel, caused immense confusion, to the point of a danger of a loss of direction, within the GSS itself. We shall note at once that those directly involved, namely GSS investigators and legal advisers and their superiors, constitute a small minority of the total GSS personnel. But because the Investigators Unit is an integral part of the GSS, the injury and the confusion spread throughout the GSS.

1.7   This was not the first shock sustained by the GSS; it was preceded by the shock of the affair known as the No. 300 Bus Affair, which was perhaps even more painful. According to our Letter of Appointment, we were not to deal with that affair, which ended on 25 June 1986 when the President pardoned eleven GSS personnel, among them members of the GSS senior personnel, followed by the resignation of most of them from the GSS, including the then head of the GSS, Mr. Avraham Bendor (Shalom). But we shall not be wrong in saying that it was the very grave failure of these persons, with respect to their criminal conspiracy to subvert the deliberations [3] of, and mislead the committees that investigated that affair, which prepared the ground for the revelations that attended the *Nafsu* affair: once confidence was so badly shaken as a result of the first affair, it was no longer possible to cover up the manifestations that were exposed in the *Nafsu* appeal.

1.8   The investigation staff of the GSS is characterized by professionalism, devotion to duty, readiness to undergo exhausting working conditions at all hours of the day and night and to confront physical danger, but above all by high inner motivation to serve the nation and the State in secret activity, with "duty being its own reward", without the public glory which comes with publicity. It is all the more painful and tragic that a group of persons like this failed severely in its behaviour as individuals and as a group. In saying this we are not referring to the methods of interrogation they employed – which are largely to be defended, both morally and legally, as will be explained below – but to the method of giving false testimony in court, a method which has now been exposed for all to see and which deserves utter condemnation. The revelation of this method increased the crisis of confidence in the GSS's moral fibre, which had begun earlier, and

it is undermining the sense of self-confidence and self-respect of every GSS officer. This evil must be eradicated, for it is a matter of life and death for us all, in the full sense of the term.

1.9   We are convinced that today, recognition of the necessity to turn a new leaf and to rehabilitate the standing of the GSS in the eyes of the public and in the eyes of its own personnel, extends to every person in the GSS, from its senior personnel, under the leadership of the current Head, to the most junior interrogator. We see a first step toward this essential catharsis of the GSS from its failings, in the disclosure of the whole truth which marked the testimony of the GSS personnel who appeared before us. They opened their hearts to us and admitted their errors without hiding anything, and we believe in the sincerity of their intentions to set straight what was twisted. The interim period in which the GSS has been awaiting the report of this Commission has lasted until today. We regard our principal function as being to guide the essential process of rehabilitation and healing with regard to the GSS activity on HTA, by integrating this vital activity into the framework of [4] the values of the rule of law which the state of Israel espouses. We hope that in this way the GSS personnel will have restored to them their inner conviction of the rightness of their way, which they require for their work, and the ability to distinguish between right and wrong, without needing the help of a legal expert at every step and turn.[5]

## Chapter Two: Description of Facts

### The Izzat Nafsu Case

2.1   Since the *Nafsu* case was posited as the point of departure for the appointment of this Commission, it is proper to open with a concise description of its main points. To this end, we must turn to the description of the facts in the Supreme Court's judgment in Criminal Appeal 124/87 of 24.5.87. This appeal was submitted by Izzat Nafsu, by leave of the President of the Supreme Court, in accordance with Sec. 440-9 of the Military Justice Law, 1955.[4] The findings of facts in the appeal were determined on the basis of the appellant's admission before the Supreme Court of facts which constitute an offence of exceeding authority to the point of impelling State security, under Sec. 73(a) of the Military Justice Law, 1955. The

---

4   9 L.S.I. 184, as amended S.H. (1986) no. 1183, p.172. This amendment granted appeal with leave of judgments of the Military Court to the Supreme Court.

Prosecution, for its part, agreed to have the Special Court Martial's judgment of 29.6.82 set aside, in which the appellant was also convicted of grave offences of treason, espionage, and aiding the enemy during wartime, for which he was sentenced to 18 years' imprisonment from the day of arrest, 4.1.80, and dismissed from the Army. It also agreed to have the Military Appeals Court's judgment given on 29.6.86 set aside. Instead, the Supreme Court sentenced the appellant to 24 months' imprisonment, and demoted him from lieutenant to sergeant-major. Before convicting the appellant of the offence, the Supreme Court convinced itself, on the basis of a thorough clarification that it conducted with the appellant in court, that his confession before the Court was a truthful one.

2.2   As stated in the Supreme Court's judgment, Nafsu maintained in a "trial within the trial" held concerning the confessions he gave to his interrogators in 1980, that during his interrogation, GSS interrogators committed acts of violence against him, which included pulling his hair, shaking him, throwing him to the ground, kicks, slaps and insults. He was ordered to strip and was sent to take a shower with cold water. He was prevented from sleeping for hours at a stretch, during the day but chiefly at night, and was forced to stand in the yard of the prison premises for long hours also when he was not being interrogated. He was also threatened with [6] the arrest of his mother and wife, as well as with the publication of personal information about himself that the interrogators possessed.

These allegations were denied in the testimony under oath of the interrogators, headed by the person who at that time was Head of the GSS Interrogation team which investigated Nafsu's case. The Court Martial preferred their denial over Nafsu's testimony, and after weighing the evidence, in a very detailed judgment, it accepted Nafsu's confessions as truthful and lawfully obtained, and convicted him – principally on the basis of these confessions – on all the counts of the indictment, including the smuggling of combat material for a terrorist organization from Southern Lebanon into the country.

2.3   In its Judgment, the Special Court Martial rejected Nafsu's allegations concerning violence exerted on him and threats made against him. The Judges did not desist from this belief, even though they discovered false denials by the interrogators concerning the interrogation of others, as well as concerning certain details relating to the interrogation of Nafsu himself. Nor was the Military Appeals Court impressed by the Defence's arguments, and it added a reprimand in sharp terms of the defence for daring to attack the interrogators' testimony.

2.4   Some time before the Military Appeals Court gave its Judgment, the criminal conspiracy entered into by several senior GSS personnel to obstruct the proceedings of committees investigating the bus affair which occurred on 12.4.84, was revealed. In this conspiracy, a senior GSS official, Mr. Yossi Ginnosar, acted as a "Trojan horse" on the Zorea Committee, as a committee member sitting with Maj. Gen. (res.) Zorea. This Committee submitted its report in May 1984. Afterwards, a team headed by the State Attorney Mr. Y. Blattman, was also misled, through coordinated obstruction in the form of false testimony to that team, which submitted its report in July 1985. When this disgraceful conspiracy was revealed, the doubts among GSS personnel concerning the justness of Nafsu's conviction, which had existed here and there in the GSS already beforehand, increased, and in January 1987 the new GSS Head at his initiative ordered that an internal investigation be conducted to reexamine this case. In this investigation, the [7] interrogators admitted the validity of most of Nafsu's claims in the trial concerning means of pressure exerted on him, with the exception of his contentions regarding blows and slaps. As a result, prior to the hearing of the appeal by the Supreme Court, an agreement was reached between the Chief Military Advocate, who represented the Prosecution in the appeal and who had also investigated the case himself, and the Defence. In the agreement the Prosecution, with the concurrence of the Attorney General, agreed to annul the judgments of the first two instances, after admitting that because of the means of pressure exerted on Nafsu, it could no longer be argued that the confessions obtained from him were admissible and credible. The appellant Nafsu for his part confessed, in accordance with the agreement, to the lighter offence of which he was convicted by the Supreme Court, as noted above. The Supreme Court's decision concerning his guilt and the degree of his guilt now conclusively constitutes *res judicata*.

2.5   In the above-mentioned internal investigation, which was conducted in February 1987, Nafsu's interrogators maintained that in using means of pressure they had not gone beyond what was allowed to them in the GSS directives that existed at the time, and – what was even graver – they claimed that even in giving false testimony at the trial within the trial, in which they denied having exerted such pressures, they also had not deviated from accepted practice in the GSS, and this with the knowledge of their superiors. These contentions on the part of the interrogators drew not one word of reservation by anyone taking part in the internal investigation. With regret and shame, we must find that these claims concerning permis-

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 22 of 70 PageID #:559

sion to employ pressure, together with the related "norm" of giving false testimony in Court, were proved to us to be correct (although permission to use physical means of pressure was greatly reduced in the years since 1980, as detailed in the second part of this report). We shall elaborate on this matter below.

2.6  From these points of view, then, the proceedings in the *Nafsu* trial – and particularly the false testimony given in the trial within the trial – were no different from what occurred in other such trials in which GSS interrogators testified. Yet this should not be considered the main factor underlying the perversion of justice due to which Nafsu was imprisoned for [8] years, beyond the 24 months to which he was finally sentenced by the Supreme Court.

As will be explained below, the GSS is very scrupulous about not accepting from persons under interrogation false confessions concerning untrue facts. The aim is to obtain a true confession, using psychological pressure if need be, and sometimes even physical pressure, such as was exerted against Nafsu. Any false confession, mistakenly believed to be true, disrupts – for obvious reasons – the GSS's methods of struggle to foil Hostile Terrorist Activity. It is for this reason that a thorough comparison is made between the information obtained in a confession with information obtained from other suspects and with information in the hands of the GSS from privileged sources, which cannot be revealed to the Court.

2.7  This was not the case in the *Nafsu* affair. Here credible secret evidence was almost totally lacking, since the main witness, an informer who had provided information against Nafsu, had been termed a "dyed-in-the-wool liar" by the interrogators. He was not brought to court to testify. The only additional testimony which supported the confession of Nafsu himself, was in fact the testimony of that same informer's wife, which was accepted as reliable. For this reason Nafsu's interrogators were prepared to release him at a certain stage of the investigation. But in the end, the results of Nafsu's polygraph test – which his investigators at the time believed indicated a sense of guilt – were decisive. The trouble is that this case can serve as an example of the risks involved in unreservedly relying on the interpretation of polygraph tests, since recently the results of Nafsu's test were re-examined and it was found that due to his character, he should be considered "unexaminable" – in other words, the polygraph test proved nothing.

At the time a great deal of effort was devoted to the *Nafsu* investigation, taking into consideration his status as an IDF officer accused of such severe offences of treason and spying. Basic disagreements emerged among the eight interrogators who took part in the various stages of the investigation: two of them believed that Nafsu was entirely innocent, another found that he had committed all the offences of which he was accused, the head of the team himself had doubts as to Nafsu's guilt of the most serious of the counts [9] against him: smuggling combat material into Israel. These differences are well reflected in a final, comprehensive report drawn up at the conclusion of Nafsu's interrogation. The summation was unusual in comparison with the customary procedure in GSS interrogations, since it contained no clear conclusion as to Nafsu's guilt and its degree. (These differences among the interrogators, including also the matter of interpretation of the polygraph test, exist to this day, as we learned from their statements in their testimony before us.)

In view of the differences among the interrogators, the then GSS Head decided to submit the material gathered to the Chief Military Advocate's office for a decision on whether Nafsu should be brought to trial, and on which counts. However, not all the material was submitted to the Military Advocate's office, nor was it explained to that office that a minority opinion existed regarding Nafsu's guilt in the above-mentioned final report. Only later, at the defence's demand, did the GSS submit the final report to the Court. Incomplete disclosure of this nature to the Prosecution was also regular GSS practice, and the justification advanced for that was the need for absolute compartmentalization of information, as will be evident later. The Court was critical of this "filtering" of the material submitted to the Military Advocate's Office. But this too did not suffice to shake the Court's belief in Nafsu's confessions and the version according to which he was guilty on all counts. The Prosecutor at the trial did not know about the pressures brought to bear upon Nafsu, because the GSS interrogators and legal advisers concealed these as well from the Military Advocate, in accordance with accepted practice in the GSS.

If these pressures had been revealed to the Court, it might have influenced the stand taken by the Military Prosecution and, ultimately, the Court's conclusions regarding Nafsu's guilt. In this matter, at least, the Court was misled by the GSS, through the Military Prosecution, which acted in this respect as the unwitting agent of the GSS.

2.8  To sum up: this case serves as an alarm and a warning, not only [10] because of the miscarriage of justice to Nafsu himself, but no less because

of the corruption inherent in perjury, which was exposed to the light of day and which must now be wholly eradicated.

### The Terrorist Organizations and "The Armed Struggle"

2.9  We have heard testimony and read exhaustive reviews about the development of Hostile Terrorist Activity (HTA) in the territories and in Israel. It may be said, concisely, that the objective of the terrorist organizations is the destruction of the State of Israel, by means of terrorist acts and disruption of normal life.

*Arafat's Fatah*, which began to operate in 1965, remains the veteran and dominant of the Palestinian organizations, and it is also the chief component of the "Palestinian Liberation Organization" (PLO). Fatah is the progenitor of the idea of "the armed struggle," as a systematic and methodical conception in its "Palestinian Convenant" (1968). Article 8 of the Covenant states:

"The Palestinian people is at the stage of national struggle for the liberation of its homeland. For that reason, differences between Palestinian national forces must give way to the fundamental difference that exists between Zionism and imperialism on the one hand and the Palestinian Arab people on the other. On that basis, the Palestinian masses, both as organizations and as individuals, whether in the homeland or in such places as they now live as refugees, constitute A SINGLE NATIONAL FRONT WORKING FOR THE RECOVERY AND LIBERATION OF PALESTINE THROUGH ARMED STRUGGLE."

Article 9: "ARMED STRUGGLE IS THE ONLY WAY TO LIBERATE PALESTINE. Thus it is the overall strategy, not merely a tactical phase. The Palestinian Arab people assert their absolute determination and firm resolution to continue their armed struggle and to work for an armed popular revolution for the liberation of their country and their return to it. They also assert their right to normal life [11] in Palestine and to exercise their right to self-determination and sovereignty over it."
[Emphases added by the Commission.]

We must therefore see straightforwardly that as long as Fatah retains this doctrine, the path of violence remains in its view the only path. And indeed, this was stated again in the concluding political Statement of the 18th session of the Palestine National Council, held last Spring (1987) in

Algeria:

"On the basis of the Palestinian National Covenant, and out of a commitment to the resolutions of the Palestine National Council, we stress the following elements as a basis for Palestinian national action within the framework of the PLO, the sole legitimate representative of the Palestinian people."

"On the Palestinian level: continuation of the struggle in all its forms an armed, mass and political struggle, in order to realize the national goals and to liberate the Palestinian and Arab lands from the Israeli occupation ..."

On this issue, the other Arab terrorist organizations concur with Fatah. "The Popular Front for the Liberation of Palestine," headed by George Habash, with its dogmatically Marxist ideology, and Naif Hawatmeh's "Democratic Front for the Liberation of Palestine," which recently joined the PLO, also preach the "armed struggle" in all the territory of Eretz Israel; and the same holds good for other organizations of the "Rejection Front."

2.10  This doctrine of destruction of the State and the killing of its citizens is no mere proclamation. We are witness to the fact that the terrorist organizations spend their maximum efforts to perpetrate terrorist acts on a continuous basis, in order to realize their doctrine. They draw no distinction between military and civilian targets: the "armed struggle" is conducted against every possible target. Some of them declare publicly that there no difference between a military and a civilian target, since both serve Israel's "aggressive policy." Others disguise attacks on civilian targets with the claim that all the targets they attack are military or intelligence targets. For the purpose of "the armed struggle," the terrorist organizations have [12] perpetrated terror attacks of mass murder in public places, such as public transportation, public squares and markets, movie theaters, and bathing places.

The overwhelming majority of the acts of terrorism are planned by terrorists across the "Green Line," to be perpetrated on the territory of the State. The attacks are perpetrated with extreme brutality, indiscriminately against men, women and children; every human target serves their aims. They also deal in terrorism on an individual basis: against Jews, soldiers, security personnel and civilians, as well as against Arabs suspected by ter-

Case: 1:03-cr-00078 Document #: 175 Filed: 04/18/05 Page 24 of 70 PageID #:161

rorist organizations of collaborating with the Israeli authorities. They pursue their schemes relentlessly.

According to the method of the terrorist organizations, terror, or what they call "the armed struggle", abets the coalescence of the natural identity of the Palestinians, wherever they are. It aids in expanding the ranks of the organizations themselves with new recruits, and it is designed to undermine the morale and security of the State's population. It also underscores the presence of the organizations in the regional and international arenas. Their tactical objective is to arouse the Arab population in the territories and in Israel to violent open revolt against the State.[13]

. . .

## Description of GSS Activity

2.16    A description of the tasks and structure of the GSS we include in the second, classified, part of this Report. . . .

2.17    The GSS has always attached the utmost importance to collecting information for preventing and thwarting [HTA]. Obtaining evidence for the trial of those interrogated did not have top priority in the work of the interrogators.

A ranking GSS official who testified before the Commission put it this way:

"The network that deals with all of this is mainly a collecting system. In the end, we thought, and we still think today, that the tool of [16] interrogation is a system for collecting intelligence information. This also explains, albeit very partially and perhaps not very convincingly, why we were less interested in, or why we cared less about putting them on trial, because after catching the person responsible and solving the crime, I go on to the next stage – I go after the next suspect."

This does not mean that prosecution was shunted aside. The GSS has always considered putting terrorists on trial an important means of thwarting HTA. One of the GSS personnel described it thus in his testimony:

"From our point of view, obviously, the fact that the accused is convicted and jailed is part of the foiling process. The foiling element takes the form of the offender being 'neutralized' for the X years of his imprisonment. That is definitely foiling ..."

2.18    Basic differences exist between the essence of a police interrogation of an ordinary criminal, on the one hand, and an interrogation carried out by the GSS of persons suspected of HTA or subversive political activity, on the other. The police investigation is aimed at collecting evidence against individuals within the society, suspected of criminal offences, and its purposes are to have the accused convicted so that he will change his ways, to deter him and others from committing future crimes, and to give him the punishment he deserves. Whereas the direct goal of the GSS interrogation is to protect the very existence of society and the State against terrorist acts directed against citizens, to collect information about terrorists and their modes of organization and to thwart and prevent the perpetration of terrorist acts whilst they are still at a state of incubation, by apprehending those who carried out such acts in the past – and they will surely continue to do so in the future – and those who are plotting such acts, as well as seeking out those who guide them.

Another difference between a police investigation and one by the GSS is that when the police are trying to uncover a criminal offence, they seek to collect evidence (testimonies from witnesses, real evidence, clues left at the scene of the crime, etc.) which will further the process of finding the culprit; whilst in a GSS interrogation, the investigator does not usually possess evidence of this [17] kind: eye-witnesses to acts of terrorism, such as the murder of a Jew in an Arab area, are unwilling to assist the investigators and generally even provide cover for the perpetrators because of the local population's sympathy for and fear of the terrorists. Only rarely is the perpetrator of a terrorist act caught red-handed.

GSS interrogations in terrorist cases are hampered by the determination of those interrogated not to reveal information known to them, as the result of ideological indoctrination which includes a thorough briefing on how to cope with an interrogation, with this coping as such being considered an act of bravery by the terrorist's organization. On the other hand, there is the fear of the person under interrogation that he will be attacked while still inside the prison if he reveals information known to him, and his unwillingness to cooperate with the interrogators which is fed by the hope that he will at all events be freed from prison early in a prisoner exchange, as has happened in the past.

Under these circumstances, the interrogation of an HTA suspect by the GSS turns into a difficult confrontation between the vital need to discover what he knows, based on a well-founded assumption, usually from classified sources, and the will of the person interrogated to keep silent and con-

ceal what he knows or to mislead the interrogators by providing false information.

2.19    From the above it emerges that every time a truthful confession is obtained from a person under interrogation, then as distinct from the majority of criminal cases which are investigated by the Police, in HTA cases submitted by the GSS to the military or civil Prosecution, the accused's confession, as taken down from him and signed by him before a police interrogator, to whom the accused is handed over following the completion of his interrogation by the GSS interrogator – is almost always the main evidence against the accused. Even if GSS interrogation personnel possess additional incriminating information against the suspect, this information often cannot serve as evidence in court, either because it is inadmissible under the laws of evidence or because the harm liable to be caused by its disclosure outweighs the benefit of bringing it before the court. Hence the [18] major importance of obtaining a truthful confession from an accused on trial for terrorist acts.

2.20 . . . [I]n the past twenty years the GSS has scored considerable achievements in protecting the State and its citizens from HTA. As for terrorist attacks that were carried out, the perpetrators were captured sooner or latter in 80–90 percent of the cases. Of the tens of thousands of interrogations carried out by the GSS during the period in question, some 50 percent were brought to trial on an annual basis. Most of the other suspects were released after the interrogation, with administrative measures such as detention, restriction, expulsion etc. taken against a minority of them whom it was impossible to bring to Court due to the secrecy of the reliable information against them. The overwhelming majority of those tried were convicted on the basis of their confession in court; as for the rest – also quite a large number – trials were held in which they pleaded not guilty and evidence was heard . . .

. . . In the second and secret part of this Report [we have included a survey of] the interrogation methods applied by the GSS to HTA suspects from 1967 onwards, and of the permission given to interrogators from time to time to employ means of pressure, including physical pressure. Summing up the description of the development throughout the years of the grant of permission to use pressure, the Commission notes that among almost all those engaged in this subject the prevailing view is that recourse to some [19] measure of physical pressure in the interrogation of HTA suspects is unavoidable. The changes which occurred regarding this topic over

the years – in the direction of both expansion and of reduction and prohibition, to the point where today the use of such means is greatly restricted – indicate soul-searching within the GSS stemming from moral inhibitions and a constant examination of the effectiveness of such methods, as against their necessity. The issue was also affected by outside complaints, by deviations from permitted methods, and by specific restrictions imposed by the political echelon . . .

### False Testimony in "Trials within a Trial"

2.22    When the accused's confession during interrogation is the main evidence against him, the accused's plea of not guilty in Court is tantamount to an allegation that his confession was obtained by improper methods, and is therefore invalid and inadmissible as evidence against him. Such an allegation necessitates the conducting of a "trial within a trial" on the admissibility of the confession. Needless to say that in such circumstances, the "trial within a trial" constitutes the essence of the trial itself, and the verdict in it is in effect a decision in the entire trial, against the accused or in his favour.

The accused's confession as submitted to the Court is set forth as an orderly document detailing the accused's name and particulars, the name and particulars of the person who took down the confession, the place and time the confession was taken down, a statement noting that the accused was informed of his right not to say anything if he so wishes, and then the accused's statement. At the bottom of the statement, the person who took it down notes that the accused said what appears in the statement voluntarily and of his own free will, that the statement was read out to the accused – and [20] translated for him, if necessary – and that the accused confirmed its accuracy with his signature.

GSS personnel have never engaged in taking down such confessions. They interrogate the accused in their interrogation premises, when the main effort is directed toward inducing the accused to show readiness to give information and in the process admit to the acts attributed to him. Once this stage has been completed successfully and the suspect is actually ready to confess, he is handed over to a police investigator who takes down his confession in accordance with the law. This confession is subsequently presented in court by the policeman who took it down, and who appears as witness for the Prosecution.

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 26 of 70 PageID #:563

2.23   According to Sec. 12 of the Evidence Ordinance (New Version), 1971:

"Testimony of the accused's confession to having committed an offence shall be admissible only if the Prosecutor presents testimony concerning the circumstances in which the confession was made, and the Court finds that the confession was made voluntarily and of free will."[5]

Up to the 1967 Six Days War the interrogation of Hostile Terrorist Activity (HTA) suspects, whose number was small, was conducted according to the law and the Supreme Court's decisions of that time – without recourse to any physical pressure. Likewise, in the first years following the Six Days War, the Prosecution encountered no difficulty on this matter. Concerning the circumstances of obtaining and taking down of the confession, only the policeman who engaged in this at the end of the interrogation process would be brought to court to testify. He could testify in all good faith and conscience that at the stage in which he was involved, i.e. taking down the confession, everything went smoothly and the accused indeed made his confession voluntarily and of his own free will, as required by the law. The entire interrogation procedure preceding this stage, i.e. the interrogation by GSS interrogators, would not be raised in court at all, and no GSS interrogator was called as a witness in trials within the trial.

2.24   Such was the situation until 1971, when a fundamental change [21] occurred in trials within a trial. More and more defence lawyers began resorting in Court to the argument that the confession – ostensibly made to a policeman voluntarily and of the accused's own free will – resulted from improper methods used by GSS interrogators on the accused at the previous stage. These arguments forced the Prosecution, as part of the duty incumbent on it under Sec. 12 of the said Ordinance, to call GSS interrogators as witnesses for the Prosecution in order to have them testify on the circumstances of the interrogation and the making of the confession, and thereby refute the Defence's allegation that the confession had to be rejected.

As a result, since 1971 the phenomenon of GSS interrogators appearing as witnesses for the Prosecution in trials within the trial has become common. This, in turn, led to the grave phenomenon under discussion here –

5   2 L.S.I. [N.V.] 198, at 200.

that of untruthful testimony by GSS interrogators in trials within the trial.[22]

. . .

## The Reasons for Giving False Testimony

2.37   The principal reason why GSS interrogators lied in court, during the trial within the trial, and denied applying any physical pressure whatsoever on [29] persons under interrogation, was the operative need not to expose the methods of interrogation. By its nature the GSS is a body which acts and must act, in secret and far from the public eye. To this end the GSS has imposed virtually total compartmentalization on itself and its staff. If this is so for the GSS in general, it is all the more so for the investigation unit. For a long time, varied and diverse methods of interrogation, the chief effectiveness of which lies in their secrecy, have been employed in this unit. The moment such a method is exposed and revealed, its efficacy is damaged or completely disappears. One method of interrogation is physical pressure, which interrogators regard as an interrogation tool of the utmost importance. It is the view of the unit that without this tool, effective interrogation is inconceivable. Thus, if its details are exposed, its effectiveness will disappear and serious damage will accrue to investigation work in general which has – it bears reiterating – scored many successes, both in thwarting and discovering attacks, and has saved many lives.

Hence, in order to preserve their investigative tool, i.e. absolute compartmentalization, the investigators felt that it must apply to everyone including even the Courts. The logical continuation was to give false testimony in Court.

2.38   The second reason is directly related to the judicial process itself. We have already said that the GSS, justifiably, views the conviction of a terrorist and his imprisonment for a lengthy period as a most important preventive measure. Accordingly, the judicial process through which the terrorist is removed from the sphere of terrorist activity is one in which the GSS takes a great interest. The success of the GSS in a trial is, therefore, directly dependent on the acceptance of the accused's confession – in the majority of cases the only evidence against him – by the Courts. Revelation of the acts of physical pressure exerted in interrogations puts at risk the admissibility of the confession by the Court. Therefore the GSS concluded and from its viewpoint this was the most logical conclusion, that the danger of having confessions rejected must be prevented by concealing the means of physical pressure from the Court, even if this entailed perjury.

2.39   The third reason for employing the method, and especially for its [30] survival for such a lengthy period, has already been mentioned: it simply succeeded. For years the GSS interrogators who testified in Court received the full trust of the judges. Because of this trust, and the success of the method of false testimony, no one ever saw the need to reflect on it or search for other methods which would ensure the conviction of the guilty.

### Rationalizations for Committing Perjury

2.40   Although the interrogators, in their view, had good reasons for lying in court, and although this became an accepted and continuous method, they felt very uneasy in this situation, and their conscience troubled them. This is true for at least some of them. In order to be able to continue employing this method while also being at peace with their conscience, over the years they had developed a series of rationalizations for this situation. We have extracted the following from their testimony before us:

Interrogation work for uncovering Hostile Terrorist Activity and its prevention is a sacred mission which justifies the means, any means. We the members of the GSS – as someone said – are the emissaries of the people of Israel to perform actions which the State cannot take upon itself. Here we are talking about "the cleaning of sewers" the existence of which endangers State security, and this unpleasant mission has been imposed upon us. One cannot clean sewers without dirtying oneself. We took risks just as soldiers on the front take risks.

Statements in this spirit we heard from numerous senior GSS personnel. By means of such self-justification, the criminality of perjury becomes an ideological criminality, whose central motto is that security is above the law.

2.41   The GSS personnel declared to us, with a hint of pride, that they had been extremely scrupulous in ensuring that any confession presented to the Court would be a truthful one, whatever the means used in obtaining it. Never, they explained to us, was such a confession brought before the court before it was examined and verified by other intelligence sources, including sources which could not be brought before the Court. Furthermore, there were cases where investigators had full confessions of persons under [31] interrogation which were not presented in court, because the interrogators were uncertain about their veracity. Never, one of the investigators testified before us, did I feel that I was putting an innocent person into prison.

We were convinced that this was indeed the aim of interrogations by GSS investigators. We will also emphasize here that in this respect their methods are as far as East is from West, from the notorious methods of the secret police in certain totalitarian states, where pressure is used to extract false confessions from a person under interrogation for something he did not do, in order to liquidate him later, after a staged show-trial, or to send him into exile.

Because the investigators were convinced that what was said in confessions was the truth, its presentation [to the] Court was easier for them, even at the cost of perjury.

2.42   The investigators found an additional rationalization for doing what they did in the unqualified backing they received from their superiors. Within the framework of a clear and rigid hierarchy such as that of the GSS, backing "from above" is very meaningful. Naturally, it is much easier for an investigator on the witness stand to commit perjury when he knows that his action is performed not only with the knowledge, but also with the blessing of his superiors.

The investigators also found justification for their actions in the fact that, in many cases persons under interrogation exaggerated greatly in their descriptions of the physical pressure employed against them. A situation thus developed that when interrogators denied in their testimony the use of any physical pressure whatsoever, at least part of their testimony – that which related to physical pressure alleged by suspects, but not actually employed – was true. Under these conditions, it was easier – at least for the conscience – to deny also the physical pressure that had been employed.

Above all else, of course, was the principal rationalization of "no alternative." One of the GSS Chiefs told us frankly that he did not change the norm of committing perjury, and was incapable of changing it, because [32] "there is no alternative to this situation". Simply, he said, I had no other solution.[33]

### Conclusion

2.53   The picture which emerges from the above is a dismal and regrettable one: The GSS which has done and is doing work of the utmost importance in [39] preserving Israel's security and has to its credit many outstanding achievements in this area, failed utterly, in permitting itself to violate the law systematically and for such a long period by assenting,

approving, and even encouraging the giving of false testimony in Court. The GSS top echelon failed by not comprehending that no activity in the field of security, however important and vital it may be, can place those acting above the law. It did not understand that it was entrusted with a vital task, which perhaps justifies means, but not all means, and certainly not the means of giving false testimony.

The Commission notes with satisfaction that this harmful practice has now been totally abolished.[40]

. . .

## Chapter Three: Legal and Moral Aspects [48]

. . .

## Investigative Powers of GSS Investigators on HTA Matters

3.3  As is explained in the chapter on the structure of the GSS, the GSS contains a unit whose task it is to carry out interrogations relating to HTA. Only some of this unit's personnel have been designated investigators by the Minister of Justice, on the model of appointments of police investigators, according to Sec. 2(1) of the Criminal Procedure (Evidence) Ordinance.[6] We accept the GSS interpretation that the purpose of this arrangement is to determine the obligation of a person under interrogation to reply truthfully to the questions of such an authorized investigator, as stated in Sec. 2(2) of the Ordinance; however, from this it is not to be inferred that this is the only means available to authorize a policeman or other public official (such as GSS investigators) to carry out interrogations within the ambit of his duties.[49] This was decided by the Supreme Court as far back as the Mandate period.[7] The source of this power currently resides in Sec. 17 of the Interpretation Law, 1981,[8] which vests a holder of substantive authority with the power to determine also his own work procedure, and in general the auxiliary powers required for the fulfillment of his functions. The investigator must exercise these powers subject to the limitations prescribed by law.

---

6    Drayton, *Laws of Palestine*, vol. 1, p. 467.
7    *Attorney General v. Hamad Muhsin Mohmud* (1946) 1 A.L.R. 674, at 676, and see also *Mizrahi v. Attorney General* (1953) 7 P.D. 415, at 421.
8    35 L.S.I. 370.

---

## Limitations According to Law

3.4  Legal limitations on methods of investigation may derive from criminal, civil or administrative law (including internal administrative orders binding on the investigator).

## Limitations According to Criminal Law

Sec. 277 of the Penal Law, 1977,[9] states that a public servant commits a criminal offence when he uses or directs the use of force or violence against a person for the purpose of extorting from him a confession to an offence or information relating to an offence. Also relevant are sec. 428 on blackmail by means of threats, sec. 415, on obtaining anything by deceit, sec. 416, on obtaining anything by means of a stratagem, and the sections on assault (sec. 378 *et seq.*).

## Limitations According to Civil Law

Harm inflicted physically on a suspect, or on his well-being, can amount to the tort of assault, under secs. 23 and 25 of the Civil Wrongs Ordinance (New Version).[10]

## Limitations According to Administrative Law

A GSS investigator, like any other public servant, must maintain the obligations imposed by law on administrative acts, such as the obligation not [50] to exceed the authority vested in him under the law and to wield his authority in good faith, and not for goals which are foreign to the purposes for which he was vested with his authority. In addition, the investigator must fulfil special administrative directives which have been laid down by the law for the fulfilment of his tasks. In this context, we must make special reference to the "Judges' Rules."

3.5  The Judges' Rules were received into Israeli law from English law, by way of Supreme Court rulings. They are not today, and never were in the past, in the nature of binding law the violation of which leads to unequivocal legal sanctions. This bears emphasizing, because GSS investigators of

---

9    L.S.I. Special volume.
10   2 L.S.I. [N.V.] 5.

Case: 1:03-cr-00978 Document #: 175 Filed 04/18/05 Page 30 of 70 PageID #:567

various ranks who testified before us were apparently briefed to the effect that anyone who violates the Judges' Rules by so much as one iota necessarily incriminates himself, and that a confession by a suspect obtained without strict observance of the Judges' Rules must necessarily be *ipso facto* rejected; and since it is impossible to conduct an effective interrogation while completely observing the Judges' Rules, no choice remains but to violate them; hence the conclusion that a GSS interrogation must necessarily be conducted outside the framework of the law. However, this is not so: the underlying assumption of this approach is wholly misconceived.

The Judges' Rules originated in England in 1912, following an appeal by a Chief Constable to the Judges of the High Court there, that police personnel be guided how to conduct an interrogation of suspects, since contradictions had emerged in judges' comments on the obligation of the police to caution a suspect.[11] The judges acceded to this request and formulated regulations to guide the police – an exceptional case of judicial legislation outside the framework of a formal judgment.

In 1964, a new and amended version of the Judges' Rules was issued. There is no point here in going into detail. Suffice it to say that they indeed ensure the suspect's right to remain silent, about which the interrogator must inform the suspect as part of the caution administered to him. However, they also [51] provide wide scope for the interrogation of a suspect, as long as the interrogator has not decided to charge him with committing an offence.

Judicial decisions in England are to the effect that a confession not obtained in accordance with the Judges' Rules is nevertheless admissible as evidence in a trial.[12]

Our Supreme Court adopted the Judges' Rules, according to their English format, and therefore ruled along the same lines.[13] The Supreme Court has occasionally observed that the Police would do well to act in accordance with the Judges' Rules, but things have never reached the stage where a confession was thrown out because of a violation of the Rules. Instead, emphasis has always been placed on the condition that the confession must be given "of free will".[14]

11  See the Report of the Royal Commission on Criminal Procedure, 1981 (London, H.M. S.O., 1981) 153.
12  *R. v. Atay* (1952) 36 Cr. App. R. 91, 93; *R. v. Best* (1909) 1 K.B. 692.
13  See the leading judgments in *Ali Abdul Hadi and Muflih Za'arur v. Attorney General* (1950) 3 P.D. 13, at 33; and *Hussein Yastin v. Attorney General* (1963) 17 P.D. 1541, at 1566.
14  See Para. 3.18 below.

Concerning the suspect's right to remain silent, it bears mentioning that in various laws Israeli legislation has sanctioned directives which oblige a suspect to reply to an interrogator's questions. Therefore, the right to remain silent is not to be viewed as an inviolable principle."[52] . . .

## Pleas in the Investigator's Defence

3.7  We return now to the topic of the limitations placed on a GSS investigator by criminal and civil law, and will set out the pleas an investigator can put forward in his defence against a criminal charge for an act or omission that he committed during an interrogation, or in a tort suit resulting therefrom.

Sec. 24(1)(a) of the Penal Law exempts from responsibility an accused who acted in obedience to an order given by a competent authority, provided that the order was not manifestly illegal. This term was interpreted in the *Kfar Kasem* case,[16] in which, as will be recalled, the Military Appeals Court affirmed Judge Halevy's striking simile at first instance that "manifestly illegal" means that any person of conscience will see a black flag saying "prohibited" flying over such an order.

3.8  In our opinion, great importance attaches to the defence of "necessity" in sec. 22 of the Penal Law, where a GSS investigator's criminal responsibility is concerned. The significance of this defence in the special context of activities designed to foil terrorist acts has not yet been considered in an Israeli court ruling. In other judicial systems, in the common law world outside it, we found a discussion of it in legal literature, but there, too, the Courts have not yet expressed their opinion on it in this context, as far as we know. This statutory provision has to be filled with interpretative content, in order to offer a response to new problems that arise in novel situations, even (though the legislator may not have envisaged these problems when formulating the statutory provision.[17] In Israel, two learned authors have devoted a full discussion to the defence of necessity in general: Prof. A. Enker, in his book on *Necessity and Compulsion*

15  See Income Tax Ordinance (New Version) (1 L.S.I. [N.V.] 145), sec. 138; Customs Ordinance (New Version) (1 L.S.I. [N.V.] 51), sec. 2; Value Added Tax Law, 1975 (29 L.S.I. 46), sec. 108; Currency Control Law, 1978 (32 L.S.I. 134), sec. 14.
16  *Ofer v. Chief Military Prosecutor* (1960) 44 P.E. 362.
17  And see *Kaufmann v. Margines* (1952) 6 P.D. 1005, at 1034.

*Penal Law*,[18] and Prof. S.Z. Feller, first in his article on "Necessity *Stricto Sensu* as a Situation Negating the Criminality of an Act",[19] and more recently in his comprehensive book, *Elements of Criminal Law*.[20][53]

3.9 Sec. 22 of the Penal Law was copied from Sec. 18 of the Criminal Law Ordinance of 1936, without any substantive change. The Mandatory legislator imported it through the Cyprus Penal Code, from the Criminal Law Digest compiled by Justice Stephen. This historical development is reviewed by Prof. Enker in his book (p. 98). Stephen explains his approach to this subject in his book, *A History of the Criminal Law of England*.[21] It is noteworthy that English jurists are divided over the very existence of a general defence based on necessity.[22] The oscillations apparent in the conclusions of various Commissions that wrestled with this problem there, one after the other, testifies to this. In 1974, a team of jurists affiliated with the Law Commission wrote an opinion favouring the introduction of such a general defence into statutory law "provided that it can be formulated in a manner that will preclude its applicability in exceptional and inappropriate cases." This reservation reflects the apprehensions that such a general defence could easily become a "disguise for anarchy," as stated by Edmund Davis L.J. in his judgment in *Southwark London Borough Council v. Williams*.[23] However, in 1974 the plenum of the Commission rejected this recommendation, in its Report on "Defences of General Application".[24] To date the last word on this subject was said in a further report, submitted to the Commission in 1985.[25] In par. 13.26 of this report (p. 120) it was proposed to leave the entire question for decision within the framework of the common law, or in other words for the decision of the Courts. Nevertheless, included in the draft Criminal Code proposed there (p. 195) is the defence of necessity for "one who performs an act which he believes is immediately necessary, in order to prevent death or serious injury to himself or others, when the danger he believes exists is of such a nature that it would have been impossible to demand of him to act otherwise."

18 (Ramat Gan, Bar-Ilan University, 1973, in Hebrew).
19 (1972) 4 *Mishpatim* 5.
20 (Jerusalem, 1987, in Hebrew) vol. 2, p. 387ff.
21 (London, Macmillan, 1882) vol. 2, p. 108ff.
22 See the discussion of this in Glanville Williams, *Textbook of Criminal Law* (London, Stevens, 2nd ed., 1983) 597ff.
23 (1971) 2 All E.R. 175, at 186.
24 Law Com. No. 83, para. 4.33 (London, H.M.S.O., 1977).
25 Law Com. No. 143 (London, H.M.S.O., 1985).

3.10 In U.S. law, the dominant view is that a general defence of necessity should be allowed, because "such a reservation, like the requirements of criminal intention, is essential for the logic and justice of all criminal [54] prohibitions," and that the defence of necessity is designed to prevent a greater evil than that which the law which defines the offence seeks to prevent.[26]

3.11 As far as we are concerned, the determining factor is, of course, the statutory provision in sec. 22 of the Penal Law (and its parallel in the territories, in Sec. 11 of the Order on the Rules of Responsibility for an Offence),[27] which reads:

"A person may be exempted from criminal responsibility for an act or omission if he can show that it was done or made in order to avoid consequences which could not otherwise be avoided and which would have inflicted grievous harm or injury on his person, honour or property or on the person or honour of others whom he was bound to protect or on property placed in his charge: Provided that he did no more than was reasonably necessary for that purpose and that the harm caused by him was not disproportionate to the harm avoided."

Prof. Feller comments[28] that in this section two theoretically different legal defences were intermingled, i.e., protection of others (in Prof. Feller's terminology "necessity *stricto sensu*") and self-defence. Of interest to us here is the protection of others, which the section exempts from criminal responsibility, provided three cumulative conditions have been fulfilled:

1. That the accused acted in order to prevent grievous harm to his person or honour or to the person of others whom he was bound to protect or property placed in his charge.

26 Model Penal Code, sec. 3.02, and see p.10: "The formulation makes the actor's belief in the necessity sufficient (assuming a valid choice between evils) ... Questions of immediacy ... have bearing, of course, on the genuineness of a belief in necessity ..." See also the discussion of this flexible test for choosing the lesser evil in R.M. Perkins and R.M. Boyce, *Criminal Law* (New York, Foundation Press, 3rd ed., 1982) 1071.
27 Z. Priesler, ed. *Legislation in Judea and Samaria* (Jerusalem, Kiuvim, 1987, in Hebrew) 144.
28 In his aforementioned article, *supra* n. 19, and in his book, *Elements of Criminal Law* *supra* n. 20.

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 31 of 70 PageID #:568

2. That this harm could not otherwise have been avoided.[55]
3. That he did no more than was reasonably necessary for that purpose and that the harm caused thereby was not disproportionate in the circumstances of the case.

The section accords the perpetrator of the act full exemption from criminal responsibility, and does not confine itself to formal conviction with mitigation of punishment. It reflects the clash of opposing values: on the one hand, values protected by means of the prohibitions of criminal law, and on the other hand, the duty, grounded in ethical precepts, to protect one's life or bodily integrity or that of others. Like the defence of obedience to orders, according to sec. 24(1)(a), the law confronts this dilemma of: "the impossibility of reaching an absolute reconciliation between these two values purely by means of formal law, and thus it foregoes the attempt to solve the problem only by these means, and breaches, as it were, the barrier of judicial categories, and appeals to the sense of legality innate in the conscience of every human being ...", as was stated in the appeal in the *Kfar Kassem* case.[29] In other words, the law itself deviates under these circumstances from the framework of the criminal prohibitions laid down by law, for the sake of preserving a human value which is of higher importance than implementing these prohibitions.

3.12 We shall now consider the above-mentioned three conditions for the defence of necessity, as they are reflected in the interrogation of a suspect by a GSS investigator, during which the investigator performs an act or makes an omission, such as an injury to the person or well-being of the suspect, or a threat to him, which contain elements of a criminal offence from among the offences cited above (in Par. 3.4). But before this, we should discuss a fourth condition, which is not stated in Sec. 22, but which learned authors, and among them Prof. Feller,[30] suggest in order to qualify the defence of necessity: that the harm which the defendant acted to prevent must be imminent harm. Similarly, it was also stated in an opinion which the Military Advocate General wrote in 1986 concerning the interpretation of Sec. 22, that the section will apply only if obtaining immediate information from the suspect is vital for preventing injury to human life, and as an illustration he [56] mentions the case of a bomb which has just been planted in a crowded supermarket, and which is about to explode at any moment.

29    *Supra* n. 16, at 410.
30    In his book, *supra* n. 20, at 389, 400.

It bears noting here that the requirement of imminence of the danger is sometimes intermixed by authors with the requirement of immediately obtaining information from the suspect.

According to this version, then, the defence of necessity is not applicable except when, because of the time factor, the danger is liable to be realized immediately, and THEREFORE it is essential to get the information immediately from the suspect. This is not our opinion. The section itself makes no mention of such a qualification; rather it is built entirely upon the idea of "the concept of the lesser evil." Indeed the typical case of SELF-DEFENCE is against an immediate danger to the person being attacked, but this too is not a *sine qua non*: "The use of force may be immediately necessary to prevent an attack in the future."[31]

As regards the question under discussion: the harm done by violating a provision of the law during an interrogation must be weighed against the harm to the life or person of others which could occur sooner or LATER. This is the idea underlying the three conditions of Sec. 22. Prof. Paul H. Robinson of Rutgers University illustrates this choice in his monograph on *Criminal Law Defences*,[32] which contains the most complete discussion known to us on this topic. Under the heading "Lesser Evil Defence (Choice of Evils, Necessity)" he gives the following example:

"Suppose a ship's crew discovers a slow leak soon after leaving port. The captain unreasonably refuses to return to shore. The crew must mutiny in order to save themselves and the passengers. If the leak would not pose an actual danger of capsizing the vessel for two days, should its crew be forced to wait until the danger is IMMINENT, even though the disabled ship will be too far out at sea to reach shore when it is? Or should they be able to act before it is too late, even [57] though it may be several days before the danger of capsizing is present?"[33]

And as an additional example, closer in its facts to our subject:

"Consider the case of the bombmaker, X, whose construction plans require a 10-day period for building the weapon. Suppose further that the actor, D, knows that X is going to set off the bomb in a school. He also knows that X's construction plans require 10 days to build the

31    G. Williams, *op.cit. supra* n. 22, at 502.
32    (West Publishing Co., 1984) vol. 2, p. 43.
33    *Ibid.*, at 56-57.

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 32 of 70 PageID #:569

weapon, and that police and other authorities are unavailable to intervene. Under the simple requirement that the conduct be 'necessary', the actor could trespass on X's property and abort the plan by disabling the bomb at any time, including the first day, as long as such an action was the least drastic means of preventing the project's completion. Under the 'immediately necessary' restriction, the actor would be obliged to wait until the last day, presumably until the last moment that intervention would still be effective."[34]

Here, the learned author comments that the second alternative is justified only to enable A to abandon his scheme in the meantime; however, many legislators would prefer to protect society at the cost of earlier intervention against one plotting such a scheme.

We are in accord with these remarks. They are consistent with the wording of our statutory provision in Sec. 22, which, as stated, makes no mention of any particular requirement for the imminence of the danger, but posits instead the flexible test of "the concept of the lesser evil," as in the example of the aforementioned provision in the Model Penal Code.

3.13   Regarding the first condition, the information which an interrogator can obtain from the suspect, about caches of explosive materials in the possession or knowledge of the suspect, about acts of terrorism which are about to be perpetrated, about the members of a terrorist group to which he belongs, about the headquarters of terrorist organizations inside the country or abroad, and about terrorist training camps – any such information can prevent mass killing and individual terrorist acts which are about to be [58] carried out. GSS investigators are charged with the task of protecting the citizenry against this as part of their official tasks, as stated in Sec. 22. It should be noted here that Prof. Feller maintains [35] that "a security interest of the State is not among the social values worthy to be saved from the danger of grave and immediate attack, without assuming the risk of being held accountable under the law for a crime committed in the act of rescue ..." May we remark that it is a salient security interest of the State to protect the lives of its citizens, and the duty to defend them, imposed on the State, certainly falls within the category of the need to prevent bodily harm or grievous injury, as stated in Sec. 22.

34   *Ibid.*, at 58.
35   *Supra* n. 20, at 399.

The proposal for the General Part of a new Penal Code which was drawn up by Prof. Feller and Dr. M. Kremnitzer following the work of a Committee headed by Justice Agranat and published in *Mishpatim*[36] maintains, in Sec. 45 ("necessity of circumstances"), that a "security interest of the state is also among the protected interests. We do not believe that this addition is required in regard to the security interest to protect the general public, for the public is composed of individuals needing protection of their lives and their bodily integrity. In addition, the State, as the framework for social existence, needs protection against the machinations of terrorist organizations aimed at undermining its foundations and destroying it.

3.14   The second condition embodied in Sec. 22 is that it was impossible to prevent the anticipated harm in any other way. It has already been explained above, in regard to GSS interrogations, that the information possessed by a member of a terrorist organization (or a member of a group of local persons which has organized at its own initiative to perpetrate acts of terrorism) cannot be uncovered except through the interrogation of persons concerning whom the GSS has previous information about their affiliation with such an organization or group; we also saw that without some such previous information the GSS does not commence the interrogation of a suspect. Without such an interrogation there is no way to get to the arms caches and explosive materials stores, the location of which is a secret known only to the [59] suspect and the members of his group – and only he can reveal information about fellow members of his group to his interrogators.

3.15   The third condition is that, for the purpose of obtaining this information, the interrogator did not do more than was reasonably necessary and did not thereby cause disproportionate harm under the circumstances. This condition should be discussed in light of "the concept of the lesser evil," with which we have dealt above. We will again begin with an extreme example, from an article by Adrian A.S. Zuckerman of Oxford University, entitled "The Right against Self-Incrimination: An Obstacle to the Supervision of Interrogation".[37] He discusses the inadmissibility of a confession obtained by beating a person interrogated, and adds:

"This is not to say that it is impossible to envisage situations where the

36   (1984) 14 *Mishpatim* 127ff.
37   (1986) 102 Law Quarterly Review 45.

organs of the State may excusably resort to torture. Where it is known that a bomb has been planted in a crowded building, it is perhaps justifiable to torture the suspect so that lives may be saved by discovering its location."[38]

This is an extreme example of actual torture, the use of which would perhaps be justified in order to uncover a bomb about to explode in a building full of people. Under such circumstances, the danger is indeed imminent. However, we cited above additional examples from Prof. Robinson's monograph, in which vigorous action to prevent the danger of loss of life is also justified, even though the danger will only be realized in course of time. And indeed, when the clock wired to the explosive charge is already ticking, what difference does it make, in terms of the necessity to act, whether the charge is certain to be detonated in five minutes or in five days? The deciding factor is not the element of time, but the comparison between the gravity of the two evils – the evil of contravening the law as opposed to the evil which will occur sooner or later; and as was already stated above, weighing these two evils, one against the other, must be performed according to the concepts of morality implanted in the heart of every decent and honest person. To put it bluntly, the alternative is: are we to accept the offence of assault entailed in [60] slapping a suspect's face, or threatening him, in order to induce him to talk and reveal a cache of explosive materials meant for use in carrying out an act of mass terror against a civilian population, and thereby prevent the greater evil which is about to occur? The answer is self-evident.

3.16   Everything depends on weighing the two evils against each other. The correct test for this is what the doer of the deed reasonably believed, and not what the situation actually was.

> "The determinant is in terms of belief and not actuality. It it not whether the harm avoided was in fact greater than the harm caused, but whether the defendant reasonably believed it to be so. If it were necessary to bring in extrinsic evidence to determine the actual degree of the unrelated harms, the result might be in some case, although human life was in no way involved, that defendant would be convicted for doing what any ordinary person would have done under the circumstances – and that is not acceptable."[39]

38  *Ibid.*, at n. 4.

39  Perkins and Boyce, *supra* n. 26, at 1071.

It is true that strict care must be taken, lest a breach of the structure of prohibitions of the criminal law bring about a loosening of the reins, with each interrogator taking matters into his own hands through the unbridled, arbitrary use of coercion against a suspect. In this way the image of the State as a law-abiding polity which preserves the rights of the citizen, is liable to be irreparably perverted, with it coming to resemble those regimes which grant their security organs unbridled power. In order to meet this danger, several measures must be taken: first, disproportionate exertion of pressure on the suspect is inadmissible; the pressure must never reach the level of physical torture or maltreatment of the suspect or grievous harm to his honour which deprives him of his human dignity. Second, the possible use of less serious measures must be weighed against the degree of anticipated danger, according to the information in the possession of the interrogator. Third, the physical and psychological means of pressure permitted for use by an interrogator must be defined and limited in advance, by issuing binding directives. Fourth, there must be strict supervision of the implementation in practice of the directives given to GSS interrogators. Fifth, the interrogator's superiors must react firmly and without hesitation to every deviation from the [61] permissible, imposing disciplinary punishment, and in serious cases by causing criminal proceedings to be instituted against the offending interrogator. (In the second, secret, part of this Report, these means are defined more precisely.)

3.17   Here we would like to add some words from an author, about the cruel dilemmas a State which believes in liberal principles must face in the war against terrorism which threatens its existence. Professor Paul Wilkinson of Aberdeen University, Scotland, writes in his book, *Terrorism and the Liberal State*:[40]

> "... internal terrorism is after all a particularly barbaric form of unconventional war and political leaders and decision-makers may need to make tough and unpleasant decisions to safeguard the security of State and citizens ... In the final analysis terrorists are engaged in a test of will with the democratic community and its leaders." (p. 105)

> "Ultimately the liberal State has no *deus ex machina* it can rely upon to rescue it from the agonizing political and moral dilemmas of waging

40  (New York, Wiley and Sons, 1977).

Case: 03:0898 Document: 1781 Filed: 04/18/01 Page 34 of 70 Page ID #:571

Case 1:03-cr-00978 Document #:175 Filed: 04/18/05 Page 35 of 70 PageID #:572

war on terrorism. In the end each sovereign liberal state is left to shift as best it can in the constant struggle to uphold the rule of law and to protect the life and limb of its citizens."(p. 234)

### Admissibility of a Confession as Evidence in a Trial

3.18 We will now proceed to discuss the admissibility in a criminal trial of confessions obtained from persons interrogated in GSS investigations, which were conducted in accordance with the directives to which we have just referred. A clear distinction must be drawn between this subject and the subject of what is permissible and what is precluded in an interrogation: the confession obtained may fulfil the directives for conducting the interrogation, yet at the same time be rejected as evidence in criminal proceedings brought against the person who made the confession (and when the confession is the main evidence available to the Prosecution, the accused will [62] necessarily be acquitted, if the confession is rejected). On the other hand, the interrogation which brought about the confession may have been conducted in violation of directives given to the interrogator, but the Court will nevertheless accept it as valid evidence. This depends on the judicial rulings which it is for the Supreme Court to evolve, in interpreting Sec. 12 on the Evidence Ordinance, which states that the confession of an accused will be admitted only if it is proved that the confession was made "freely and voluntarily." Similarly, Sec. 477 of the Military Justice Law, 1955, states that: "A military court shall not admit the confession of an accused as evidence unless it is convinced that the accused made it of his own free will." As is well known, this provision was also imported from the rules of evidence of the English common law. The body of jurisprudence which developed in Israel around the term "freely and voluntarily," from the first days of the State until now, is wide-ranging and tortuous, and we do not intend to explore it fully here. Suffice it to say that the term "freely and voluntarily" was in the past interpreted in the spirit of English precedents, as disqualifying confessions obtained as a result of a promise made to the suspect or a threat made to harm him, if he would not talk. In addition, the concept of "freely" was imbued with a meaning which is far from its normal meaning in human discourse: that a confession be considered "free and voluntary", as long as the suspect had the freedom of choice between two possibilities: to observe his right to remain silent, or to make a confession in order to remove the pressure of the interrogation.[41] On the flexible

41   See the *Hussein Yassin* case, *supra* n. 13, at 153).

English rule concerning the freeness of a confession, see the judgment of the House of Lords in *D.P.P v. Ping Lin*.[42]

By the way, we will mention here that whereas in Israel judicial decisions are still struggling with the legacy of English common law on the question of "free will," in England itself, the test of "free and voluntary" has already become outmoded, due to the intervention of the legislature. In Sec. 76(2) of the Police and Criminal Evidence Act, 1984. This section qualifies as evidence in court a confession obtained by oppression against the person confessing, or if it is made as a result of something said or done [63] which was liable to make the confession unreliable (even thought confession might be truthful). This provision was enacted following the 11th Report of the the Criminal Law Revision Committee. The term "oppression" is defined in Sec. 76(8) as including "torture, inhuman or degrading treatment and the use or threat of violence (whether or not amounting to torture)."

This innovation in statutory English law opened a new era in relation to the admissibility of confessions, and the English courts need no longer follow previous judgments concerning the "freeness" of the confession.[43]

3.19 The rulings of our Supreme Court are still formally confined to the Procrustean bed of Sec. 12 of the Evidence Ordinance. Over the years, however, the Court has gone a long way toward admitting confessions taken from accused persons by means of pressure that are far from testifying to the free will of the person confessing. A survey of this development may be found in Professor Harnon's book on the *Law of Evidence*.[44] The Military Courts in the territories are also following these precedents, without applying the proviso of Sec. 9 of the Order on Security Directives, that "a Military Court is authorized to deviate from the laws of evidence for special reasons, which shall be recorded, if it seems to it just to do so." Until now, this development has crystallized, from the legal point of view, in the judgment in the case of the Mu'adi brothers.[46] In the full opinions written by the three judges who sat in that case, previous judgments were reviewed. It is true that the Court rejected the view that a confession taken

42   (1975) 3 All E.R. 175, at 182, 188.
43   See *R. v. Fulling* (1987) 2 W.L.R. 923.
44   (Jerusalem, Academic Press, 1979, in Hebrew) 248ff.
45   *Supra* n. 27, at 6.
46   *Ila'il Mu'adi v. State of Israel* (1984) 38(i) *P.D.* 197.

by use of excessive pressure must be disqualified without even investigating whether it is truthful – a question over which the judges disagreed in the earlier *Abu Midjem* case.[47] The court reaffirms the test of the credibility of the confession, and also adopts the earlier interpretation which equates the freedom of choice of the person interrogated with his free will.[48] Nevertheless, the judges introduce a reservation by disqualifying confessions [64] obtained by violating basic accepted values.[49] Therefore a confession obtained by physical abuse, or in a way that arouses feelings of moral repugnance, will *ipso facto* be disqualified.[50] But, says the late Supreme Court President Y. Kahan, quoting an earlier ruling, "the gravity of the offence at issue can affect the court's willingness to admit the confession given, and judicial policy on this subject may change, as the need grows to combat an increase in crime."[51]

The judgment recently given in the appeal of *Avrushmi*,[52] is in the same spirit. According to this line of thought, the court is willing to admit a confession obtained in a protracted interrogation, including interrogation at night, if there was substantive justification for continuing the interrogation,[53] and a confession obtained by means of a ruse,[54] including the use of an agent provocateur vis-à-vis the accused, will not be rejected. It may be said that at present judicial precedent allows the admissibility of a confession, even if it was obtained from the accused by means of pressure or by misleading him, as long as the interrogator did not use extreme means which contradict accepted basic values or are degrading. Other evidence obtained by means of an inadmissible confession ("the poisonous tree") is not disqualified under the law obtaining in Israel, nor has the *Miranda* ruling[55] handed down by the U.S. Federal Supreme Court, which disqualifies confessions given without a warning, been accepted here. It should be noted that from then (1966) until now, these strict requirements have been eroded there, too, on grounds of public safety.[56]

---

47  *Abu Midjem v. State of Israel* (1980) 34(iv) *P.D.* 533.
48  *Supra* n. 46, at 246-247.
49  *Ibid.*, at 224.
50  *Ibid.*, at 249-250.
51  *Ibid.*, at 248.
52  *Avrushmi v. State of Israel* (1987) 41(i) *P.D.* 387.
53  *Abu Amra v. State of Israel* (1980) 34(ii) *P.D.* 272.
54  *Supra* n. 46, at 245.
55  *Miranda v. Arizona* 384 U.S. 436 (1966).
56  *New York v. Quarles* 104 S.Ct. 2626 (1984).

The time has come for our legislature, too, to have its say on the admissibility of confessions in criminal proceedings. Two possible versions for this were proposed in Sec. 37 of the new Bill of the Law of Evidence, 1985, published by the Ministry of Justice.[57] [65]

. . .

## International Conventions

3.21  We shall now briefly survey the provisions of international conventions relating to the methods of interrogation of persons suspected of terrorist activity. We do so although the State of Israel is not formally bound by these conventions. However, in the chapter of this report in which we shall submit our conclusions and recommendations, we shall take note of what they contain, with the aim of abiding by the general prohibitions they posit:

(1)  Art. 5 of the Universal Declaration of Human Rights: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."

(2)  The International Covenant on Civil and Political Rights, which was passed by the United Nations General Assembly on 16.12.1966, reiterates Art. 5 of the above-mentioned Universal Declaration in Art. 7, adding in Art. 10(1) that "all persons deprived of their liberty shall be treated with humanity, and with respect for the inherent dignity of the human person."

(3)  Similarly, the European Convention of Human Rights, which was entered into by the member-states of the Council of Europe and took effect in 1950, states in Art. 3 that:

"No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

3.22  Under Art. 19, complaints about Convention violations are brought before the European Commission of Human Rights, and its decisions may be appealed in the European Court of Human Rights. A matter of special interest for us is the Judgment of the European Court of 18.1.78 on Ireland's complaint against the United Kingdom.[58] Discussed there were

---

57  (1986) 16 *Mishpatim* 3 and Explanatory Notes, at 26-27.
58  *Yearbook of the European Convention on Human Rights, 1978* (The Hague, Nijhoff) 602.

certain methods used by the Northern Ireland police force in its "interrogation in depth" of persons suspected of terrorism. This is how the Court describes these five methods, which were termed "techniques" of "disorientation" or "sensory deprivation".[68]

(1)  Being made to stand against a wall for several hours "in a stress position", with fingers above the head, legs spread apart and standing on the toes, so that body weight is chiefly on the fingers and toes. Persons under interrogation were made to stand in this position for periods of between 6 and 15 hours.

(2)  Covering the head with a bag continually, except during interrogation.

(3)  Keeping persons under interrogation in a room full of a constant, loud hissing noise.

(4)  Deprivation of sleep between interrogation sessions.

(5)  Reducing diet and drink during interrogations.

These methods were given "high level" approval. Northern Ireland Police were briefed on their use at the Centre for British Intelligence, in a seminar held in April 1971. The European Commission on Human Rights emphasized that ill-treatment must reach a certain severe level, in order to be included in the ban contained in Art. 3 of the Convention. The Commission found that the above-mentioned methods could be construed as torture, in the sense of Art. 3. However, the Court disagreed with the Commission. It ruled that the term "torture" meant deliberate inhuman treatment causing very serious and cruel suffering," which should be branded with "a special stigma." Although the aim of the above-mentioned "techniques" was to extract confessions from those interrogated – in order to discover the names of others and to obtain information – and although they were used systematically, they did not occasion suffering of the particular intensity and cruelty implied by the term "torture," as so understood. However, these same techniques, "as applied in combination," amounted to inhuman and degrading treatment. (The words "as applied in combination" almost seem to be echoed by the Supreme Court's remarks on the *Nafsu* case, since according to the statement made by the Government's representative, "the GSS investigators went beyond the permissible, in his

opinion, in terms of the combined weight of their actions...") In other words, it remains to be [69] considered whether each of these acts separately constituted a deviation form what is permissible.

3.23  In the opinion of the European Commission of Human Rights, on complaints by a number of States against Greece, pertaining to violations of Art. 3 of the European Convention in the interrogation of political prisoners (The Greek Case), published in the 1969 Yearbook of the European Convention on Human Rights, it is stated that the Greek security forces violated the Article's provisions by their methods of interrogation. In discussing these cases, the Commission notes:

"It appears from the testimony of a number of witnesses that a certain roughness of treatment of detainees by both police and military authorities is tolerated by most detainees and even taken for granted. Such roughness may take the form of slaps or blows of the hand on the head or face."

In this context the Commission remarks that the amount of physical violence which detainees are ready to accept, as being neither cruel nor inordinate, varies between different societies, and even between different sections of them. Such distinctions between individuals seem questionable to us. At all events, the implied conclusion is that the Commission itself held that a moderate measure of physical violence of this kind does not violate the prohibition in Art. 3, relating to torture and inhuman or degrading treatment.

3.24  Article 31 of the Fourth Geneva Convention of 1949 Relative to the Protection of Civilian Persons in Time of War, the humanitarian provisions of which Israel undertook to carry out, states:

"No physical or moral coercion shall be exercised against protected persons, in particular to obtain information from them or from third parties."

This provision should be read together with Art. 5 of the Convention, which deprives a person who is under definite suspicion of activities hostile to the security of the State, or who is engaged in such activities, of the rights and [70] privileges under the Convention, to the degree that the granting of such rights harms the security of the State. Nevertheless, such persons

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 37 of 70 PageID #:574

are entitled to humane treatment, and if put on trial they are entitled to a fair and regular trial. [71]

. . .

### Chapter Four: Conclusions and Recommendations

4.1 In this Chapter of the Report we have to draw our conclusions from all that has been stated above. We also consider it right to add recommendations on suitable procedures for investigations of HTA in the future, and further recommendations in which we shall point to a way out of the tangle in which the Service has become involved, so that its members, and in particular members of the Investigation Unit, may be able to overcome the feelings of distress and anxiety due to the burden of the past that weighs on them. In our Letter of Appointment we were, as it were, guided to have regard, in formulating our recommendations, "to the unique needs of the struggle against HTA." It is hardly necessary to state that we are well aware of these needs, but no less have we directed our attention to those values of law and morals without which no civilized State can exist.

4.2 Three ways exist for solving this grave dilemma between the vital need to preserve the very existence of the State and its citizens, and to maintain its character as a law-abiding State which believes in basic moral principles – for the methods of police interrogation which are employed in any given regime are a faithful mirror of the character of the entire regime."[59] And let us add here: all the more so with respect to the interrogation methods of a security service, which is always in danger of sliding towards methods practiced in regimes which we abhor.

4.3 The first way proposed is to recognize that because of crucial interests of State security, the activity of the Security Services in their war against terrorism occurs in a "twilight zone" which is outside the realm of the law, and therefore these services should be freed from the bonds of the law and must be permitted deviations from the law.

This way must be utterly rejected. The law, which expresses the will of a free people, is the keystone for the existence of a State such as ours, which believes in values of liberty and equality. If the GSS, with its immense latent power, is not to be subject to the rule of law in its interrogations, who will [77] determine its ways in that regard? Will it be its own conductor

59 *Arzi v. Attorney General* (1966) 20(i) *P.D.* 225, at 231.

or will the political echelon lay down for it a legality of its own? It is easy to see that if this way is followed, control over the GSS is one-day liable to fall into the hands of an unscrupulous person or group of persons, and from there to the despotism of a police state it is but a hair's breadth. If we do not preserve the rule of law zealously in this area as well, the danger is great that the work of those who assail the existence of the State from without will be done through acts of self-destruction from within, with "men devouring each other." If the GSS needs scope for its operations in addition to what the law of the land allows, the solution lies in convincing the legislator that the law should be amended, not in disregarding the existing law.

A version slightly different from the above would have the GSS subordinate to its own quasi-legal system, parallel to but separate from the law of the land, with the GSS acting on its own by setting up internal law for itself and scrupulously preserving that internal law, through the imposition of discipline and, when the need arises, punitive sanctions, on its own personnel. We saw that this path led the GSS into an impasse from which it must extricate itself, in order to take the high road of full obedience to the laws of the State, as regards its methods of interrogation.

4.4 The second way is that of the hypocrites: they declare that they abide by the rule of law, but turn a blind eye to what goes on beneath the surface. We found an apposite description of this frame of mind in an article by Prof. Joseph W. Bishop, Jr., of Yale University on "Control of Terrorism and Insurrection: The British Laboratory Experience".[60] Referring to harsh methods of interrogation, the author says:

"The inclination of the average, ordinarily humanitarian, Member of Parliament (or Congressman, or voter) is to tolerate the use of such methods, but only when they are 'unbeknownst' to him. Neither Parliament nor any responsible Minister was prepared explicitly to authorize the system of questioning described in the Compton Report ..."[78]

Or, in the figurative language of one of the GSS witnesses: It is convenient for the citizen to sit on the clean green grass in front of his house, while beneath him the refuse is washed away in the sewerage pipes." But the comparison is not apt. because it is impossible to isolate any one State authority

60 (1978) 42 Law and Contemporary Problems 140, at 166.

from the overall social structure, and rot in one place is liable to spread and engulf the entire structure.

4.5  There is no alternative but to opt for the third way – the truthful road of the rule of law – also where this difficult subject is concerned. The law itself must ensure a proper framework for the activity of the GSS regarding Hostile Terrorist Activity (HTA) investigations, with all their attendant problems and dilemmas. At the conclusion of our long deliberations, we are convinced that this is essential for the moral strength of Israeli society and of the GSS as a part of it, and that it is feasible, on the lines we shall describe below.

Acts of terrorism have as their aim to deprive citizens of the State of a basic right, namely the right to life and to physical integrity. Organizations which set this as their goal have no moral right to demand that the State for its part maintain towards them the usual civil rights. Nevertheless, it is incumbent upon the State and its authorities, including the GSS, to preserve humanitarian behaviour and human dignity in their treatment of terrorists, in order to uphold the credo of the State itself as a law-abiding State grounded in fundamental concepts of morality. Any infringement of these basic concepts, even as against those who would destroy the State, is liable to recoil on us by engendering internal moral corruption.

4.6  We are convinced that effective activity by the GSS to thwart terrorist acts is impossible without use of the tool of the interrogation of suspects, in order to extract from them vital information known only to them and unobtainable by other methods.

The effective interrogation of terrorist suspects is impossible without the use of means of pressure, in order to overcome an obdurate will not to disclose information and to overcome the fear of the person under interrogation that harm will befall him from his own organization, if he does reveal information.[79]

Interrogation of this kind is permissible under the law, as we interpreted it above, and we think that a confession thus obtained is admissible in a criminal trial, under the existing rulings of the Supreme Court.

4.7  The means of pressure should principally take the form of nonviolent psychological pressure through a vigorous and extensive interrogation, with the use of stratagems, including acts of deception. However, when these do not attain their purpose, the exertion of a moderate measure of physical pressure cannot be avoided. GSS interrogators should be

guided by setting clear boundaries in this matter, in order to prevent the use of inordinate physical pressure arbitrarily administered by the interrogator. As is set out in detail in the Second Part of this Report, guidelines concerning such boundaries have existed in the Service ever since the scope of investigation of HTA was expanded, as required by the new situation following the Six Days War. These guidelines underwent occasional changes, generally in the direction of restrictions on the use of physical force, which were imposed from time to time at the initiative of the political echelon, until today the authorization of physical contact with the person under interrogation is extremely limited.

4.8  These instructions are at present scattered among various internal GSS instructions. They should be collected in one document. In a Chapter of this Report, which for understandable reasons will be included in the second, secret Part, we have therefore formulated a code of guidelines for GSS interrogators which define, on the basis of past experience, and with us much precision as possible, the boundaries of what is permitted to the interrogator and mainly what is prohibited to him. We are convinced that if these boundaries are maintained exactly in letter and in spirit, the effectiveness of the interrogation will be assured, while at the same time it will be far from the use of physical or mental torture, maltreatment of the person being interrogated, or the degradation of his human dignity.

We note once again that no investigation is to be opened against a person unless information exists giving reasonable grounds to suspect that he is involved in some manner in HTA, or in political subversion which is [80] prohibited by law in Israel or the territories. The GSS has always followed this rule, and it is not to be deviated from.

The code of detailed guidelines which we recommend in the Report's secret Part shall be brought annually for reappraisal before a small Ministerial Committee whose creation has already been recommended in another Report. This Committee can make whatever changes it deems fit, according to changing circumstances. Afterwards the guidelines will be made known to the Services Subcommittee of the Knesset's Defence and Foreign Affairs Committee.[81]

. . .

# Exhibit B

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 41 of 70 PageID #:578





# JEWISH VIRTUAL LIBRARY

# Text of Supreme Court Decision on GSS Practices

## (September 6, 1999)

## Judgment

### President A. Barak:

The General Security Service (hereinafter, the "GSS") investigates individuals suspected of committing crimes against Israel's security. Is the GSS authorized to conduct these interrogations? The interrogations are conducted on the basis of directives regulating interrogation methods. These directives equally authorize investigators to apply physical means against those undergoing interrogation (for instance, shaking the suspect and the "Shabach" position). The basis for permitting such methods is that they are deemed immediately necessary for saving human lives. Is the sanctioning of these interrogation practices legal? - These are the principal issues presented by the applicants before us.

## Background:

1. The State of Israel has been engaged in an unceasing struggle for both its very existence and security, from the day of its founding. Terrorist organizations have established as their goal Israel's annihilation. Terrorist acts and the general disruption of order are their means of choice. In employing such methods, these groups do not distinguish between civilian and military targets. They carry out terrorist attacks in which scores are murdered in public areas, public transportation, city squares and centers, theaters and coffee shops. They do not distinguish between men, women and children. They act out of cruelty and without mercy (For an in depth description of this phenomenon see the Report of the Commission of Inquiry Regarding the GSS' Interrogation Practices with Respect to Hostile Terrorist Activities headed by (ret. ) Justice M. Landau, 1987 - hereinafter, "Commission of Inquiry Report") published in the Landau Book 269, 276 (Volume 1 , 1995).

The facts presented before this Court reveal that one hundred and twenty one

Case: 1:03-cv-00978 Document #:175 Filed: 04/18/05 Page 42 of 70 PageID #:579

people died in terrorist attacks between 1.1.96 to 14.5.98. Seven hundred and seven people were injured. A large number of those killed and injured were victims of harrowing suicide bombings in the heart of Israel's cities. Many attacks-including suicide bombings, attempts to detonate car bombs, kidnappings of citizens and soldiers, attempts to highjack buses, murders, the placing of explosives, etc.- were prevented due to the measures taken by the authorities responsible for fighting the above described hostile terrorist activities on a daily basis. The main body responsible for fighting terrorism is the GSS.

In order to fulfill this function, the GSS also investigates those suspected of hostile terrorist activities. The purpose of these interrogations is, among others, to gather information regarding terrorists and their organizing methods for the purpose of thwarting and preventing them from carrying out these terrorist attacks. In the context of these interrogations, GSS investigators also make use of physical means. The legality of these practices is being examined before this Court in these applications.

## The Applications:

2. These applications are entirely concerned with the GSS' interrogation methods. They outline several of these methods, in detail, before us. Two of the applications are of a public nature. One of these (H.C. 5100/94) is brought by the Public Committee Against Torture in Israel. It submits that GSS investigators are not authorized to investigate those suspected of hostile terrorist activities. Moreover, they claim that the GSS is not entitled to employ those pressure methods approved by the Commission of Inquiry's Report ("the application of non-violent psychological pressure" and the application of "a moderate degree of physical pressure"). The second application (hereafter 4054/95), is brought by the Association for Citizen's Rights in Israel (ACRI) . It argues that the GSS should be instructed to refrain from shaking suspects during interrogations.

Five of the remaining applications involve specific applicants who turned to the Court individually. They each petitioned the Court to hold that the methods used against them by the GSS are illegal. Who are these applicants?

3. The applicants in H.C. 5188/96 (Wa'al Al Kaaqua and Ibrahim Abd'alla Ganimat) were arrested at the beginning of June 1996. They were interrogated by GSS investigators. They appealed to this Court (on 21-7-96) via the Center for the Defence of the Individual, founded by Dr. Lota Saltzberger. Their attorney petitioned the Court for an order *nisi* prohibiting the use of physical force against the applicants during their interrogation. The Court granted the order. The two applicants were released from custody prior to the hearing. As per their attorney's request, we have elected to continue hearing their case, in light of the importance of the issues they raise in principle.

4. The applicant in H.C. 6536/96 (Hat'm Abu Zayda), was arrested (on 21-9-95) and interrogated by GSS investigators. He turned to this Court (on 22-10-95) via of the Center for the Defence of the Individual, founded by Dr. Lota

Saltzberger. His attorney complained about the interrogation methods allegedly used against his client (deprivation of sleep, shaking, beatings, and use of the "Shabach" position). We immediately instructed the application be heard. The Court was informed that the applicant's interrogation had ended (as of 19-10-95). The information provided to us indicates that the applicant in question was subsequently convicted of activities in the military branch of the Hamas terrorist organization. He was sentenced to seventy four months in prison. The convicting Court held that the applicant both recruited and constructed the Hamas' infrastructure, for the purpose of kidnapping Israeli soldiers and carrying out terrorist attacks against security forces. It has been argued before us that the information provided by the applicant during the course of his interrogation led to the thwarting of an actual plan to carry out serious terrorist attacks, including the kidnapping of soldiers.

5. The applicant in H.C. 7563/97 (Abd al Rahman Ismail Ganimat) was arrested (on 13-11-97) and interrogated by the GSS. He appealed to this Court (24-12-97) via the Public Committee Against Torture in Israel. He claimed to have been tortured by his investigators (through use of the "Shabach" position", excessive tightening of handcuffs and sleep deprivation). His interrogation revealed that he was involved in numerous terrorist activities in the course of which many Israeli citizens were killed. He was instrumental in the kidnapping and murder of IDF soldier (Sharon Edry, of blessed memory); Additionally, he was involved in the bombing of the Cafe "Appropo" in Tel Aviv, in which three women were murdered and thirty people were injured. He was charged with all these crimes and convicted at trial. He was sentenced to five consecutive life sentences plus an additional twenty years of prison.

A powerful explosive device, identical to the one detonated at Cafe "Appropo" in Tel Aviv, was found in the applicant's village (Tzurif) subsequent to the dismantling and interrogation of the terrorist cell to which he belonged. Uncovering this explosive device thwarted an attack similar to the one at Cafe "Appropo". According to GSS investigators, the applicant possessed additional crucial information which he only revealed as a result of their interrogation. Revealing this information immediately was essential to safeguarding state and regional security and preventing danger to human life.

6. The applicant in H.C. 7628/97 (Fouad Awad Quran) was arrested (on 10-12-97) and interrogated. He turned to this Court (on 25-12-97) via the Public Committee against Torture in Israel. Before the Court, he claimed that he was being deprived of sleep and was being seated in the "Shabach" position. The Court issued an order *nisi* and held an immediate hearing of the application. During the hearing, the State informed the Court that "at this stage of the interrogation the GSS is not employing the methods alleged by the applicant against him". For this reason, no interim order was granted.

7. The applicant in H.C.1043/99 (Issa Ali Batat) was arrested (on 22-2-99) and interrogated by GSS investigators. The application, brought via the Public Committee Against Torture in Israel, argued that physical force was used against the applicant during the course of the interrogation. The Court issued an order *nisi*. While hearing the application, it came to the Court's attention

Case: 1:03-cv-00978 Document #: 175 Filed: 04/18/05 Page 44 of 70 PageID #:581

that the applicant's interrogation had ended and that he was being detained pending trial; The indictment alleges his involvement in hostile activities, the purpose of which was to harm the "area's" (Judea, Samaria and the Gaza strip) security and public safety.

## The Physical Means

8. The physical means employed by the GSS investigators were presented before this Court by the GSS investigators. The State's attorneys were prepared to present them for us behind closed doors (in camera). The applicants' attorneys were opposed to this proposal. Thus, the information at the Court's disposal was provided by the applicants and was not tested in each individual application. This having been said, the State's position, which failed to deny the use of these interrogation methods, and even offered these and other explanations regarding the rationale justifying the use of an interrogation methods or another, provided the Court with a picture of the GSS' interrogation practices.

The decision to utilize physical means in a particular instance is based on internal regulations, which requires obtaining permission from various ranks of the GSS hierarchy. The regulations themselves were approved by a special Ministerial Committee on GSS interrogations. Among other guidelines, the Committee set forth directives pertaining to the rank authorized to allow these interrogation practices. These directives were not examined by this Court. Different interrogation methods are employed depending on the suspect, both in relation to what is required in that situation and to the likelihood of obtaining authorization. The GSS does not resort to every interrogation method at its disposal in each case.

## Shaking

9. A number of applicants (H.C. 5100/94; H.C. 4054/95; H.C. 6536/95) claimed that the shaking method was used against them. Among the investigation methods outlined in the GSS' interrogation regulations, shaking is considered the harshest. The method is defined as the forceful shaking of the suspect's upper torso, back and forth, repeatedly, in a manner which causes the neck and head to dangle and vacillate rapidly. According to an expert opinion submitted in one of the applications (H.C. (motion) 5584/95 and H.C. 5100/95), the shaking method is likely to cause serious brain damage, harm the spinal cord, cause the suspect to lose consciousness, vomit and urinate uncontrollably and suffer serious headaches.

The State entered several countering expert opinions into evidence. It admits the use of this method by the GSS. To its contention, there is no danger to the life of the suspect inherent to shaking; the risk to life as a result of shaking is rare; there is no evidence that shaking causes fatal damage; and medical literature has not to date listed a case in which a person died directly as a result of having been only shaken. In any event, they argue, doctors are present in all interrogation compounds, and instances where the danger of medical damage presents itself are investigated and researched.

Text of Supreme Court Decision on GSS Practices

All agree that in one particular case (H.C. 4054/95) the suspect in question expired after being shaken. According to the State, that case constituted a rare exception. Death was caused by an extremely rare complication resulting in the atrophy of the neurogenic lung. In addition, the State argues in its response that the shaking method is only resorted to in very particular cases, and only as a last resort. The interrogation directives define the appropriate circumstances for its application and the rank responsible for authorizing its use. The investigators were instructed that in every case where they consider resorting to shaking, they must probe the severity of the danger that the interrogation is intending to prevent; consider the urgency of uncovering the information presumably possessed by the suspect in question; and seek an alternative means of preventing the danger. Finally, the directives respecting interrogation state, that in cases where this method is to be used, the investigator must first provide an evaluation of the suspect's health and ensure that no harm comes to him. According to the respondent, shaking is indispensable to fighting and winning the war on terrorism. It is not possible to prohibit its use without seriously harming the GSS' ability to effectively thwart deadly terrorist attacks. Its use in the past has lead to the thwarting of murderous attacks.

## Waiting in the "Shabach" Position

10. This interrogation method arose in numerous applications (H.C. 6536/95, H.C. 5188/96, H.C. 7628/97). As per applicants' submission, a suspect investigated under the "Shabach" position has his hands tied behind his back. He is seated on a small and low chair, whose seat is tilted forward, towards the ground. One hand is tied behind the suspect, and placed inside the gap between the chair's seat and back support. His second hand is tied behind the chair, against its back support. The suspect's head is covered by an opaque sack, falling down to his shoulders. Powerfully loud music is played in the room. According to the affidavits submitted, suspects are detained in this position for a prolonged period of time, awaiting interrogation at consecutive intervals.

The aforementioned affidavits claim that prolonged sitting in this position causes serious muscle pain in the arms, the neck and headaches. The State did not deny the use of this method before this Court. They submit that both crucial security considerations and the investigators' safety require tying up the suspect's hands as he is being interrogated. The head covering is intended to prevent contact between the suspect in question and other suspects. The powerfully loud music is played for the same reason.

## The "Frog Crouch"

11. This interrogation method appeared in one of the applications (H.C. 5188/96). According to the application and the attached corresponding affidavit, the suspect being interrogated was found in a "frog crouch" position. This refers to consecutive, periodical crouches on the tips of one's toes, each lasting for five minute intervals. The State did not deny the use of this method, thereby prompting Court to issue an order *nisi* in the application where this method was alleged. Prior to hearing the application, however, this interrogation practice ceased.

Text of Supreme Court Decision on GSS Practices

## Excessive Tightening of Handcuffs

12. In a number of applications before this Court (H.C. 5188/96; H.C. 7563/97), various applicants have complained of excessive tightening of hand or leg cuffs. To their contention, this practice results in serious injuries to the suspect's hands, arms and feet, due to the length of the interrogations. The applicants invoke the use of particularly small cuffs, ill fitted in relation to the suspect's arm or leg size. The State, for its part, denies any use of unusually small cuffs, arguing that those used were both of standard issue and properly applied. They are, nonetheless, prepared to admit that prolonged hand or foot cuffing is likely to cause injuries to the suspect's hands and feet. To the State's contention, however, injuries of this nature are inherent to any lengthy interrogation.

## Sleep Deprivation

13. In a number of applications (H.C. 6536/96; H.C. 7563/97; H.C. 7628/97) applicants have complained of being deprived of sleep as a result of being tied in the "Shabach" position, being subjected to the playing of powerfully loud music, or intense non-stop interrogations without sufficient rest breaks. They claim that the purpose of depriving them of sleep is to cause them to break from exhaustion. While the State agrees that suspects are at times deprived of regular sleep hours, it argues that this does not constitute an interrogation method aimed at causing exhaustion, but rather results from the prolonged amount of time necessary for conducting the interrogation.

## Applicants' Arguments

14. Before us lie a number of applications. Different applicants raise different arguments. In principle, all the applications raise two essential arguments: First, they submit that the GSS is never authorized to conduct interrogations. Second, they argue that the physical means employed by GSS investigators not only infringe upon the human dignity of the suspect undergoing interrogation, but in fact constitute criminal offences. These methods, argue the applicants, are in violation International Law as they constitute "Torture," which is expressly prohibited under International Law. Thus, the GSS investigators are not authorized to conduct these interrogations. Furthermore, the "necessity" defence which, according to the State, is available to the investigators, is not relevant to the circumstances in question. In any event, the doctrine of "necessity" at most constitutes an exceptional *post factum* defence, exclusively confined to criminal proceedings against investigators. It cannot, however, by any means, provide GSS investigators with the preemptory authorization to conduct interrogations *ab initio*. GSS investigators are not authorized to employ any physical means, absent unequivocal authorization from the Legislator pertaining to the use of such methods and conforming to the requirements of the Basic Law: Human Dignity and Liberty. There is no purpose in engaging in a bureaucratic set up of the regulations and authority, as suggested by the Commission of Inquiry's Report, since doing so would merely regulate the torture of human beings.

We asked the applicants' attorneys whether the "ticking time bomb" rationale was not sufficiently persuasive to justify the use of physical means, for instance, when a bomb is known to have been placed in a public area and will undoubtedly explode causing immeasurable human tragedy if its location is not revealed at once. This question elicited a variety of responses from the various applicants before the Court. There are those convinced that physical means are not to be used under any circumstances; the prohibition on such methods to their mind is absolute, whatever the consequences may be. On the other hand, there are others who argue that even if it is perhaps acceptable to employ physical means in most exceptional "ticking time bomb" circumstances, these methods are in practice used even in absence of the "ticking time bomb" conditions. The very fact that, in most cases, the use of such means is illegal provides sufficient justification for banning their use altogether, even if doing so would inevitably absorb those rare cases in which physical coercion may have been justified. Whatever their particular views, all applicants unanimously highlight the distinction between the ability to potentially escape criminal liability *post factum* and the granting of permission to use physical means for interrogation purposes *ab initio*.

## The State's Arguments

15. The position of the State is as follows: The GSS investigators are duly authorized to interrogate those suspected of committing crimes against Israel's security. This authority emanates from the government's general and residual (prerogative) powers (Article 40 of the Basic Law: the Government). Similarly, the authority to investigate is equally bestowed upon every individual investigator by virtue of article 2(1) of the Criminal Procedure Statute (Testimony) and the relevant accessory powers. With respect to the physical means employed by the GSS, the State argues that these do not violate International Law. Indeed, it is submitted that these methods cannot be qualified as "torture," "cruel and inhuman treatment" or "degrading treatment," that are strictly prohibited under International Law. Instead, the practices of the GSS do not cause pain and suffering, according to the State's position.

Moreover, the State argues that these means are equally legal under Israel's internal (domestic) law. This is due to the "necessity" defence outlined in article 34(11) of the Penal Law (1977). Hence, in the specific cases bearing the relevant conditions inherent to the "necessity" defence, GSS investigators are entitled to use "moderate physical pressure" as a last resort in order to prevent real injury to human life and well being. Such "moderate physical pressure" may include shaking, as the "necessity" defence provides in specific instances. Resorting to such means is legal, and does not constitute a criminal offence. In any case, if a specific method is not deemed to be a criminal offence, there is no reason not to employ it even for interrogation purposes. As per the State's submission, there is no reason for prohibiting a particular act, in specific circumstances, *ab initio* if it does not constitute a crime. This is particularly true with respect to the GSS investigators' case, who, according to the State, are after all responsible for the protection of lives and public safety. In support of their position, the State notes that the use of physical means by GSS investigators is most unusual and is only employed as a last resort in very

extreme cases. Moreover, even in these rare cases, the application of such methods is subject to the strictest of scrutiny and supervision, as per the conditions and restrictions set forth in the Commission of Inquiry's Report. This having been said, when the exceptional conditions requiring the use of these means are in fact present, the above described interrogation methods are fundamental to saving human lives and safeguarding Israel's security.

## The Commission of Inquiry's Report

16. The GSS' authority to employ particular interrogation methods, and the relevant law respecting these matters were examined by the Commission of Inquiry (whose report was published, as mentioned, in the Landau Book (1995) Volume 1 at 269). The Commission, appointed by the government by virtue of the Commission of Inquiry Statute (1968), considered the GSS' legal status [among other issues]. Following a prolonged deliberation, the Commission concluded that the GSS is authorized to investigate those suspected of hostile terrorist acts, even in absence of express statutory regulation of its activities, in light of the powers granted to it by specific legislation and the government's residual (prerogative) powers, outlined in the Basic Law: the Government (article 29 of the old statute and article 40 of the new version). In addition, the power to investigate suspects, granted to investigators by the Minister of Justice as per article 2(1) of the Statute of Criminal Procedure [Testimony], equally endows the GSS with the authority to investigate (supra, p.301 and following). Another part of the Commission of Inquiry's Report deals with, "the investigator's potential defences" (defences available to the investigator). With regards to this matter, the Commission concluded that in cases where the saving of human lives necessarily requires obtaining certain information, the investigator is entitled to apply both psychological pressure and "a moderate degree of physical pressure" (supra, at 328). Thus, an investigator who, in the face of such danger, applies that specific degree of physical pressure, which does not constitute abuse or torture of the suspect, but is instead proportional to the danger to human life, can avail himself of the "necessity" defence, in the face of potential criminal liability. The Commission was convinced that its conclusions to this effect were not in conflict with International Law, but instead reflect an approach consistent with both the Rule of Law and the need to effectively safeguard the security of Israel and its citizens.

The Commission approved the use of, " a moderate degree of physical pressure" with various stringent conditions including directives that were set out in the second (and secret) part of the Report, and for the supervision of various elements both internal and external to the GSS. The Commission's recommendations were duly approved by the government.

## The Applications

17. A number of applications dealing with the application of physical force by the GSS for interrogation purposes have made their way to this Court throughout the years (See, for example, H.C. 7964/95 Billbissi v. The GSS (unpublished); H.C. 8049/96 Hamdan v. The GSS (unpublished); H.C. 3123/94

*Atun v. The Head of the GSS* (unpublished); H.C. 3029/95 *Arquan v. The GSS* (unpublished); H.C. 5578/95 *Hajazi v. The GSS* (unpublished)). An immediate hearing was ordered in each of these cases. In most, the State declared that the GSS does not employ physical means. As a result, the applicants requested to withdraw their applications. The Court accepted these motions and informed the applicants of their right to set forth a complaint if physical means were or are in fact being used against them (See H.C. 3029/95 *supra.*). Only a in a minority of complaints did the State did not issue the above mentioned notice. In other instances, an interim order was issued. At times, the Court noted that, "we (the Court) did not receive any information regarding the interrogation methods which the respondent (generally the GSS) seeks to employ and we did not take any position with respect to these methods" ( See H.C. 8049/96 *Hamdan v. The GSS* (unpublished). In a different case, the Court noted that, "[T]he annulment of the interim order does not in any way constitute permission to employ methods that do not conform to the law and binding directives" (In H.C. 336/96; In H.C. 7954/95 *Billbissi v. The GSS* (unpublished)).

Until now, therefore, the Court did not actually decide the issue of whether the GSS is permitted to employ physical means for interrogation purposes in circumstances outlined by the defence of "necessity". Essentially, we did not do so due to the fact that it was not possible for the Court to hear the sort of arguments that would provide a complete normative picture, in all its complexity. At this time, by contrast, a number of applications before us have properly laid out (both orally and in writing) complete arguments from sides' respective attorneys. For this we thank them.

Although the various applications are somewhat distinct in that some are rather general or theoretical while others are quite specific, we have decided to deal with them, since above all we seek to clarify (uncover) the state of the law in this most complicated question. To this end, we shall begin by addressing the first issue- namely, are GSS investigators generally authorized to conduct interrogations. We shall then proceed to examine whether a general power to investigate would potentially sanction the use of physical means- including mental suffering-the likes of which the GSS employs. Finally, we shall probe the circumstances under which the above mentioned methods are immediately necessary to rescue human lives and whether these circumstances justify endowing GSS investigators with the authority to employ physical interrogation methods.

## The Authority to Interrogate

18. The term "interrogation" takes on various meanings in different contexts. For the purposes of the applications before the Court at present, we refer to the asking of questions which seek to elicit a truthful answer (subject to the limitations respecting the privilege against self-incrimination; See article 2 of the Criminal Procedure Statute [Testimony ]). Generally, the investigation of a suspect is conducted at the suspect's place of detention. An interrogation inevitably infringes upon the suspect's freedom, even if physical means are not used. Indeed, undergoing an interrogation infringes on both the suspect's

dignity and his individual privacy. In a state adhering to the Rule of Law, interrogations are therefore not permitted in absence of clear statutory authorization, be it through primary legislation or secondary legislation, the latter being explicitly rooted in the former. This essential principle is expressed by the Legislator in the Criminal Procedure Statute (Powers of Enforcement-Detention - 1996) which states as follows:

"Detentions and arrests shall be conducted only by law or by virtue of express statutory authorization for this purpose" (article 1(a)).

Hence, the statute and regulations must adhere to the requirements of the Basic Law: Human Dignity and Liberty (see article 8 of the Basic Law). The same principle applies to interrogations. Thus, an administrative body, seeking to interrogate an individual- an interrogation being defined as an exercise seeking to elicit truthful answers , as opposed to the mere asking of questions as in the context of an ordinary conversation- must point to the explicit statutory provision which legally empowers it. This is required by the Rule of Law (both formally and substantively). Moreover, this is required by the principle of administrative legality. "If an authority (government body) cannot point to a statute from which it derives its authority to engage in certain acts, that act is *ultra vires* (beyond its competence) and illegal.". (See I. Zamir, *Administrative Authority* (1996) at 50; See also B. Bracha, *Administrative Law* (Vol. 1, 1987) at 25).

19. Does a statute, authorizing GSS investigators to carry out interrogations (as we defined this term above) exist? A specific instruction, dealing with GSS agents, in their investigating capacity was not found. "The Service's status, its function and powers are not in fact outlined in any statute addressing this matter" (Commission of Inquiry's Report, *supra*, at 302). This having been said, the GSS constitutes an integral part of the executive branch. The fact that the GSS forms part of the executive branch is not in itself sufficient to invest it with the authority to interrogate. It is true that the government does possess residual or prerogative powers, defined as follows:

> "The Government is authorized to perform in the
> name of the State and subject to any law, all actions
> which are not legally incumbent on another
> authority." (Article 40, Basic Law: The Government).

However, we are not to conclude from this provision the authority to investigate, for our purposes. As mentioned, the power to investigate infringes on a person's individual liberty. The government's residual (prerogative) powers authorize it to act whenever there is an "administrative vacuum" (See H.C. 2918/93 *The City of Kiryat Gatt v. The State of Israel and others*, 37 (5) P.D. 832 at 843).

A so called "administrative vacuum" of this nature does not appear in the case at bar, as the relevant field is entirely occupied by the principle of individual freedom. Infringing upon this liberty therefore requires specific directives, as insisted upon by President Shamgar:

Case: 1:03-cv-00978 Document #: 175 Filed: 04/18/05 Page 51 of 70 PageID #:588

"There are activities which do not fall within the government's powers or scope. Employing them, absent statutory authorization, runs contrary to our most basic normative understanding, an understanding which emanates from our system's very [democratic] character. Thus, it is respecting basic rights that forms part of our positive law, whether they have been spelled out in a Basic Law or whether this has yet to be done. Thus, the government is not endowed with the capacity to, for example, shut down a newspaper on the basis of an administrative decision, absent explicit statutory authorization to this effect, irrespective of whether a Basic Law expressly protects freedom of expression; An act of this sort would undoubtedly run contrary to our basic understanding regarding human liberty and the [democratic] nature of our regime, which provides that liberty may only be infringed upon by virtue of explicit statutory authorization...Hence, freedom of expression, a basic right, forms an integral part of our positive law, creates an exception binding the executive (branch) and does not allow it to stray from the prohibition respecting guaranteed human liberty, absent statutory authorization" (In H.C. 5128/94 *Federman v. The Minister of Police*, 48(5) P.D. 647 at 652.).

In a similar vein, Professor Zamir has noted:

"While allowing the government to act, article 40 of the Basic Law: The Government (article 29 to the old Basic Law) simultaneously subjects it to the law. Clearly, this exception precludes the government from acting in a manner contrary to statutory directives. Moreover, it prevents the government from infringing upon individuals' basic rights. This is of course all the more true respecting specific rights protected explicitly by the Basic Laws Human Dignity and Liberty and Freedom of Occupation. Notwithstanding, this is also the case for human rights not specifically enumerated in the Basic Laws. For instance, article 29 (now article 40) does not in any way authorize the government to limit freedom of expression... Indeed, article 29 "(now 40) merely endows the administrative authority with general executive powers that cannot serve to directly infringe upon human rights, unless there is explicit or implicit statutory authorization for doing so" (I. Zamir, *Administrative Authority* (vol. 1, 1996) at 337).

Text of Supreme Court Decision on GSS Practices

This is the law relevant to the case at bar. An individual's liberty is not to be the object of an interrogation- this is a basic liberty under our constitutional regime. There are to be no infringements on this liberty absent statutory provisions which successfully pass constitutional muster. The government's general administrative powers fail to fulfill these requirements. Indeed, when the Legislator sought to endow the GSS with the power to infringe upon a person's individual liberty, he proceeded to legislate specific provisions accordingly. Thus, for instance, it is stipulated that the head of a security service, under special circumstances, is authorized to allow for the secret monitoring of telephone conversations (See article 5 of the Secret Interception of Communication Statute-1979; Compare article 19(3)(4) of the Protection of Privacy Statute-1981). This requires that the following question be asked: Does there exist a special statutory instruction endowing GSS investigators with interrogating powers?

20. A specific statutory provision authorizing GSS investigators to conduct interrogations does not exist. While it is true that various interrogation directives, some with ministerial approval, followed the Commission of Inquiry's Report, these do not satisfy the requirement that the authority flow directly from statute or from explicit statutory authorization. The directives set out following the Inquiry Commission's Report merely constitute internal regulations. Addressing these directives, Justice Levin opined:

"Clearly, these directives are not to be understood as being tantamount to a "statute", as defined in article 8 of the Basic Law: Human Dignity. They are to therefore be struck down if they are found not to conform to it" (H.C. 2581/91 Salhat v. The State of Israel, 47(4) P.D. 837, at 845).

From where then, do the GSS investigators derive their interrogation powers? The answer is found in article 2(1) of the Criminal Procedure Statute [Testimony] which provides (in its 1944 version, as amended):

"A police officer, of or above the rank of inspector, or any other officer or class of officers generally or specially authorized in writing by the Chief Secretary to the Government, to hold enquiries into the commission of offences, may examine orally any person supposed to be

Case: 1:03-cv-03978 Document #: 175 Filed: 04/18/05 Page 53 of 70 PageID #:590

acquainted with the facts and circumstances of any offence in respect whereof such officer or police or other authorized officer as aforesaid is enquiring, and may reduce into writing any statement by a person so examined."

It is by virtue of the above provision that the Minister of Justice particularly authorized the GSS investigators to conduct interrogations regarding the commission of hostile terrorist activities. It has been brought to the Court's attention that in the authorizing decree, the Minister of Justice took care to list the names of those GSS investigators who were authorized to conduct secret interrogations with respect to crimes committed under the Penal Law-1977, the Prevention of Terrorism Statute-1948, the (Emergency) Defence Regulations-1945, The Prevention of Infiltration Statute (Crimes and Judging)-1954, and crimes which are to be investigated as per the Emergency Defence Regulations (Judea, Samaria and the Gaza strip- Judging in Crimes and Judicial Assistance-1967). It appears to us - and we have heard no arguments to the contrary- that the question of the GSS' authority to conduct interrogations can thus be resolved. By virtue of this authorization, GSS investigators are tantamount to police officers in the eyes of the law. If this solution is appropriate, is there not place for regulating the GSS investigators' powers by statute? We shall express an opinion on the matter at this time.

## The Means Employed for Interrogation Purposes

21. As we have seen, the GSS investigators are endowed with the authority to conduct interrogations (See par. 20, *supra*). What is the scope of these powers and do they encompass the use of physical means in the course of the interrogation in order to advance it? Can use be made of the physical means presently employed by GSS investigators (such as shaking, the "Shabach" position, and sleep deprivation) by virtue of the investigating powers given the GSS investigators? Let us note that the State did not argue before us that all the means employed by GSS investigators are permissible by virtue of the

Page 14 of 30

Text of Supreme Court Decision on GSS Practices    Case 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 54 of 70 PageID #:591

"law of interrogation" per se. Thus, for instance, the State did not make the argument that shaking is permitted simply because it is an "ordinary" investigator's method in Israel. Notwithstanding, it was argued before this Court that some of the physical means employed by the GSS investigators are permitted by the "law of interrogation" itself. For instance, this is the case with respect to some of the physical means applied in the context of waiting in the "Shabach" position: the placing of the head covering (for preventing communication between the suspects); the playing of powerfully loud music (to prevent the passing of information between suspects); the tying of the suspect's hands to a chair (for the investigators' protection) and the deprivation of sleep, as deriving from the needs of the interrogation. Does the "law of interrogation" sanction the use of physical means, the like used in GSS interrogations?

22. An interrogation, by its very nature, places the suspect in a difficult position. "The criminal's interrogation," wrote Justice Vitkon over twenty years ago, "is not a negotiation process between two open and fair vendors, conducting their business on the basis of maximum mutual trust" (Cr. A 216/74 *Cohen v The State of Israel*) 29(1) P.D. 340 at 352). An interrogation is a "competition of minds", in which the investigator attempts to penetrate the suspect's thoughts and elicit from him the information the investigator seeks to obtain. Quite accurately, it was noted that:

> "Any interrogation, be it the fairest and most reasonable of all, inevitably places the suspect in embarrassing situations, burdens him, intrudes his conscience, penetrates the deepest crevices of his soul, while creating serious emotional pressure". (Y. Kedmi, *On Evidence*, Part A, 1991 at 25).

> Indeed, the authority to conduct interrogations, like any administrative power, is designed for a specific purpose, which constitutes its foundation, and must be in conformity with the basic principles of the [democratic] regime. In crystallizing the interrogation rules, two values or interests clash. <u>On the one hand</u>, lies the desire to uncover the truth, thereby fulfilling the public interest in exposing crime and preventing it. <u>On the other hand</u>, is the wish to protect the dignity and liberty of the individual being interrogated. This having been said, these interests and values are not absolute. A democratic, freedom-loving society does not accept that investigators use any means for the purpose of uncovering the truth. " The interrogation practices of the police in a given regime," noted Justice Landau, "are indicative of a regime's very character" (Cr. A. 264/65 *Artzi v. The Government's Legal Advisor*, 20(1) P.D. 225 at 232). At times, the price of truth is so high that a democratic society is not prepared to pay it (See Barak, *On Law, Judging*

*and Truth*, 27 Mishpatim (1997) 11 at 13). To the same extent however, a democratic society, desirous of liberty seeks to fight crime and to that end is prepared to accept that an interrogation may infringe upon the human dignity and liberty of a suspect provided it is done for a proper purpose and that the harm does not exceed that which is necessary. Concerning the collision of values, with respect to the use of evidence obtained in a violent police interrogation, Justice H. Cohen opined as follows:

> " On the one hand, it is our duty to ensure that human dignity be protected; that it not be harmed at the hands of those who abuse it, and to do all that we can to restrain police investigators from fulfilling the object of their interrogation through prohibited and criminal means; On the other hand, it is (also) our duty to fight the increasingly growing crime rate which destroys the positive aspects of our country, and to prevent the disruption of public peace to the caprices of violent criminals that were beaten by police investigators" (Cr. A. 183/78 *Abu Midjim v. The State of Israel*, 34(4) P.D. 533 at 546).

Our concern, therefore, lies in the clash of values and the balancing of conflicting values. The balancing process results in the rules for a 'reasonable interrogation' (See Bein, *The Police Investigation- Is There Room for Codification of the 'Laws of the Hunt'*, 12 Iyunei Mishpat (1987) 129). These rules are based, on the one hand, on preserving the "human image" of the suspect (See Cr. A. 115/82 *Mouadi v. The State of Israel* 35 (1) P.D. 197 at 222-4) and on preserving the "purity of arms" used during the interrogation ( Cr. A. 183/78, *supra, ibid.*). On the other hand, these rules take into consideration the need to fight the phenomenon of criminality in an effective manner generally, and terrorist attacks specifically. These rules reflect "a degree of reasonableness, straight thinking (right mindedness) and fairness" (Kedmi, *supra*, at 25). The rules pertaining to investigations are important to a democratic state. They reflect its character. An illegal investigation harms the suspect's human dignity. It equally harms society's fabric.

23. It is not necessary for us to engage in an in-depth inquiry into the "law of interrogation" for the purposes of the applications before us. These vary from one matter to the next. For instance, the law of interrogation, as it appears in the context of an investigator's potential criminal liability, as opposed to the

purpose of admitting evidence obtained by questionable means. Here, by contrast, we deal with the "law of interrogation" as a power activated by an administrative authority ( See Bein *supra*.). The "law of interrogation" by its very nature, is intrinsically linked to the circumstances of each case. This having been said, a number of general principles are nonetheless worth noting:

First, a reasonable investigation is necessarily one free of torture, free of cruel, inhuman treatment of the subject and free of any degrading handling whatsoever. There is a prohibition on the use of "brutal or inhuman means" in the course of an investigation (F.H. 3081/91 *Kozli v. The State of Israel*, 35(4) P.D. 441 at 446). Human dignity also includes the dignity of the suspect being interrogated. (Compare H.C. 355/59 *Catlan v. Prison Security Services*, 34(3) P.D. 293 at 298 and C.A.4463/94 *Golan v. Prison Security Services*, 50(4) P.D. 136). This conclusion is in perfect accord with (various) International Law treaties -to which Israel is a signatory -which prohibit the use of torture, "cruel, inhuman treatment" and "degrading treatment" (See M. Evans and R. Morgan, Preventing Torture (1998) at 61; N.S. Rodley, The Treatment of Prisoners under International Law (1987) at 63). These prohibitions are "absolute". There are no exceptions to them and there is no room for balancing. Indeed, violence directed at a suspect's body or spirit does not constitute a reasonable investigation practice. The use of violence during investigations can potentially lead to the investigator being held criminally liable. (See, for example, article 277 of the Penal Law: Pressure on a Public Servant; *supra* at 130, 134; Cr. A. 64/86 *Ashash v. The State of Israel* (unpublished)). Second, a reasonable investigation is likely to cause discomfort; It may result in insufficient sleep; The conditions under which it is conducted risk being unpleasant. Indeed, it is possible to conduct an effective investigation without resorting to violence. Within the confines of the law, it is permitted to resort to various machinations and specific sophisticated activities which serve investigators today (both for Police and GSS); Similar investigations- accepted in the most progressive of societies- can be effective in achieve their goals. In the end result, the legality of an investigation is deduced from the propriety of its purpose and from its methods. Thus, for instance, sleep deprivation for a prolonged period, or sleep deprivation at night when this is not necessary to the investigation time wise may be deemed a use of an investigation method which surpasses the least restrictive means.

## From the General to the Particular

24. We shall now turn from the general to the particular. Plainly put, shaking is a prohibited investigation method. It harms the suspect's body. It violates his dignity. It is a violent method which does not form part of a legal investigation. It surpasses that which is necessary. Even the State did not argue that shaking is an "ordinary" investigation method which every investigator (in the GSS or police) is permitted to employ. The submission before us was that the justification for shaking is found in the "necessity" defence. That argument shall be dealt with below. In any event, there is no doubt that shaking is not to be resorted to in cases outside the bounds of "necessity" or as part of an "ordinary" investigation.

25. It was argued before the Court that one of the investigation methods employed consists of the suspect crouching on the tips of his toes for five minute intervals. The State did not deny this practice. This is a prohibited investigation method. It does not serve any purpose inherent to an investigation. It is degrading and infringes upon an individual's human dignity.

26. The "Shabach" method is composed of a number of cumulative components: the cuffing of the suspect, seating him on a low chair, covering his head with an opaque sack (head covering) and playing powerfully loud music in the area. Are any of the above acts encompassed by the general power to investigate? Our point of departure is that there are actions which are inherent to the investigation power (Compare C.A. 4463/94, *supra.*, *ibid.*). Therefore, we accept that the suspect's cuffing, for the purpose of preserving the investigators' safety, is an action included in the general power to investigate ( Compare H.C. 8124/96 *Mubarak v. The GSS* (unpublished)). Provided the suspect is cuffed for this purpose, it is within the investigator's authority to cuff him. The State's position is that the suspects are indeed cuffed with the intention of ensuring the investigators' safety or to prevent fleeing from legal custody. Even the applicants agree that it is permissible to cuff a suspect in similar circumstances and that cuffing constitutes an integral part of an interrogation. Notwithstanding, the cuffing associated with the "Shabach" position is unlike routine cuffing. The suspect is cuffed with his hands tied behind his back. One hand is placed inside the gap between the chair's seat and back support, while the other is tied behind him, against the chair's back support. This is a distorted and unnatural position. The investigators' safety does not require it. Therefore, there is no relevant justification for handcuffing the suspect's hands with particularly small handcuffs, if this is in fact the practice. The use of these methods is prohibited. As was noted, "Cuffing causing pain is prohibited" (See the *Mubarak* affair *supra.*). Moreover, there are other ways of preventing the suspect from fleeing from legal custody which do not involve causing the suspect pain and suffering.

27. This is the law with respect to the method involving seating the suspect in question in the "Shabach" position. We accept that seating a man is inherent to the investigation. This is not the case when the chair upon which he is seated is a very low one, tilted forward facing the ground, and when he is sitting in this position for long hours. This sort of seating is not encompassed by the general power to interrogate. Even if we suppose that the seating of the suspect on a chair lower than that of his investigator can potentially serve a legitimate investigation objective (for instance, to establish the "rules of the game" in the contest of wills between the parties, or to emphasize the investigator's superiority over the suspect), there is no inherent investigative need for seating the suspect on a chair so low and tilted forward towards the ground, in a manner that causes him real pain and suffering. Clearly, the general power to conduct interrogations does not authorize seating a suspect on a forward tilting chair, in a manner that applies pressure and causes pain to his back, all the more so when his hands are tied behind the chair, in the manner described. All these methods do not fall within the sphere of a "fair" interrogation. They are

Case: 1:05-cr-00978 Document #: 175 Filed: 04/18/05 Page 58 of 70 PageID #:595

not reasonable. They impinge upon the suspect's dignity, his bodily integrity and his basic rights in an excessive manner (or beyond what is necessary). They are not to be deemed as included within the general power to conduct interrogations.

28. We accept that there are interrogation related considerations concerned with preventing contact between the suspect under interrogation and other suspects and his investigators, which require means capable of preventing the said contact. The need to prevent contact may, for instance, flow from the need to safeguard the investigators' security, or that of the suspects and witnesses. It can also be part of the "mind game" which pins the information possessed by the suspect, against that found in the hands of his investigators. For this purpose, the power to interrogate- in principle and according to the circumstances of each particular case- includes preventing eye contact with a given person or place. In the case at bar, this was the explanation provided by the State for covering the suspect's head with an opaque sack, while he is seated in the "Shabach" position. From what was stated in the declarations before us, the suspect's head is covered with an opaque sack throughout his "wait" in the "Shabach" position. It was argued that the sack (head covering) is entirely opaque, causing the suspect to suffocate. The edges of the sack are long, reaching the suspect's shoulders. All these methods are not inherent to an interrogation. They do not confirm the State's position, arguing that they are meant to prevent eye contact between the suspect being interrogated and other suspects. Indeed, even if such contact should be prevented, what is the purpose of causing the suspect to suffocate? Employing this method is not connected to the purpose of preventing the said contact and is consequently forbidden. Moreover, the statements clearly reveal that the suspect's head remains covered for several hours, throughout his wait. For these purposes, less harmful means must be employed, such as letting the suspect wait in a detention cell. Doing so will eliminate any need to cover the suspect's eyes. In the alternative, the suspect's eyes may be covered in a manner that does not cause him physical suffering. For it appears that at present, the suspect's head covering - which covers his entire head, rather than eyes alone,- for a prolonged period of time, with no essential link to the goal of preventing contact between the suspects under investigation, is not part of a fair interrogation. It harms the suspect and his (human) image. It degrades him. It causes him to lose sight of time and place. It suffocates him. All these things are not included in the general authority to investigate. In the cases before us, the State declared that it will make an effort to find an "ventilated" sack. This is not sufficient. The covering of the head in the circumstances described, as distinguished from the covering of the eyes, is outside the scope of authority and is prohibited.

29. Cutting off the suspect from his surroundings can also include preventing him from listening to what is going on around him. We are prepared to assume that the authority to investigate an individual equally encompasses precluding him from hearing other suspects under investigation or voices and sounds that, if heard by the suspect, risk impeding the interrogation's success. Whether the means employed fall within the scope of a fair and reasonable interrogation warrant examination at this time. In the case at bar, the detainee is found in the

"Shabach" position while listening to the consecutive playing of powerfully loud music. Do these methods fall within the scope or the general authority to conduct interrogations? Here too, the answer is in the negative. Being exposed to powerfully loud music for a long period of time causes the suspect suffering. Furthermore, the suspect is tied (in place) in an uncomfortable position with his head covered (all the while). The use of the "Shabach" method is prohibited. It does not fall within the scope of the authority to conduct a fair and effective interrogation. Powerfully loud music is a prohibited means for use in the context described before us.

30. To the above, we must add that the "Shabach" position includes all the outlined methods employed simultaneously. Their combination, in and of itself gives rise to particular pain and suffering. This is a harmful method, particularly when it is employed for a prolonged period of time. For these reasons, this method does not form part of the powers of interrogation. It is an unacceptable method. "The duty to safeguard the detainee's dignity includes his right not to be degraded and not to be submitted to sub-human conditions in the course of his detention, of the sort likely to harm his health and potentially his dignity" (In Cr. A. 7223/95 *The State of Israel v. Rotenstein* (not yet published)).

A similar- though not identical- combination of interrogation methods were discussed in the case of *Ireland v. United Kingdom* (1978) 2 EHRR 25. In that case, the Court probed five interrogation methods used by England for the purpose of investigating detainees suspected of terrorist activities in Northern Ireland. The methods were as follows: protracted standing against the wall on the tip of one's toes; covering of the suspect's head throughout the detention (except during the actual interrogation); exposing the suspect to powerfully loud noise for a prolonged period and deprivation of sleep, food and drink. The Court held that these methods did not constitute "torture". However, since they treated the suspect in an "inhuman and degrading" manner, they were nonetheless prohibited.

31. The interrogation of a person is likely to be lengthy, due to the suspect's failure to cooperate or due to the information's complexity or in light of the imperative need to obtain information urgently and immediately (For instance, see The *Mubarak* affair, *supra*; H.C. 5318/95 *Hajazi v. GSS* (unpublished)). Indeed, a person undergoing interrogation cannot sleep as does one who is not being interrogated. The suspect, subject to the investigators' questions for a prolonged period of time, is at times exhausted. This is often the inevitable result of an interrogation, or one of its side effects. This is part of the "discomfort" inherent to an interrogation. This being the case, depriving the suspect of sleep is, in our opinion, included in the general authority of the investigator (Compare: H.C. 3429/94 *Shbana v. GSS* (unpublished)). So noted Justice Shamgar, in a similar instance:

> "The interrogation of crimes and in particular, murder
> or other serious crimes- cannot be accomplished
> within the confines of an ordinary public servant's
> work day...The investigation of crime is essentially

Text of Supreme Court Decision on GSS Practices    Case: 1:03-cv-06379 Document #: 175 Filed: 04/18/05 Page 60 of 70 PageID #:597

mental resistance...For this reason, the interrogation is often carried out at consecutive intervals. This, as noted, causes the investigation to drag on ...and requires diligent insistence on its momentum and consecutiveness." (Cr. A. 485/76 *Ben Loulou v. The State of Israel* (unpublished)).

The above described situation is different from those in which sleep deprivation shifts from being a "side effect" inherent to the interrogation, to an end in itself. If the suspect is intentionally deprived of sleep for a prolonged period of time, for the purpose of tiring him out or "breaking" him- it shall not fall within the scope of a fair and reasonable investigation. Such means harm the rights and dignity of the suspect in a manner surpassing that which is required.

32. All that was stated regarding the exceptions pertinent to an interrogation, flowing from the requirement that an interrogation be fair and reasonable, is the accepted law with respect to a regular police interrogation. The power to interrogate given to the investigator GSS investigator by law is the same interrogation powers the law bestows upon the ordinary police force investigator. It appears that the restrictions applicable to the police investigations are equally applicable to GSS investigations. There is no statutory instruction endowing a GSS investigator with special interrogating powers that are either different or more serious than those given the police investigator. From this we conclude that a GSS investigator, whose duty is to conduct the interrogation according to the law, is subject to the same restrictions applicable to a police interrogation.

## Physical Means and the "Necessity" Defence

33. We have arrived at the conclusion that the GSS personnel who have received permission to conduct interrogations (as per the Criminal Procedure Statute [Testimony]) are authorized to do so. This authority-like that of the police investigator- does not include most of the physical means of interrogation which are the subject of the application before us. Can the authority to employ these interrogation methods be anchored in a legal source beyond the authority to conduct an interrogation? This question was answered by the State's attorneys in the affirmative. As noted, an explicit authorization permitting GSS to employ physical means is not to be found in our law. An authorization of this nature can, in the State's opinion, be obtained in specific cases by virtue of the criminal law defense of "necessity", prescribed in the Penal Law. The language of the statute is as follows: (Article 34 (1)):

> *"A person will not bear criminal liability for committing any act immediately necessary for the purpose of saving the life,*

Case: 1:03-cr-00378 Document #: 175 Filed: 04/18/05 Page 61 of 70 PageID #:598

> *liberty, body or property, of either himself or his fellow person, from substantial danger of serious harm, imminent from the particular state of things [circumstances], at the requisite timing, and absent alternative means for avoiding the harm."*

The State's position is that by virtue of this "defence" to criminal liability, GSS investigators are also authorized to apply physical means, such as shaking, in the appropriate circumstances, in order to prevent serious harm to human life or body, in the absence of other alternatives. The State maintains that an act committed under conditions of "necessity" does not constitute a crime. Instead, it is deemed an act worth committing in such circumstances in order to prevent serious harm to a human life or body. We are therefore speaking of a deed that society has an interest in encouraging, as it is deemed proper in the circumstances. It is choosing the lesser evil. Not only is it legitimately permitted to engage in the fighting of terrorism, it is our moral duty to employ the necessary means for this purpose. This duty is particularly incumbent on the state authorities- and for our purposes, on the GSS investigators- who carry the burden of safeguarding the public peace. As this is the case, there is no obstacle preventing the investigators' superiors from instructing and guiding them with regard to when the conditions of the "necessity" defence are fulfilled and the proper boundaries in those circumstances. From this flows the legality of the directives with respect to the use of physical means in GSS interrogations. In the course of their argument, the State's attorneys submitted the "ticking time bomb" argument. A given suspect is arrested by the GSS. He holds information respecting the location of a bomb that was set and will imminently explode. There is no way to diffuse the bomb without this information. If the information is obtained, however, the bomb my be diffused. If the bomb is not diffused, scores will be killed and maimed. Is a GSS investigator authorized to employ physical means in order to elicit information regarding the location of the bomb in such instances? The State's attorneys answers in the affirmative. The use of physical means shall not constitute a criminal offence, and their use is sanctioned, to the State's contention, by virtue of the "necessity" defence.

34. We are prepared to assume that- although this matter is open to debate - (See A. Dershowitz, *Is it Necessary to Apply 'Physical Pressure' to Terrorists- And to Lie About It?*, [1989] 23 Israel L. Rev. 193; Bernsmann, *Private Self- Defence and Necessity in German Penal Law and in the Penal Law Proposa- Some Remarks*, [1998] 30 Israel L. Rev. 171, 208-210) - the "necessity" defence is open to all, particularly an investigator, acting in an organizational capacity of the State in interrogations of that nature. Likewise, we are prepared to accept - although this matter is equally contentious- (See M. Kremnitzer, *The Landau Commission Report- Was the Security Service Subordinated to the Law or the Law to the Needs of the Security Service?*, [1989] 23 Israel L. Rev.

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 62 of 70 PageID #:599

216, 244-247) - that the "necessity" exception is likely to arise in instances of "ticking time bombs", and that the immediate need ("necessary in an immediate manner" for the preservation of human life) refers to the imminent nature of the act rather than that of the danger. Hence, the imminence criteria is satisfied even if the bomb is set to explode in a few days, or perhaps even after a few weeks, provided the danger is certain to materialize and there is no alternative means of preventing its materialization. In other words, there exists a concrete level of imminent danger of the explosion's occurrence (See Kremnitzer and Segev, *The Application of Force in the Course of GSS Interrogations- A Lesser Evil?*, [1998] 4 Mishpat U' Mimshal 667 at 707; See also Feller, *Not Actual "Necessity" but Possible "Justification"; Not "Moderate Pressure", but Either "Unlimited" or "None at All"*, [1989] 23 Israel L. Rev. 201, 207).

Consequently we are prepared to presume, as was held by the Inquiry Commission's Report, that if a GSS investigator- who applied physical interrogation methods for the purpose of saving human life-is criminally indicted, the "necessity" defence is likely to be open to him in the appropriate circumstances (See Cr. A. 532/91 *Anonymous v. The State of Israel* (unpublished)). A long list of arguments, from both the fields of Ethics and Political Science, may be raised for and against the use of the "necessity" defence, (See Kremnitzer and Segev, *supra*, at p.696; M.S. Moor, *Torture and the Balance of Evils*, [1989] 23 Israel L. Rev. 280; L. Shelf, *The Lesser Evil and the Lesser Good- On the Landau Commission's Report, Terrorism and Torture*, [1990] 1 Plilim 185; W.L. & P.E. Twining, *Bentham on Torture*, [1973] 24 Nothern Ireland Legal Quarterly 305; D. Stetman, *The Question of Absolute Morality Regarding the Prohibition on Torture*, [1997] 4 Mishpat U' Mimshal 161 at 175; A. Zuckerman, *Coersion and the Judicial Ascertainment of Truth*, [1989] 23 Israel L. Rev. 357. This matter, however, has already been decided under Israeli law. Israel's Penal Law recognizes the "necessity" defence.

35. Indeed, we are prepared to accept that in the appropriate circumstances, GSS investigators may avail themselves of the "necessity" defence, if criminally indicted. This however, is not the issue before this Court. We are not dealing with the potential criminal liability of a GSS investigator who employed physical interrogation methods in circumstances of "necessity." Moreover, we are not addressing the issue of admissibility or probative value of evidence obtained as a result of a GSS investigator's application of physical means against a suspect. We are dealing with a different question. The question before us is whether it is possible to infer the authority to, in advance, establish permanent directives setting out the physical interrogation means that may be used under conditions of "necessity". Moreover, we are asking whether the "necessity" defence constitutes a basis for the GSS investigator's authority to investigate, in the performance of his duty. According to the State, it is possible to imply from the "necessity" defence, available (*post factum*) to an investigator indicted of a criminal offence, an advance legal authorization endowing the investigator with the capacity to use physical interrogation methods. Is this position correct?

36. In the Court's opinion, a general authority to establish directives respecting

the use of physical means during the course of a GSS interrogation cannot be implied from the "necessity" defence. The "necessity" defence does not constitute a source of authority, allowing GSS investigators to make use physical means during the course of interrogations. The reasoning underlying our position is anchored in the nature of the "necessity" defence. This defence deals with deciding those cases involving an individual reacting to a given set of facts; It is an ad hoc endeavour, in reaction to a event. It is the result of an improvisation given the unpredictable character of the events (See Feller, *ibid.* at 209). Thus, the very nature of the defence does not allow it to serve as the source of a general administrative power. The administrative power is based on establishing general, forward looking criteria, as noted by Professor Enker:

"Necessity is an after-the-fact judgment based on a narrow set of considerations in which we are concerned with the immediate consequences, not far-reaching and long-range consequences, on the basis of a clearly established order of priorities of both means and ultimate values...The defence of Necessity does not define a code of primary normative behaviour. Necessity is certainly not a basis for establishing a broad detailed code of behaviour such as how one should go about conducting intelligence interrogations in security matters, when one may or may not use force, how much force may be used and the like (Enker, "The Use of Physical Force in Interrogations and the Necessity Defense," in Israel and International Human Rights Law: The Issue of Torture 61,62 (1995)).

In a similar vein, Kremnitzer and Segev note:

"[t]he basic rationale underlying the necessity defence is the absence of the possibility to establish accurate rules of behaviour in advance, appropriate in concrete emergency situations, whose circumstances are varied and unexpected. From this it follows, that the necessity defence is not well suited for regulation a general situation, the circumstances of which are known and (often) repeat themselves. In similar cases, there is no reason for not setting the rules of behaviour in advance, in order that their content be determined in a thought out and well-planned manner, in advance, permitting them to apply in a uniform manner to all" (*supra*, at 705).

Moreover, the "necessity" defence has the effect of allowing one who acts

Case: 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 64 of 70 PageID #:601

under the circumstances of "necessity" to escape criminal liability. The "necessity" defence does not possess any additional normative value. In addition, it does not authorize the use of physical means for the purposes of allowing investigators to execute their duties in circumstances of necessity. The very fact that a particular act does not constitute a criminal act (due to the "necessity" defence) does not in itself authorize the administration to carry out this deed, and in doing so infringe upon human rights. The Rule of Law (both as a formal and substantive principle) requires that an infringement on a human right be prescribed by statute, authorizing the administration to this effect. The lifting of criminal responsibility does not imply authorization to infringe upon a human right. It shall be noted that the Commission of Inquiry did not hold that the "necessity" defence is the source of authority for employing physical means by GSS investigators during the course of their interrogations. All that the Commission of Inquiry determined is that if an investigator finds himself in a situation of "necessity", constraining him to choose the "lesser evil" - harming the suspect for the purpose of saving human lives - the "necessity" defence shall be available to him. Indeed, the Commission of Inquiry noted that, "the law itself must ensure a proper framework governing the [security] service's actions with respect to the interrogation of hostile terrorist activities and the related problems particular to it" (*ibid.* at 328).

37. In other words, general directives governing the use of physical means during interrogations must be rooted in an authorization prescribed by law and not from defences to criminal liability. The principle of "necessity" cannot serve as a basis of authority (See Kremnitzer, *ibid.* at 236). If the State wishes to enable GSS investigators to utilize physical means in interrogations, they must seek the enactment of legislation for this purpose. This authorization would also free the investigator applying the physical means from criminal liability. This release would flow not from the "necessity" defence but from the "justification" defense which states:

> "A person shall not bear criminal liability for an act committed in one of the following cases:
>
> (1) He was obliged or authorized by law to commit it.
> "

> > (Article 34(13) of the Penal Law) The defence to criminal liability by virtue of the "justification" is rooted in a area outside of the criminal law. This "external" law serves as a defence to criminal liability. This defence does not rest upon the "necessity", which is "internal" to the Penal Law itself. Thus, for instance, where the question of when an officer is authorized to apply deadly force in the course of detention arises, the authority is found in a provision of

Case: 1:03-cv-00978 Document #:175 Filed: 04/18/05 Page 65 of 70 PageID #:602

the Law of Detention, external to the Penal Law. If a man is killed as a result of the application of force, the provision is likely to give rise to a defence, by virtue of the "Justification" (See Cr. A. 486/88, *Ankonina v. The Chief Army Prosecutor* 34(2) P.D. 353). The "necessity" defence cannot constitute the basis for the determination of rules respecting the needs of an interrogation. It cannot constitute a source of authority on which the individual investigator can rely on for the purpose of applying physical means in an investigation that he is conducting. The power to enact rules and to act according to them requires legislative authorization, by legislation whose object is the power to conduct interrogations. Within the boundaries of this legislation, the Legislator, if he so desires, may express his views on the social, ethical and political problems, connected to authorizing the use of physical means in an interrogation. These considerations did not, from the nature of things, arise before the Legislature at the time when the "necessity" defence was enacted (See Kremnitzer, *supra*, at 239-40). The "necessity" defence is not the appropriate place for laying out these considerations (See Enker, *supra*, at 72). Endowing GSS investigators with the authority to apply physical force during the interrogation of suspects suspected of involvement in hostile terrorist activities, thereby harming the latters' dignity and liberty, raise basic questions of law and society, of ethics and policy, and of the Rule of Law and security. These questions and the corresponding answers must be determined by the Legislative branch. This is required by the principle of the Separation of Powers and the Rule of Law, under our very understanding of democracy (See H.C. 3267/97 *Rubinstein v. Minister of Defence* (has yet to be published)).

38. Our conclusion is therefore the following: According to the existing state of the law, neither the government nor the heads of security services possess the authority to establish directives and bestow authorization regarding the use

of liberty infringing physical means during the interrogation of suspects suspected of hostile terrorist activities, beyond the general directives which can be inferred from the very concept of an interrogation. Similarly, the individual GSS investigator-like any police officer- does not possess the authority to employ physical means which infringe upon a suspect's liberty during the interrogation, unless these means are inherently accessory to the very essence of an interrogation and are both fair and reasonable.

An investigator who insists on employing these methods, or does so routinely, is exceeding his authority. His responsibility shall be fixed according to law. His potential criminal liability shall be examined in the context of the "necessity" defence, and according to our assumptions (See paragraph 35 *supra*.), the investigator may find refuge under the "necessity" defence's wings (so to speak), provided this defence's conditions are met by the circumstances of the case. Just as the existence of the "necessity" defence does not bestow authority, so too the lack of authority does not negate the applicability of the necessity defense or that of other defences from criminal liability. The Attorney General can instruct himself regarding the circumstances in which investigators shall not stand trial, if they claim to have acted from a feeling of "necessity". Clearly, a legal statutory provision is necessary for the purpose of authorizing the government to instruct in the use of physical means during the course of an interrogation, beyond what is permitted by the ordinary "law of investigation", and in order to provide the individual GSS investigator with the authority to employ these methods. The "necessity" defence cannot serve as a basis for this authority.

## A Final Word

39. This decision opens with a description of the difficult reality in which Israel finds herself security wise. We shall conclude this judgment by re-addressing that harsh reality. We are aware that this decision does not ease dealing with that reality. This is the destiny of democracy, as not all means are acceptable to it, and not all practices employed by its enemies are open before it. Although a democracy must often fight with one hand tied behind its back, it nonetheless has the upper hand. Preserving the Rule of Law and recognition of an individual's liberty constitutes an important component in its understanding of security. At the end of the day, they strengthen its spirit and its strength and allow it to overcome its difficulties. This having been said, there are those who argue that Israel's security problems are too numerous, thereby requiring the authorization to use physical means. If it will nonetheless be decided that it is appropriate for Israel, in light of its security difficulties to sanction physical means in interrogations (and the scope of these means which deviate from the ordinary investigation rules), this is an issue that must be decided by the legislative branch which represents the people. We do not take any stand on this matter at this time. It is there that various considerations must be weighed. The pointed debate must occur there. It is there that the required legislation may be passed, provided, of course, that a law infringing upon a suspect's liberty "befitting the values of the State of Israel," is enacted for a proper purpose, and to an extent no greater than is required. (Article 8 to the Basic Law: Human Dignity and Liberty).

Text of Supreme Court Decision on GSS Practices

40. Deciding these applications weighed heavy on this Court. True, from the legal perspective, the road before us is smooth. We are, however, part of Israeli society. Its problems are known to us and we live its history. We are not isolated in an ivory tower. We live the life of this country. We are aware of the harsh reality of terrorism in which we are, at times, immersed. Our apprehension is that this decision will hamper the ability to properly deal with terrorists and terrorism, disturbs us. We are, however, judges. Our bretheren require us to act according to the law. This is equally the standard that we set for ourselves. When we sit to judge, we are being judged. Therefore, we must act according to our purest conscience when we decide the law. The words of the Deputy President of the Supreme Court, Justice Landau, speak well to our purposes:

> "We possess proper sources upon which to construct our judgments and have no need, and while judging, are forbidden from, involving our personal views as citizens of this country in our decisions. Still, great is the fear that the Court shall be perceived as though it had abandoned its proper place and descended to the midst of public debate, and that its decision making will be obstructed by one side of the population's uproar and by the other side's absolute and emotional rejection. In that sense, I see myself here as someone whose duty is to decide according to the law in all cases legally brought before the Court. I am strictly bound by this duty. As I am well aware in advance that the public at large will not pay attention to the legal reasoning, but to the end result alone. And that the Court's proper status, as an institution above partisan debates, risks being harmed. What can we do, as this is our function and role as judges." (H.C. 390/79 *Dawikat v. The State of Israel*, 34(1) P.D. 1 at 4).

The Commission of Inquiry pointed to the "difficult dilemma between the imperative need to safeguard the State of Israel's very existence and the lives of its citizens, and preserving its character- that of a country subject to the Rule of Law and holding basic moral values" (*supra*, p.326). The Commission rejected an approach suggesting that the actions of security services in the context of fighting terrorism, shall take place in the recesses of the law. The Commission equally rejected the "ways of the hypocrites, who remind us of their adherence to the Rule of Law, while ignoring (being willfully blind) to what is being done in practice" (*ibid.* at 327). The Commission elected to follow a third route, "the way of Truth and the Rule of Law" (*Ibid.*, at p.328). In so doing, the Commission of Inquiry outlined the dilemma faced by Israel in a manner both transparent and open to inspection by Israeli society.

Consequently, it is decided that the order *nisi* be made absolute, as we declare that the GSS does not have the authority to "shake" a man, hold him in the "Shabach" position (which includes the combination of various methods, as

Case 1:03-cr-00978 Document #: 175 Filed: 04/18/05 Page 68 of 70 PageID #:605

mentioned in paragraph 30), force him into a "frog crouch" position and deprive him of sleep in a manner other than that which is inherently required by the interrogation. Likewise, we declare that the "necessity" defence, found in the Penal Law, cannot serve as a basis of authority for the use of these interrogation practices, or for the existence of directives pertaining to GSS investigators, allowing them to employ interrogation practices of this kind. Our decision does not negate the possibility that the "necessity" defence be available to GSS investigators, be within the discretion of the Attorney General, if he decides to prosecute, or if criminal charges are brought against them, as per the Court's discretion.

**Deputy President** S. Levin:

I agree.

**Justice** T. Or

I agree.

**Justice** E. Mazza

I agree.

**Justice** M. Cheshin

I agree.

**Justice** I. Zamir

I agree.

**Justice** T. Strasberg-Cohen

I agree.

**Justice** D. Dorner

I agree.

**Justice J' Kedmi**

I accept the result conclusion which has been reached by my fellow, the President, by which the use of exceptional interrogation methods, according to the directives of the Ministerial Committee - that relies on a collection of legal provisions suggested by the attorneys for the State - "has no authority, and is therefore, illegal". Similarly, I am of the opinion that the time has arrived for this issue to be regulated by

primary and explicit legislation, that is clear and non-partial.

Notwithstanding, it is difficult for me to accept a state of things in which, due to the absence of explicit legislation as noted (above), the State should be helpless from a legal perspective, in those rare emergencies that merit being defined as, "ticking time bombs"; and that the State would not be authorized to order the use of exceptional interrogation methods in those circumstances. As far as I am concerned, such an authority exists in those circumstances, deriving from the basic obligation of being a State- like all countries of the world- to defend (protect) its existence, its well-being, and to safeguard (the lives of) its citizens. It is clear that in those circumstances, the State - as well as its agents - will have the natural right of "self-defence", in the larger meaning of the term, since terrorist organizations, that seek the soul and the souls of its inhabitants, and carry out shocking terrorist attacks to advance their cause (objectives).

On this background, and deriving from the intention will to prevent a situation where the "time bomb will tick" before our eyes and the State's hand will be shortened to help, I suggest that the judgment be suspended from coming into force for a period of one year. During that year, the GSS could employ exceptional interrogative methods in those rare cases of "ticking time bombs", on the condition that explicit authorization is given by the Attorney General .

The suspension under these conditions, does not infringe the ruling of the judgment, that the use of exceptional interrogation methods - that relies on directives of the Ministerial Committee as noted above - is illegal. This is because according to the suggested conditions, the suspension of the judgment does not constitute an authorization to continue acting according to those directives; and the authorization of the Attorney General does not legalize the performance of an illegal action according to the judgment, but rather deals with the non-indictment (of a violator) for the employment of exceptional interrogation methods in those emergency circumstances defined as, "ticking bombs".

During the suspension period, the Knesset will be given an opportunity to consider the issue (speak its

words) concerning the views of exceptional interrogation methods in security investigations, both in general and in times of emergency. The GSS will be given the opportunity to cope with emergency situations until the Knesset considers the issue. Meanwhile, the GSS will also have an opportunity to adapt itself, after a long period in which the directives of the Ministerial Committee have governed, to the new state of things, which expresses the development that has occurred in Israel concerning the status and weight of human rights.

I, therefore, join in the judgment of the President subject to my proposal regarding the suspension of the judgment from coming into force for a period of one year, as explained above.

**Decided According the President's Opinion**

**Given today, the 6th of September, 1999.**

Copyright 2005 The American-Israeli Cooperative Enterprise