# PEOPLE'S LAW OFFICE

1180 N. Milwaukee
Chicago, Illinois, 60622
(773) 235-0070
Fax (773) 235-6699

PeoplesLaw@aol.com

Michael E. Deutsch
Ben H. Elson
Janine L. Hoft
Joey L. Mogul
John L. Stainthorp
Jan Susler
G. Flint Taylor, Jr.
Erica L. Thompson

*Of Counsel*
Jeffrey H. Haas

November 17, 2005

Joseph Ferguson
Assistant United States Attorney
219 South Dearborn Street                    Hand Delivery
5th Floor
Chicago, Illinois 60604

RE:  *United States v. Marzook, et al.*, No. 03 CR 978

Dear Counsel:

We are in receipt of your letter of today's date and appreciate your itemized responses which will facilitate the presentation of our discovery motion to the judge.   Needless to say, however, we dispute your characterization of our requests as a "fishing expedition."  Rather, we persist in our position that the requested documents are both relevant and necessary to our presentation at the motion to suppress hearing.  Moreover, while we acknowledge your position to the contrary, we maintain our position that as the proponent of the evidence, you are obligated to secure the requested documentation from Israel.

With regard to your specific claim that our Request No. 5 in our letter of 11-4-05 is vague and overbroad, please refer to your own Bates numbered document 09496, which specifically references communication between these two individuals related to Mr. Salah.

Finally, we are in receipt of your response to our Motion to Suppress, and while we acknowledge your articulated position that you "will not accommodate future requests to track down materials we do not possess or control," we propound the following additional requests directly related to

601 MBE

your response:

1. All documentation reflecting an attorney visit with Mr. Salah on 1-31-93.

2. All documentation reflecting the policies and/or guidelines which require the INP or any other Israeli law enforcement officer to report claimed and/or suspected mistreatment by a detainee.

3. All photographs of Mr. Salah in which he is alleged to be "smiling and waving."

4. All documentation, including but not limited to notes, written materials, and/or recordings of any kind which Meron Suliaman claims to have "reduced to writing."

5. All documentation of changes, additions, and/or deletions that Mr. Salah made in any statement he is alleged to have given.

6. All documentation regarding the detention, interrogation, and investigation of Dr. Mahmud ar-Rumayhi that is in any way related to Mr. Salah.

7. The complete transcript and all documentation of each and every court date and/or other proceeding before the military tribunal that concerned Mr. Salah.

8. All documentation submitted to the military tribunal, including but not limited to *in camera* submissions.

Thank you for your prompt cooperation.

Sincerely,


Michael E. Deutsch

[03 CR 978 00932]

security clearance

Court _____

Minutes    Page nr.: <u>90</u>
                    Case nr.: <u>4221/93</u>

1 March 1994

| 2. | Prosecutor | As I said, what remains in the investigative file are technical details, internal correspondence. In our opinion, this correspondence is confidential and it all falls under the certificate of confidentiality. We are prepared to have the Court peruse the remaining material and hand down a decision. |
|---|---|---|
| 9. | Attorney for the Defense | I believe that it is appropriate for the Prosecutor to say at this stage or to give at this stage a list of the documents inside the investigative file. I do, of course, rely on the Court, but despite that, based on the heading of the document, I can express an opinion as to the extent to which the document is required for the defense and to what extent it is confidential. |
| 17. | Prosecutor | The only heading we can declare is "Information collection pages". All the documents that we have in our possession, bound together, are information collection pages. Some of them are technical matters but they have bearing on the investigative methods. What remains in the investigative file is confidential. This is information which does not relate to the main stages of the investigation, this is internal correspondence about procedures done and procedures whose execution must be considered, which the Defendant is not aware of. These are periodical evaluations and the determination of desired directions for the interrogation, which do not contain information that relates to the investigation itself but rather, as stated, only directions and stages in the investigation of the Defendant, which necessarily expose the confidential methods of investigation [...] |

[printed form text:] form 3670  catalog number 441172036

[03 CR 978 00879]

security clearance

Court _____

Minutes Page nr.: <u>144</u>

Case nr.: <u>4221/93</u>

10 April 1994

| 2. | A. | Chaim is in charge of the interrogations at the general level. I will not specify exactly the working methods with the subjects of the interrogation. |
| 5. | Q. | Did you act according to directives with regard to lengths of interrogation and periods between one interrogation and another, or did everyone improvise based on his knowledge and understanding? |
| 9. | A. | We have a person in charge on interrogation – "Chaim" – based on his instructions. |
| 10. | Q. | We will return to T-3. You step up to interrogate the Defendant upon instructions from "Chaim". |
| 14. | A. | This interrogation is done in coordination with "Chaim." |
| 16. | Q. | Is the coordination with "Chaim" binding with regard to the amount of time the interrogation is held? |
| 19. | A. | There is no specific coordination for that. When it will it end is not my decision. There is a framework and it is binding. The framework tells me how to interrogate, based on the GSS. I perform this interrogation according to GSS guidelines. |
| 25. | Q. | Did this interrogation take place based on a procedure that determines the lengths of interrogation? |
| 28. | A. | The interrogation was performed according to GSS interrogation procedures. |

[03 CR 978 00878]

security clearance

Court _____

Minutes Page nr.: <u>145</u>
Case nr.: <u>4221/93</u>

10 April 1994

| 3. | A. | GSS procedures are known and I work according to them. Everything I did with the Defendant meets the procedure. |
|---|---|---|
| 6. | Q. | In order for it to be operated, the procedure, someone must oversee the investigative procedures. Is there someone who oversees them, to make sure they are kept? |
| 10. | A. | Each interrogator who starts interrogation is responsible for the fact that GSS procedures be maintained. It is not possible for an interrogator to come to a subject of the interrogation and not know what happened to the subject of the interrogation beforehand. |
| 14. | Q. | In that case, when you step in to interrogate the aforementioned Defendant, you know how many hours he was interrogated, how much rest, and so forth? |
| 18. | A. | When I stepped up to the Defendant, I knew the occurrence in the course of the interrogation. Today, I do not know and I will only know if I am presented with memoranda. |
| 22. | Q. | I am telling you that a subject of the interrogation who is brought into the facility at 1:40, waits until 22:30, interrogated until 7:00 in the morning and waits until 11:30, is interrogated between 11:30 and 13:00, waits between 13:00 and 14:00, interrogated 14:00 to 21:30. Such an interrogation goes against GSS procedures. |

[03 CR 978 00809]

security clearance

Court _____

Minutes Page nr.: <u>212</u>
Case nr.: <u>4221/93</u>

20 July 1994

| | | |
|---|---|---|
| 2. | | It is a map of the Land of Israel where he marked, after having studied the diagram in the US. He saw the diagram in London, sent it to his wife, and when he spoke with her she said that she destroyed it after she heard he had been arrested. We did not record the conversation between the Defendant and his wife and we did not listen to it.<br>We stood by him and heard what he was saying. He told us what his wife said. It was not an interrogative act and he was open with us about this issue. The Defendant's arrest was due to information that we had about his activities in Israel. I cannot display this information. We're talking about certain intelligence information that I do not intend to present to anyone. |
| 17. | Attorney for the Defense | I do not rest assured that all the relevant information was presented to the Court. |
| 21. | Witness | I was not involved in the presentation of the information to the Court, and according to my information, all of the information was presented. I do not know who gave the Prosecutor the investigative material that preceded the arrest. |
| 27. | Prosecutor | A hearing was held in the presence of the GSS legal advisor and "Nadav", who presented the material. This is to the best of my knowledge. |

[printed form text:] form 3670  catalog number 441172036

[03 CR 978 00807]

security clearance

Court _____

Minutes Page nr.: 214
Case nr.: 4221/93

20 July 1994

| 2. | | I believe that there is no room to contradict the decision that has been given. It is understood that the certificate of confidentiality formally applies to this matter. |
|---|---|---|
| 7. | | Decision |
| 10. | | We will hand down a decision on this matter later. |
| 14. | | [signature] Judge | [signature] Presiding Judge [Stamp:] K/2112145 Lieutenant Colonel Shlomo Isaacson President, The Military Court of Ramallah | [signature] Judge |
| 17. | Witness | The decision that the witness [sic] would be arrested was not mine. |
| 20. | Prosecutor | I object to having the witness answer who gave the instruction to arrest the Defendant. |
| 24. | Witness | I know who arrested the Defendant and refuse to answer. |
| 27. | Attorney for the Defense | It is not included in the certificate of confidentiality. |

[printed form text:] form 3670  catalog number 441172036

[03 CR 978 00793]

security clearance

Court _____

Minutes Page nr.: <u>228</u>

Case nr.: <u>4221/93</u>

25 August 1994

| 2. | A. | There are sometimes cases when I do not know what to ask him. |
|---|---|---|
| 5. | Q. | What was your impression based on? |
| 7. | A. | It is the course of the interrogation of that subject of the interrogation, or other subjects of interrogation, I am not prepared to reveal this. |
| 10. | A. | Were there details in this interrogation that led you to think that there was a range of subjects which the Defendant did not discuss? |
| 14. | A. | Of course. There were subjects that I thought the subject of the interrogation did not talk about. Hostile terrorist activities. |
| 17. | Q. | More specific? |
| 19. | A. | Both within the borders of the State of Israel and outside them. |
| 21. | Q. | Did you try to ask him? |
| 23. | A. | In general, you can say so – but not specifically.<br>Yes, I planned the speech elicitors' gambit.<br>I cannot say what gambit was used in the speech elicitors' gambit. |

[printed form text:] form 3670  catalog number 441172036

[03 CR 978 00792]

security clearance

Court _____

Minutes Page nr.: <u>229</u>

Case nr.: <u>4221/93</u>

25 August 1994

| 2. | Attorney for the Defense | I ask that the witness be required to answer the question. Page 195, line 28 – I refer the Court. Is it true that the speech elicitors' gambit was one where the speech elicitors present themselves as belonging to the hostile terrorist activities command. |
|---|---|---|
| 8. | Witness | I am not prepared to answer. I am not prepared to say what is presented and how it is presented. |
| 11. | Attorney for the Defense | I wish to argue the importance of revealing the gambit known as the speech elicitors', the presentation which the speech elicitors make to the Defendant, who is locked in a cell with them. The essence of the presentation was partially revealed in the primary examination of the witness, due to the witness' desire to explain thereby why a document, which was allegedly recorded in the presence of the speech elicitors, and which was later read by the person known as "Nadav", and also recorded, and for that reason is part of the interrogation.<br>Why is it that in this document the Defendant claims that he was made promises, in other words, that he would be released if he confessed. The explanation that the witness gave was that these are things the Defendant said in order to justify himself before the speech elicitors. It is obvious that the question of why the Defendant provided a confession and if he provided a confession to the speech elicitors and to the interrogators [...] |

[printed form text:] form 3670  catalog number 441172036

[03 CR 978 00783]

security clearance

Court _____

Minutes Page nr.: <u>238</u>
Case nr.: <u>4221/93</u>

<u>25 August 1994</u>

| 1. | Prosecutor | There is no objection to having a specific answer given. |
|---|---|---|
| 3. | witness | In this case, there was no electronic medium. It was not possible, in this specific case, to see what was going on in the speech elicitors' room in real time. |
| 8. | Q. | Was there in this case something outside the cell, which followed what was going on in the detainment cell? |
| 11. | A. | No. |
| 14. | Q. | Was a recording device of any kind operated, which recorded what happened in the cell during the witness' [sic. Probably should be "the Defendant's"] meeting with the speech elicitors? |
| 18. | A. | No. |
| 21. | Q. | In the course of the gambit and after the gambit, were the speech elicitors questioned about what happened in the cell and was a document written about it? |
| 25. | A. | Yes, there was a debriefing, and yes, a document was written. |
| 27. | Attorney for the Defense | I ask that the Prosecutor provide this document. |

[printed form text:] form 3670  catalog number 441172036

[03 CR 978 00782]

security clearance

Court _____

Minutes Page nr.: <u>239</u>
Case nr.: <u>4221/93</u>

25 August 1994

| 2. | | It is the duty of the Prosecution to inform us that such a document exists, but it is shielded from the Defense. Knowing about [the existence of] this document, I wish to argue specifically about the document. |
|---|---|---|
| 9. | Prosecutor | The document contains all the investigative methods. All of it is investigative methods. You do not need to know what the purpose of the gambit was, what its nature was – and the document contains everything. The conclusions drawn from the gambit are also investigative methods. |
| 16. | Q. | Do the speech elicitors also refer, in this document, to what happened in the cell, with the Defendant? |
| 19. | A. | Yes. |
| 21. | Q. | Do they refer to the circumstances [illegible] of the Defendant? |
| 23. | A. | Yes. |
| 26. | Attorney for the Defense | I wish to argue that this document is not included in the confidentiality. Anything that relates to the specific interrogation of the Defendant, just as no confidentiality applies [to memoranda, ...] |

[printed form text:] form 3670  catalog number 441172036

[03 CR 978 00706]

security clearance

Court _____

Minutes Page nr.: <u>309</u>
                    Case nr.: <u>4221/93</u>

<u>29 August 1994</u>

| 2. | | [...would not have said] it if Nadav were not present. The word "understanding" is actually that the person would confess and complete the interrogation. I do not know what went on between him and Nadav. I assume that Nadav spoke, because I don't think that his presence was sufficient, despite their good connection. I presume that Nadav asked him to reach an understanding, because otherwise the Defendant would not have said that he was ready to come to an understanding (T-48). After that meeting, where the Defendant confessed about the U.S., the next day I read the memorandum that Nadav had written. I did not listen to the recording, but I knew that such existed. There was no recording of my interrogations of the Defendant. Nadav interrogated the Defendant in the same room that I interrogated in. I am familiar with the means of recording in the room. The speech elicitors' gambit was complex, in stages, and at each stage we would receive progress reports from different interrogators. I read Arabic at a low level. The manuscripts from the speech elicitors are in our possession. I did not debrief and I did not meet with the speech elicitors. The names of the interrogators who did that are in our possession. In this case, there was no recording during the speech elicitors' gambit. I do not know that for sure. I do not recall that the Defendant complained that the heating system did not work in the interrogation room. If the Defendant remained in waiting it was from the hope that the interrogation continue, and if he is sent to rest from waiting, it is possible that the Defendant asked for this, or that we gave the instruction that the interrogation continue the next day. |

[03 CR 978 00684]

security clearance

Court _____

Minutes Page nr.: 357
Case nr.: 4221/93

11 October 1994

| 2. | | The statement by the Defendant dated 21 February 1994 is accepted and marked T-59 (A-I). | | |
|---|---|---|---|---|
| 7. | | [signature]<br>Judge | [signature]<br>Presiding Judge<br>[Stamp:] K/2112145 Lieutenant Colonel Shlomo Isaacson President, The Military Court of Ramallah | [signature]<br>Judge |
| 10. | To the Attorney for the Defense | As to the second statement, I do not remember if he refused the writing of the statement in Hebrew. Right at the beginning, right after the warning, he refused to sign. I do not remember if he demanded that the statement be written in Arabic. He told me at the end that he refused to sign because the statement was written in Hebrew. I do not remember if he told me [so] at the first time that he refused to sign, whether he said that was because the statement was written in Hebrew. I believe that I asked him in the beginning why it was that he was refusing to sign, but I do not remember what the Defendant's reply was. If he would have said that the testimony was being collected under pressure I would have stopped the interrogation and recorded a memorandum. I [can] write in Arabic, but I always write in Hebrew. It is possible that he didn't ask that the statement be written in Arabic. If he had asked to write it in Arabic himself, I would have let him. There are instructions about the collection of statements, and I fulfill them. There are instructions which require me to collect the statement in the language of the subject of the interrogation, but I collected it not in the language of the subject of the interrogation. | | |

[printed form text:] form 3670  catalog number 441172036

UNCLAS          TEL AVIV 07083

ACTION: CONS-1
INFO: DPO-0 CGR-0

DISTRIBUTION: CONS
CHARGE: PROG

VZCZCJUO014TVI657
PP RUFHJU
DE RUFHTV #7083/01 1310956
ZNR UUUUU ZZH
P 110956Z MAY 93
FM AMEMBASSY TEL AVIV
TO RUEHC/SECSTATE WASHDC PRIORITY 9804
INFO RUFHJU/AMCONSUL JERUSALEM 6834
BT
UNCLAS SECTION 01 OF 02 TEL AVIV 007083

E.O.  12356:  N/A
TAGS: CASC, IS, KPAL, PHUM (MAHMUD, BASSAM BASEM;
HAMDALLA, MOJED MOKLES; MOHAMMAD, MODR RAWHI)
SUBJECT:  MEETING AT MFA ON ARAB AMERICAN ARREST ISSUES
AND AIRPORT PROBLEMS

REF:  A) TEL AVIV 06133   B) STATE 121023   C) STATE
118339

1.  SUMMARY.  AT A MAY 3 MEETING WITH MFA'S DIRECTOR OF
CONSULAR AFFAIRS, CONSUL GENERAL AND ACS CHIEF
DELIVERED TALKING POINTS CONCERNING THE MISTREATMENT OF
BASSAM MAHMOUD AND OTHER ARAB AMCITS, DISCUSSED THE
RECENT INVESTIGATIONS BY MFA INTO ALLEGED MISTREATMENT,
AND RAISED THE CONTINUED HARASSMENT OF AMCITS AT BEN
GURION AIRPORT. END SUMMARY.

2.  ON MAY 3, CONSUL GENERAL AND ACS CHIEF MET WITH
MINISTRY OF FOREIGN AFFAIRS DIRECTOR OF CONSULAR
AFFAIRS, SHLOMO HOVER TO DISCUSS PROBLEMS OF ACCESS,
NOTIFICATION, AND MISTREATMENT OF ARAB AMERICAN
ARRESTEES.  ALSO PRESENT FOR PART OF THE MEETING WAS
AVI SHOKET, WHO WAS INTRODUCED AS THE MFA DEPUTY OFFICE
DIRECTOR FOR THE MIDDLE EAST DIVISION.

3.  CONSUL GENERAL FIRST ASKED ABOUT RECENT ARTICLES IN
THE PRESS REPORTING ON A PETITION TO THE SUPREME COURT
BY THE COMMITTEE AGAINST TORTURE IN ISRAEL SEEKING TO
CHANGE THE REGULATIONS (ORIGINALLY PROMULGATED IN 1987
BY THE LANDAU COMMISSION) REGARDING INTERROGATION OF
SECURITY PRISONERS.  A RESPONSE WAS RECENTLY FILED BY
THE HEAD OF THE GENERAL SECURITY SERVICES (GSS)
JUSTIFYING THE USE OF "MODERATE PHYSICAL PRESSURE".  A
MORE RECENT ARTICLE, PARTIALLY QUOTED IN REF A, NOTED
THAT THE MINISTRY OF JUSTICE WAS SETTING UP A BODY TO
EXAMINE COMPLAINTS AGAINST GSS INTERROGATORS.

UNCLAS          TEL AVIV 07083

03 CR 978                                    09570

UNCLAS        TEL AVIV 07083

CONSUL GENERAL ASKED IF THE RECENT CASES OF ALLEGED
MISTREATMENT FOR WHICH THE EMBASSY HAD REQUESTED AN
INVESTIGATION HAD BEEN REFERRED TO THIS PANEL.  HOVER
TOLD CONOFFS THAT THE INVESTIGATORY PANEL OR BODY
WITHIN MOJ WAS STILL BEING FORMED AND THESE CASES HAD
NOT BEEN REFERRED TO THE MOJ.

4.   CONSUL GENERAL EXPRESSED CONCERN THAT THE CASES
HAD ONLY BEEN REFERRED TO THE GSS WHO SIMPLY TOLD THE
MFA THAT THERE HAD BEEN NO MISTREATMENT.  HE STATED,
FOR EXAMPLE, THE MFA'S RECENT DIPLOMATIC RESPONSE TO
POST'S REQUEST FOR AN INVESTIGATION IN THE SALAH,
JARAD, AND OMAR CASES (NOTE IS QUOTED IN REF A), STATED
THAT THERE WAS NO BASIS FOR CLAIMS THAT AMCITS HAD BEEN
CONFINED TO A "REFRIGERATOR" CELL.  CONOFFS TOLD HOVER
THAT SEVERAL ARAB AMERICANS HAD REFERRED TO THIS CELL
AND THIS PARTICULAR FORM OF MISTREATMENT.  THESE
DETAINEES HAD NOT HAD ANY OPPORTUNITY TO MEET IN ORDER
TO INVENT SUCH A STORY.  THIS TENDED TO GIVE MORE
CREDIBILITY TO THEIR COMPLAINTS.  HOVER ATTEMPTED TO
REASSURE CONOFFS THAT THESE CASES HAD BEEN THOROUGHLY
INVESTIGATED BY THE PROPER AUTHORITIES WITHIN THE GSS.

5.   MR. SHOKET PROCEEDED TO TELL CONOFFS THAT ARAB
DETAINEES FREQUENTLY TALK TO THE GSS WITHOUT MUCH
EFFORT BY THE INTERROGATOR.  HE CLAIMED THEY THEN NEED
TO COVER UP THEIR "COLLABORATION" BY INVENTING STORIES
OF MISTREATMENT.  SHOKET USED THE EXAMPLE OF PHYSICAL
PRESSURE BEING NEEDED BECAUSE THE DETAINEE MAY HAVE
INFORMATION ON WHERE A BOMB IS LOCATED AND IF THE
INTERROGATOR DOES NOT EXTRACT A CONFESSION, EVEN AT THE
PRICE OF A HUMAN RIGHTS VIOLATION, PEOPLE MIGHT DIE.
THIS PRESENTED A REAL MORAL DILEMMA FOR THE
INTERROGATOR.  CONOFFS RESPONDED THAT SUCH A MORAL
DILEMMA WAS HARDLY LIKELY IN THE CASES OF INTERROGATION
OF TEENAGE ROCK THROWERS AND THESE INTERROGATIONS DID
NOT JUSTIFY HUMAN RIGHTS VIOLATIONS.  HOVER AGREED WITH
CONOFFS.

6.   MOVING TO SPECIFIC CASES, CONGEN DELIVERED TALKING
POINTS IN REF B CONCERNING BASSAM MAHMOUD.  CONGEN ALSO
TOLD HOVER THAT THE NEA/IAI OFFICE DIRECTOR HAD
MENTIONED MAHMOUD'S CASE TO AMBASSADOR RABINOVICH IN
WASHINGTON.  HOVER PROMISED TO LOOK INTO THE CASE AND
INVESTIGATE THE ALLEGED BEATINGS AND RAZOR CUTS THAT
TOOK PLACE DURING MAHMOUD'S INCARCERATION.
7.   CONGEN ALSO MENTIONED
 THE CASE OF MAJED MOKLES
HAMDALLA STATING THAT ALTHOUGH RELEASED, HAMDALLAH AND
HIS ATTORNEY HAD ASKED POST TO PROTEST HIS BEATING AT
RAMALLAH PRISON.  HOVER ASKED IF HAMDALLAH'S ATTORNEY
HAD MENTIONED THIS BEATING TO THE JUDGE.  CONOFF
PROMISED TO LOOK INTO THIS.  FINALLY, CONOFFS MENTIONED

UNCLAS        TEL AVIV 07083

UNCLAS          TEL AVIV 07083

THAT EMBASSY IS STILL AWAITING A RESPONSE TO POST'S
REQUEST FOR AN INVESTIGATION INTO THE MISTREATMENT AND
DELAYED NOTIFICATION OF THE ARREST OF MODR RAWHI
MOHAMMED.  HOVER PROMISED TO LOOK INTO THE STATUS OF
THE INVESTIGATION.  HOVER AGREED WITH CONOFFS THAT
SOMETHING HAD GONE WRONG IN THIS CASE, AS EMBASSY WAS
NOT NOTIFIED OF MODR'S ARREST FOR OVER ONE MONTH.

8.   FINALLY, CONOFFS TOLD HOVER THAT DEPARTMENT ANF
POST CONTINUE TO RECEIVE COMPLAINTS OF HARASSMENT AT
BEN GURION AIRPORT FROM DEPARTING AMCITS.   CONGEN
STATED THAT AMCITS IN CLERICAL GARB, PRIESTS AND NUNS,
AS WELL AS AMCITS WITH ARAB SURNAMES CONTINUE TO BE
SINGLED OUT FOR MORE INTENSIVE INTERROGATION.   HOVER
EXPRESSED SOME SUPRISE AT THE HARASSMENT OF RELIGIOUS
PERSONS AND PROMISED TO INVESTIGATE ANY CASES FORWARDED
TO HIM BY POST.   HERBST
BT
#7083

NNNN

UNCLAS          TEL AVIV 07083

03 CR 978                                    09572

Jerusalem

January 17, 1996

TO:  The File

FROM:  Kathleen A. Riley, Consul

SUBJECT:  Attached Affadavit of Mohammed Salah

I was contacted on January 16, 1996, by Baruch Weiss, U.S. Department of Justice, regarding the attached affadavit of Mohammed Salah. The affadavit was presented in relation to the Government of Israel's request for extradition of Dr. Mousa Abu Marzok.  In the affadavit, Mohammed Salah states that his confession was obtained under duress and therefore any statements he made should be considered in that light.

Mr. Weiss asked if Salah's allegations of mistreatment were consistent with what we knew of the conditions of his early arrest conditions. I reviewed the file and determined that most of Salah's allegations of mistreatment had been made from the beginning and seemed to track relatively consistently with the statements made in his affadavit.

I passed this information to Mr. Weiss by telephone on January 17. He stated that he planned that afternoon to go over the Salah file in Embassy Tel Aviv. We determined that the file in Tel Aviv should closely mirror our own records since most of our file consists of cables which were sent to or from Tel Aviv and Jerusalem both.

It was therefore determined that there was no need for Mr. Weiss to get any further information from Jerusalem unless he returned to us for further information. Mr. Weiss planned to meet on January 17 with Jim Gray to go over the files in Embassy Tel Aviv.

UNCLASSIFIED    JERUSALEM   000738

ORIGIN CONS-3 INFO CG DPO 5

VZCZCJUI   *
OO RUEHC RUFHTV
DE RUFHJU #0738  064 .**                    CLASS: UNCLASSIFIED
ZNR UUUUU ZZH                               CHRGE: PROG
O  051446Z MAR 93                           APPRV: CONS:DSHERMAN
FM AMCONSUL JERUSALEM                       DRFTD: CONS:DSHERMAN
TO RUEHC / SECSTATE WASHDC IMMEDIATE  0070  CLEAR: NONE
INFO RUFHTV / AMEMBASSY TEL AVIV   5972     DISTR: CONS
BT                                          ORGIN: OCR
UNCLAS JERUSALEM 00738

FOR CA/OCS/EMR:CSHUH AND NEA/IAI:SMADURA

E.O. 12356: N/A
TAGS: CASC, KPAL, PHUM, IS (SALAH, MOHAMMAD)
SUBJECT: ARREST CASE OF MOHAMMAD SALAH

REF:  (A) STATE 62551, (B) STATE 62898 AND
PREVIOUS

1.   CONSULAR ACCESS:  RESCHEDULED FOR MARCH
8.

2.  COMMENTS:  CONGEN REPRESENTATIVES WERE
UNABLE TO VISIT MOHAMMAD SALAH AS SCHEDULED
ON FRIDAY, MARCH 5. PRISON AUTHORITIES
ADVISED US OF HIS TRANSFER FROM HEBRON TO
RAMALLAH PRISON BUT ONLY AFTER  CONOFF WAS
ALREADY ENROUTE TO THE HEBRON PRISON.
HEBRON AUTHORITIES DELAYED 90 MINUTES AFTER
CONOFF ARRIVAL TO ADVISE THAT SALAH WAS NO
LONGER THERE AND THAT THEY WERE UNSURE OF
HIS WHEREABOUTS.

3.   COMMENTS CONTINUED:  EMBASSY TEL AVIV
SECURED SPECIAL PERMISSION FOR A VISIT TO
SALAH AT THE RAMALLAH PRISON DESPITE NORMAL
FRIDAY CLOSURE, AND CONOFF ATTEMPTED TO
VISIT SALAH THERE.  HOWEVER, BORDER POLICE
AUTHORITIES CONTROLLING THE ENTRY TO THE
RAMALLAH PRISON COMPOUND DENIED ENTRY TO
CONOFF DESPITE OUR PROTESTATIONS THAT THE
VISIT WAS AUTHORIZED AND EXPECTED.  THE
GUARDS SIMPLY SAID GO
HOME AND PROTEST.

4.  COMMENTS CONTINUED: CONOFF WILL ATTEMPT
VISIT AGAIN ON MONDAY, MARCH 8.  END
COMMENT.
WILLIAMSON
BT
 #0738

NNNN

UNCLASSIFIED    JERUSALEM   000738

03 CR 978                                      09525

UNCLAS          TEL AVIV 05706          *MR*

ACTION: CONS-1
INFO: DPO-1 CG-1

DISTRIBUTION: CONS
CHARGE: PROG

VZCZCJMO867
PP RUEHJM
DE RUEHTV #5706 0900844
ZNR UUUUU ZZH
P 310844Z MAR 94
FM AMEMBASSY TEL AVIV
TO RUEHC/SECSTATE WASHDC PRIORITY 8087
RUEHJM/AMCONSUL JERUSALEM 1043
BT
UNCLAS TEL AVIV 005706

FOR CA/OCS - HOBBS; NEA - KURTZER

E.O.  12356:  N/A
TAGS: CASC, PHUM, KPAL, IS (SALAH, MOHAMMED)
SUBJECT:  PROTEST OF LACK OF DUE PROCESS IN SALAH
HEARING

REF:  JERUSALEM 01103

1.  THIS IS JOINT MESSAGE FROM AMEMBASSY TEL AVIV AND
CONSUL GENERAL JERUSALEM.

2.  REFTEL IS A REPORT OF THE MARCH 23 JUDICIAL HEARING
OF AMERICAN CITIZEN MOHAMMED SALAH IN A RAMALLAH
MILITARY COURT.  THE COURT DECIDED THAT ISRAELI
INTELLIGENCE SERVICE (GSS) EVIDENCE AGAINST MR. SALAH
WILL NOT BE PROVIDED TO HIS ATTORNEY FOR USE IN HIS
DEFENSE, YET WILL BE USED AGAINST HIM.  DURING AN
ATTEMPT BY MR. SALAH'S ATTORNEY TO CROSS-EXAMINE A GSS
WITNESS ABOUT METHODS USED TO OBTAIN CONFESSIONS, THE
THREE JUDGE MILITARY COURT REFUSED TO PERMIT THE
WITNESS TO REVEAL SPECIFIC DETAILS OF INTERROGATION
METHODS THAT WOULD BE DIRECTLY RELEVANT TO HOW MR.
SALAH'S STATEMENT WAS OBTAINED DURING THE INITIAL DAYS
OF HIS DETENTION.  NEVERTHELESS, MR. SALAH'S ATTORNEY
WAS ABLE TO OBTAIN CONFIRMATION THAT MR. SALAH WAS TOLD
BY HIS INTERROGATORS THAT IF HE SIGNED A CONFESSION FOR
MINOR CHARGES HE WOULD BE RELEASED IMMEDIATELY IN
CONJUNCTION WITH A SECSTATE VISIT.  SALAH SIGNED AND
WAS NOT RELEASED.

3.  WHILE THIS CASE IS STILL ONGOING AND NO DOUBT MR.
SALAH'S ATTORNEY WILL APPEAL THE CASE BASED ON THE
TRICKS USED TO EXTRACT A SIGNED CONFESSION FROM HIS
CLIENT AND HIS INABILITY TO VIEW THE EVIDENCE BEING
USED AGAINST HIS CLIENT, THIS WHOLE JUDICIAL PROCEEDING

UNCLAS          TEL AVIV 05706

03 CR 978          09644

UNCLAS          TEL AVIV 05706

AND THE INTERROGATION ARE SERIOUSLY LACKING IN BASIC
FUNDAMENTALS OF DUE PROCESS AND FAIR EVIDENTIARY
RULES.    UNFORTUNATELY, THIS IS NOT AN ATYPICAL
PROCEEDING ON THE WEST BANK; NEVERTHELESS, IT IS ONE
THAT INVOLVES AN AMERICAN CITIZEN.

4.    WE BELIEVE THAT A MARKER MUST BE SET DOWN FIRMLY
WITH THE ISRAELI AMBASSADOR IN WASHINGTON AND AT AN
APPROPRIATE LEVEL IN THE FOREIGN MINISTRY THAT THE
UNITED STATES GOVERNMENT DOES NOT BELIEVE DUE PROCESS
IS BEING DONE IN A CASE WHERE ONE OF ITS CITIZENS IS
BEING TRIED IN A COURT WHERE EVIDENCE IS USED AGAINST
HIM WHICH NEITHER HE NOR HIS ATTORNEY IS PERMITTED TO
VIEW AND "TRICKS" INVOLVING A PROMISE OF RELEASE DURING
A SECSTATE VISIT TO ISRAEL ARE USED IN ORDER TO OBTAIN
"CONFESSIONS" TO LESSER OFFENSES.

5.    REQUEST DEPARTMENT CLEARED TALKING POINTS FOR THIS
CASE.    DJEREJIAN
BT
#5706


NNNN


UNCLAS          TEL AVIV 05706 ·


03 CR 978                                        09645