IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 03 CR 978 |
| | ) | Hon. Amy J. St. Eve |
| MUHAMMAD HAMID KHALIL SALAH, | ) | |
| a/k/a "Muhammad Abd Al-'Hamid Salah," | ) | |
| a/k/a "Abu Ahmad," and | ) | |
| ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, | ) | |
| a/k/a "Abu Hasan," | ) | |
| a/k/a "Abu Ali Hasan," | ) | |
| a/k/a "Samir" | ) | |

**GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS**

The UNITED STATES OF AMERICA, by its attorney, PATRICK J. FITZGERALD, United

States Attorney for the Northern District of Illinois, respectfully submits this written proffer,

pursuant to the provisions of Federal Rule of Evidence 801, including Federal Rules of Evidence

801(d)(2)(D) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1987), of the

government's evidence supporting the admission of co-conspirators' statements at trial. This proffer

sets forth a summary of the evidence that the government will offer at trial relating to a conspiracy

known commonly by the name "Hamas," which includes, among countless others, defendants

Muhammad Hamil Khalil Salah and Abdelhaleem Hasan Abdelraziq Ashqar. This proffer also

summarizes the defendants' and their co-conspirators' statements that furthered Hamas' criminal

conspiracy.

This proffer begins by briefly discussing the conspiracy charged in this case. It then discusses

the law governing the admissibility of co-conspirator statements under Federal Rule of Evidence

801(d)(2)(E). Next, this proffer summarizes some of the evidence supporting the admission of co-

conspirators' statements, as well as some of the co-conspirator statements the government anticipates it will seek to introduce at trial.

The government is not detailing all of its evidence showing the existence of the conspiracy commonly known as Hamas or all of the statements that were made in furtherance of the conspiracy. Instead, this proffer outlines the law governing the admissibility of such statements, provides background to the Court for evaluating the admissibility of these statements, and highlights examples of its evidence. In this manner, the government will establish to the Court the existence of the evidence available to complete the necessary foundation at trial and the roles of various pieces of evidence, as well as the bases for admission.

## I.      OVERVIEW OF THE HAMAS CONSPIRACY

Since as early as 1988, an international organization commonly referred to as "Hamas" has existed with the objective of forcing of the State and citizens of Israel to cede physical and political control over the lands comprising Israel, the West Bank, and the Gaza Strip, and replacing the Israeli governmental authority over these lands with an Islamic government, through means that have included the promotion and execution of acts of terrorism. Since at least 1989 through and including the date of the second superseding indictment, defendant Salah and defendant Ashqar were active members in Hamas who engaged in the provision of logistical, financial, strategic and administrative support to further the objective of Hamas.

## II.     THE LAW GOVERNING THE ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course

and in furtherance of the conspiracy." The admission of a co-conspirator statement against a defendant is proper where the government establishes by a preponderance of evidence that: (1) a conspiracy or conspiracy existed; (2) the defendant and the declarant were members of that particular conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy or conspiracy. *See, e.g., Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Westmoreland*, 312 F.3d 302, 309 (7th Cir. 2002).

> A. **The *Santiago* Proffer Is the Approved Method of Proffering Co-Conspirator Statements.**

In this Circuit, the preferred way for the government to makes its preliminary factual showing as to the admissibility of such statements is by filing a pretrial written proffer summarizes the government's evidence. *See, e.g., United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001); *United States v. Irorere*, 228 F.3d 816, 824 (7th Cir. 2000).[1] In making its preliminary factual determinations, the court must consider the statements themselves as evidence of a joint conspiracy and whether the statements the government seeks to admit were made in furtherance of that conspiracy. *United States v. Brookins*, 52 F.3d 615, 623 (7th Cir. 1995); *United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). In so doing, the court may consider all non-privileged evidence. *United States v. Lindemann*, 85 F.3d 1232, 1238 (7th Cir. 1996).

> B. **The Supreme Court's *Crawford* Decision Has Not Changed the Admissibility of Co-Conspirator Statements.**

The Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), changed much of the law concerning out-of-court testimonial statements, but it did not affect the admissibility

---

[1] *Accord, e.g.,United States v. Haynie,* 179 F.3d 1048, 1050 (7th Cir.1999); *United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992).

of co-conspirator statements. In *Crawford*, the prosecution introduced a tape-recorded statement made before trial by the defendant's wife to law enforcement. *Id.* at 38. At trial, however, the wife was unavailable as a witness due to the state's spousal privilege law, and thus the defendant did not have an opportunity to cross-examine her. *Id.* at 40. The Court ruled that admission of the statement violated the Confrontation Clause, holding that where the government offers an unavailable declarant's hearsay that is "testimonial" in nature, the Confrontation Clause requires actual confrontation, that is, cross-examination, regardless of how reliable the statement may be. *Id.* at 51-52. As examples of "testimonial" statements, the Court listed prior testimony at a preliminary hearing, before a grand jury, or at a prior trial or in the context of police interrogations. *Id.* at 68.

The rule in *Crawford* does not apply, however, to statements that are not hearsay. Thus, the Seventh Circuit has squarely held that *Crawford* does not apply to – and did not change the law relating to – co-conspirator statements. In *United States v. Jenkins*, 419 F.3d 614 (7th Cir.), *cert. denied*, 126 S. Ct. 782 (2005), the court noted:

> As to the Confrontation Clause argument, *Crawford* does not apply. The recordings featured the statements of co-conspirators. These statements, by definition, are not hearsay. *Crawford* did not change the rules as to the admissibility of co-conspirator statements.

419 F.3d at 618. *Accord, United States v. Bailey*, No. 05 CR 8, 2005 U.S. Dist. LEXIS 28070 at *5 (N.D. Ill. Nov. 14, 2005)(Shadur, J.)(following *Jenkins*). Because co-conspirator statements are not "testimonial" hearsay statements, *Crawford* is not implicated, and those statements may be admitted without offending the Sixth Amendment.

### C.      The Proper Standard for Admissibility Is Preponderance of the Evidence.

A district court's preliminary determination of admissibility for purposes of Rule 801(d)(2)(E) is distinct from the standard required in determining on appeal whether sufficient evidence exists to uphold a jury verdict. The standard to be applied in the context of admissibility under Rule 801(d)(2)(E) is a preponderance-of-the-evidence standard. *Lindemann*, 85 F.3d at 1238 (*citing Bourjaily*, 438 U.S. at 175-76).

### D.      Principles for Determining Membership in and Existence of the Criminal Conspiracy

#### 1.      The court may consider the proffered statements themselves.

A district court may consider the proffered statements themselves in determining the existence of a conspiracy, and a defendant's participation in it. *Bourjaily,* 483 U.S. at 180; *United States v. Stotts*, 323 F.3d 520, 521 (7th Cir. 2003); *United States v. de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990). However, the government typically must present some evidence, independent of the statements. *Lindemann*, 85 F.3d at 1238.

#### 2.      Both direct and circumstantial evidence can be considered.

To support the existence of the conspiracy, the Court may consider either direct or circumstantial evidence. *Irorere*, 228 F.3d at 823; *United States v. Pagan*, 196 F.3d 884, 889 (7th Cir.1999) ("Conspiracy . . . may be proved entirely by circumstantial evidence").[2] Indeed, "[b]ecause of the secretive character of conspiracies, direct evidence is elusive, and hence the existence and the defendants' participation can usually be established only by circumstantial

---

[2] Even though the government need not prove the crime of conspiracy for the co-conspirator doctrine to apply, criminal conspiracy cases are helpful in stating the types of evidence that are sufficient to show conspiracy. Of course, if the government meets the higher standard for criminal conspiracy, the evidentiary standard is met.

evidence." *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir. 1983). *See also Lindemann*, 85

F.3d at 1238 (secretive nature of conspiracies one reason for conspirator exception to hearsay rule).

### 3.      Requirements for determining if a person has joined the conspiracy

A defendant joins a criminal conspiracy if he agrees with another person to one or more of

the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met or

has agreed with every co-conspirator. *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir. 1986);

*United States v. Balistrieri*, 779 F.2d 1191, 1225 (7th Cir. 1985); *see also Rodriguez*, 975 F.2d at 411

(defendant must have intended to join and associate himself with the conspiracy's criminal design

and purpose).  The government need not prove, however, that a defendant knew each and every

detail of the conspiracy or played more than a minor role in the conspiracy.  *United States v. Sims*,

808 F. Supp. 620, 623  (N.D. Ill. 1992)(Alesia, J.).  As the Supreme Court has said:

> A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. . . .  The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other.  . . .  If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators.

*Salinas v. United States*, 522 U.S. 52, 63-4 (1997)(citations omitted).[3]

A defendant may be found to have participated in a conspiracy even if he joined or terminated

his relationship with others at a different time than another defendant or co-conspirator. *United*

*States v. Ramirez*, 796 F.2d 212, 215 (7th Cir. 1986); *United States v. Noble*, 754 F.2d 1324, 1329

---

[3]*See also United States v. Liefer*, 778 F.2d 1236, 1247 n.9 (7th Cir. 1985); *United States v. Towers*, 775 F.2d 184, 189 (7th Cir. 1985); *United States v. Morrow*, 971 F. Supp. 1254, 1256-57 (N.D. Ill. 1997)(Alesia, J.).

(7th Cir. 1985).[4] A district court may consider the conduct, knowledge, and statements of the defendant and others in establishing participation in a conspiracy. A single act or conversation, for example, can suffice to connect the defendant to the conspiracy if that act leads to the reasonable inference of intent to participate in an unlawful enterprise. *See, e.g., Sims*, 808 F. Supp. at 623.[5] Statements made during the course of and in furtherance of a conspiracy, even in its embryonic stages, are admissible against those who arrive late to join a going concern. *United States v. Potts*, 840 F.2d 368, 372 (7th Cir. 1987). A conspirator who has become inactive in the conspiracy nevertheless is liable for his co-conspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987). *See also United States v. Andrus,* 775 F.2d 825, 850 (7th Cir. 1985).

### E.    Statements Made in Furtherance of the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts look for a reasonable basis upon which to conclude that the statement furthered the conspiracy's goals. *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable-basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy; the statement need not have been exclusively, or even primarily, made to further the

---

[4] A defendant, even if not an "agreeing" member of a conspiracy, may nonetheless be found guilty of conspiracy if he knew of the conspiracy's existence at the time of his acts, and his acts knowingly aided and abetted the business of the conspiracy, *see United States v. Scroggins*, 939 F.2d 416, 421 (7th Cir. 1991); *Sims*, 808 F. Supp. at 623 n.1, even if the defendant was not charged with aiding and abetting, *see United States v. Kasvin*, 757 F.2d 887, 890-91 (7th Cir.1985).

[5] Similarly, efforts by an alleged co-conspirator to conceal a conspiracy may support an inference that he joined the conspiracy while it was still in operation. *See Redwine*, 715 F.2d at 321; *United States v. Robertson*, 659 F.2d 652, 657 (5th Cir. 1981).

conspiracy in order to be admissible under the co-conspirator exception. *See, e.g., Johnson*, 200 F.3d at 533 (citing *United States v. Stephenson,* 53 F.3d 836, 845 (7th Cir. 1995)).

The Seventh Circuit has found a wide range of statements to satisfy the "in furtherance" requirement. *See, e.g.*, *United States v. Cozzo*, No. 02 CR 400, 2004 U.S. Dist. LEXIS 7391 (N.D. Ill. April 16, 2004)(Zagel, J.)(collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" is admissible under Rule 801(d)(2)(E). *United States v. Santos*, 20 F.3d 280, 286 (7th Cir. 1994), *quoting United States v. Johnson*, 927 F.2d 999, 1001 (7th Cir. 1991); *accord*, *United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made: (1) to identify other members of the conspiracy and their roles, *United States v. Roldan-Zapata,* 916 F.2d 795, 803 (2d Cir. 1990); *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); (2) to recruit potential co-conspirators, *United States v. Curry*, 187 F.3d 762, 766 (7th Cir. 1999); (3) to control damage to an ongoing conspiracy, *United States v. Van Daal Wyk,* 840 F.2d 494, 499 (7th Cir. 1988); (4) to keep co-conspirators advised as to the progress of the conspiracy, *Potts*, 840 F.2d at 371; (5) to conceal the criminal objectives of the conspiracy, *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); (6) to plan or to review a co-conspirator's exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985); or (7) as an assurance that a co-conspirator can be trusted to perform his role. *United States v. Pallais*, 921 F.2d 684, 688 (7th Cir. 1990); *Van Daal Wyk*, 840 F.2d at 499.

### 1. Statements made to execute the conspiracy

Statements made by co-conspirators to conduct the business of the conspiracy and to accomplish its goals are "classic examples of statements made to conduct and further" a conspiracy. *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991). Statements such as these, which are

8

"intended to promote the conspiratorial objectives," should be admitted pursuant to Rule 801(D)(2)(E).[6/] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy.[7/] Whether a particular statement tends to advance the objectives of the conspiracy or to induce the listener's assistance is determined by an examination of the context in which it is made. *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989).

### 2. Statements regarding the conspiracy's activities

Statements "describing the purpose, method, or criminality of the conspiracy," are made in furtherance of the conspiracy because co-conspirators make such statements to guide each other toward achievement of the objectives of the conspiracy. *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992). Similarly, statements that are part of the information flow between co-conspirators made in order to help each co-conspirator perform his role are "in furtherance" of the conspiracy. *See, e.g.*, *United States v. Godinez,* 110 F.3d 448, 454 (7th Cir. 1997); *Garlington*, 879 F.2d at 283-84; *Van Daal Wyk,* 840 F.2d at 499. Statements to assure that a co-conspirator can be trusted to perform his role also satisfy the "in furtherance" requirement. *See, e.g.*, *United States v. Romo*, 914 F.2d 889, 897 (7th Cir. 1990); *de Ortiz*, 907 F.2d at 635-36 (7th Cir. 1990).

---

[6/]*United States v. Sinclair*, 109 F.3d 1527, 1534 (10th Cir. 1997); *accord, United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994).

[7/]*United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997); *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987).

### 3. Statements to recruit co-conspirators

Statements made to recruit potential members of the conspiracy are made "in furtherance" of the conspiracy. *Curry*, 187 F.3d at 766; *Godinez*, 110 F.3d at 454.[8]

### 4. Statements regarding the activities of other co-conspirators designed to inform or reassure the listener

Statements made by conspirators to other individuals who participate in, or interact with, the conspiracy contribute to the conspiracy. *See Van Daal Wyk*, 840 F.2d at 499 (wholesaler instructed his courier not to deliver any additional quantities of cocaine to the defendant, a dealer).

> The exchange of information is the lifeblood of a conspiracy, as it is of any cooperative activity, legal or illegal. Even commenting on a failed operation is in furtherance of the conspiracy, because people learn from their mistakes. Even identification of a coconspirator by an informative nickname. . . is in furtherance of the conspiracy, because it helps to establish, communicate, and thus confirm the lines of command in the organization. Such statements are "part of the information flow between conspirators intended to help each perform his role," and no more is required to make them admissible.

*Pallais*, 921 F.2d at 688. The same logic dictates that discussions concerning a conspiracy's successes are admissible as statements in furtherance of the conspiracy. *Id.; Van Daal Wyk*, 840 F.2d at 499.

Statements intended to reassure the listener regarding the progress or stability of the conspiracy also further the conspiracy. *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990) (description of past drug deals). Likewise, statements made to reassure and calm the listener may further the conspiracy, *See Garlington*, 879 F.2d at 284 ; *United States v. Molinaro*, 877 F.2d 1341,

---

[8]*See also, e.g., United States v. Doerr*, 886 F.2d 944, 951 (7th Cir. 1989); *Garlington*, 879 F.2d at 283.

1343-44 (7th Cir. 1989)(upholding admission of statements designed to iron out disputed details of the conspiracy and to control the damage apparently done to the conspiracy).

> **5.** **Statements relating to the progress and past accomplishments of the conspiracy**

Statements made by co-conspirators concerning past exploits by members of the conspiracy are in furtherance of the conspiracy when made to assist in managing and updating other members of the conspiracy. *Potts*, 840 F.2d at 371; *Molt*, 772 F.2d at 368-69. Similarly, statements regarding a co-conspirator's failure to fully accomplish the objective of the conspiracy are admissible "as updates on the status of the conspiracy" and how that status affected the future of the conspiracy. *United States v. Doyle*, 771 F.2d 250, 256 (7th Cir. 1985). All such statements also educate co-conspirators on how better to achieve conspirators how better to achieve conspiratorial objectives in the future. *See Pallais*, 921 F.2d at 688.

> **6.** **Statements to conceal the criminal objectives of the conspiracy**

Finally, statements made to conceal the criminal objectives of the conspiracy are made "in furtherance" of the conspiracy where, as here, ongoing concealment is one of its purposes. *See, e.g., United States v. Maloney*, 71 F.3d 645, 660 (7th Cir. 1995); *Kaden*, 819 F.2d at 820. "Avoiding detection by law enforcement officials clearly furthers the aims of a conspiracy." *United States v. Troop*, 890 F.2d 1393, 1404 (7th Cir. 1989). Statements made to control damage to an ongoing conspiracy have also been found to have been made in furtherance of the conspiracy. *See Stephenson*, 53 F.3d at 845; *Van Daal Wyk*, 840 F.2d at 499.

**F.    Alternative Bases for Admissibility of Statements**

The government believes that the statements of co-conspirators set forth in this proffer should be admitted as non-hearsay under the co-conspirator doctrine. There are alternative bases, however, for admission of many of the statements. These bases do not require a Rule 801(d)(2)(E) analysis.

**1.    Defendants' own statements**

A defendant's own admissions are admissible against him pursuant to Fed. R. Evid. 801(d)(2)(A), without reliance on the co-conspirator statement rule.[9] *Maholias*, 985 F.2d at 877. A defendant's own admissions, moreover, are relevant to establishing the factual predicates of the existence of and membership in a conspiracy for the admission of co-conspirator statements against him and his confederates. *See, e.g., Godinez*, 110 F.3d at 455; *Potts*, 840 F.2d at 371-72.[10]

**2.    Non-hearsay statements**

The co-conspirator statement analysis also is not triggered when the relevant verbal declaration is not a "statement" within the meaning of Federal Rule of Evidence 801(a) and when it is not hearsay. This rule defines "statement" as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion."

Thus, a statement that is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See, e.g., United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). Accordingly, statements by alleged co-conspirators may be

---

[9] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is . . . the party's own statement, in either an individual or a representative capacity."

[10] Other sections of Rule 801(d)(2) provide alternative bases of admissibility that may apply. Rule 801(d)(2)(B), for example, provides for the admissibility of "adopted" statements.

admitted into evidence without establishing the *Bourjaily* factual predicates, but with corresponding limiting instructions, when such statements are offered simply to show, for example, the existence, illegality, or nature and scope of the charged conspiracy.[11/] In addition, when words are being introduced as a verbal act, or as background for an alleged statement, they are not admitted for the truth of the matter asserted. For that reason, they are not hearsay, and may be admitted. *See, e.g., United States v. Robinzine*, 80 F.3d 246, 252 (7th Cir. 1996); *Santos*, 20 F.3d at 285 (false statement properly admitted since it was not admitted for truth of matter asserted); *United States v. Hoag*, 823 F.2d 1123, 1127 (7th Cir. 1987) ("[s]tatements introduced solely for the purpose of proving that they were made as a predicate for other proof they were false are not hearsay.").

In addition, statements by alleged co-conspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates but with corresponding limiting instructions, where such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See Herrera-Medina*, 853 F.2d at 565-66; *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69; *United States v. Magnus*, 743 F.2d 517, 521-23 (7th Cir. 1984). In addition to oral statements, "[p]hysical evidence found in the home of one conspirator is admissible against all conspirators to show the existence of the conspiracy." *United States v. Mourad*, 729 F.2d 195, 201 (7th Cir. 1984). In *Mourad*, a handgun found in one conspirator's home was admissible against all conspirators to prove the existence of a narcotics conspiracy. *Id.*; *accord United States v. Towns*, 913 F.2d 434 (7th Cir. 1990)(admitting gun and ski

---

[11/] *See, e.g., United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69. In some cases, statements by an alleged co-conspirator will include a combination of declarations offered for the truth of the matters asserted and declarations offered for other non-hearsay purposes.

mask since evidence tended to show conspiracy existed and was successful); *United States v. Pirolli*, 742 F.2d 1382, 1386 (11th Cir. 1984)(handguns found in search of conspirator's car were admissible against all conspirators as "evidence of the existence of a conspiracy"). Drug ledgers have also been found admissible as "direct evidence" of a charged conspiracy. *United States v. Tejada*, 886 F.2d 483, 487 (1st Cir. 1989); *accord United States v. Praetorius*, 622 F.2d 1054 (2d Cir. 1979)(finding heroin and cash seized from conspirator's home admissible to show existence of conspiracy).

Further, the government need not prove the author of a particular document for that document to be admissible as co-conspirator statement. In *United States v. Smith*, 223 F.3d 554, 570 (7th Cir. 2000), the Seventh Circuit upheld the admission of a recovered list of high-ranking Gangster Disciples ("GDs") as a co-conspirator statement even though the author was unknown. "The details contained in 'The List' were such that it could only have been written by a member of the GDs or by someone sufficiently involved with the business to be intimately familiar with it--in other words, by a co-conspirator. The defendants are wrong to suggest that it is necessary to know the precise identity of a coconspirator before statements can be admitted under Rule 801(d)(2)(E)." *Id.*

In RICO conspiracy cases, activities engaged in by co-conspirators have been admitted to help prove an enterprise and pattern of racketeering, although the defendants on trial had no involvement in the activities. In *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992), the Second Circuit allowed the admission of numerous instances of violent conduct by various members of a mob organization although many of the defendants at trial had no direct involvement with the violent acts. The Second Circuit noted that "the evidence of numerous crimes, including the routine resort to vicious and deadly force to eliminate human obstacles, was relevant to the charges against each defendant because it tended to prove the existence and nature of the RICO enterprise." *Id.*

"Such evidence was also relevant to prove a pattern of racketeering activity by each defendant" by providing the requisite relationship and continuity of illegal activity *Id*.

Likewise in *United States v. Brady*, 26 F.3d 282, 287 (2d Cir. 1994), the Second Circuit sanctioned evidence of murders not conducted by any of the defendants at trial since the evidence was relevant to prove the existence of a RICO enterprise and the charged conspiracy. *Accord United States v. Dierling*, 131 F.3d 722, 730-31 (8th Cir. 1997)(finding evidence of murder of co-conspirator admissible against conspirators who did not participate in the murder because it was committed in furtherance of the conspiracy to control a subordinate member of the conspiracy and was direct evidence tending to show a conspiracy existed); *United States v. Finestone*, 816 F.2d 583, 586-87 (11th Cir. 1987)(admitting evidence of murder to prove pattern of racketeering activity and membership of those involved in RICO conspiracy although defendant did not participate in murder).

## III. THE GOVERNMENT'S PROFFER REGARDING THE EXISTENCE OF A CONSPIRACY

As set forth in the second superseding indictment, the charged conspiracy was accomplished through the statements and actions of the charged defendants and uncharged co-conspirators spanning a considerable period of time. The proffer will detail certain relevant aspects of the Hamas conspiracy through the discussion of defendant Salah's and defendant Ashqar's roles in the conspiracy.

### A. Background of Hamas

From at least as early as 1988 and up until the date of the filing of the second superseding indictment, there existed an international organization known as *Harakat al Muqawama al Islamiyya*, which translates as the Islamic Resistance Movement and is commonly referred to as

"Hamas." Hamas has among its publicly stated purposes the establishment of a Palestinian/Islamic state in the lands that comprise the State of Israel and the West Bank and Gaza Strip, including Jerusalem. For purposes of this filing, the conspiracy in which defendants Salah and Ashqar were members was Hamas.

During the charged period, the West Bank and Gaza Strip were disputed territories often referred to as the Occupied Territories. Hamas has pursued the objective of a Palestinian/Islamic state by fostering support among Palestinians through community building and social welfare activities in the West Bank and Gaza Strip and has also engaged in numerous terrorist attacks aimed at Israeli military personnel, police officers and civilians. These terrorist activities, for which Hamas has repeatedly and publicly claimed credit, have as their broadly represented purpose the undermining of the Israeli-Palestinian peace process, and, more generally, forcing the State and citizens of Israel to cede physical and political control over the lands comprising Israel, the West Bank, and the Gaza Strip, and replacing the Israeli governmental authority over these lands with an Islamic government. In or about 1988, Hamas published a charter calling for such violent terrorist attacks. According to the Hamas Charter, the means of confronting the "usurpation of Palestine by the Jews" is proclaimed to be *"jihad"* (holy war). Hamas defines *jihad* as violent activities with such violent activities being carried out by Hamas's so-called military wing, commonly known as the Izz Al-Din Al-Qassam Brigades ("Al-Qassam Brigades").

Hamas has offices throughout the world. The presence of Hamas in the United States has existed since at least the late 1980s and has served, among others, two primary Hamas purposes: (1) recruitment of members; and (2) fundraising. Over the years, hundreds of thousands of dollars have been raised in the United States for Hamas. Further, individuals in the United States have been

16

conduits for money coming from overseas to be channeled to Hamas.[12/] Hamas has been comprised of various committees or bureaus, including among others, a political committee, a military committee, and a social/charitable committee, all of which worked together to achieve the goals of Hamas.

Hamas placed members of its leadership in countries in the Middle East and elsewhere, with these leaders being referred to by members of Hamas as the "outside," while Hamas also maintained leadership members, cells and committees inside the West Bank and Gaza Strip, with these elements being referred to by members of Hamas as the "inside."

### 1. General Role of Defendants Salah and Ashqar in Hamas

Defendant Salah became actively involved in Hamas at least as far back as the early 1990s, first helping to recruit and train Hamas members and later as a financial conduit. In the early 1990s, Salah took multiple trips to the Middle East to deliver money for Hamas and to assess the state of the organization in the West Bank and Gaza Strip. In January 1993, during his last trip, Salah was arrested by Israeli authorities. He ultimately pled guilty to working for Hamas. He was released in November 1997, returned to the United States, and although operating under restrictive conditions as a result of his designation, continued working for Hamas, all of which is explained in greater detail below.

---

[12/] On January 24, 1995, pursuant to Executive Order 12947, the Department of Treasury, Office of Foreign Assets Control, designated Hamas as a Specially Designated Terrorist organization. This designation makes it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of Hamas. Hamas's designation as a Specially Designated Terrorist organization has remained in place since January 24, 1995. On October 8, 1997, the Secretary of State, pursuant to the laws of the United States, designated Hamas as a "foreign terrorist organization." As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to Hamas.

From at least as early as 1989, defendant Ashqar functioned as a financial conduit of money for Hamas members both in the United States and abroad. In this role, Ashqar opened various bank accounts in and around Oxford, Mississippi that he utilized as a clearinghouse for Hamas funds from Marzook as well as other Hamas members and organizations in the United States and abroad. Ashqar also served as a critical communications conduit for the Hamas enterprise both through his participation in and linking of telephone calls between various Hamas members in the United States and abroad as well as his storing and disseminating numerous Hamas-related documents that concerned both the public activities of the Hamas enterprise as well as the internal operation of the Hamas enterprise.

### 2. Other Hamas Co-conspirators

The activities of the defendants were carried out and supported through the assistance of other Hamas members located in the United States and abroad who provided communications, logistical, and financial support in furtherance of Hamas, including but not limited to:

- Mousa Mohammed Abu Marzook, a/k/a "Abu Omar," "Tareq," and "Abu Rizq" is a self-admitted member of Hamas and the former Chief and current Deputy Chief of the Hamas political bureau. He currently resides in Damascus, Syria, where Hamas' "outside" headquarters are maintained. During the late 1980s and early 1990s, Marzook resided in Louisiana. He then moved to Falls Church, Virginia. While in the United States, Marzook coordinated the actions of various U.S.-based Hamas members, including Salah. In addition, millions of dollars flowed through Marzook's bank accounts to other individuals and, ultimately, to the Middle East. Marzook returned to the U.S. in August 1995 and was taken into custody in New York based on an Israeli extradition warrant. After two years of litigation, Israel decided not follow through with the extradition and Marzook was sent to Amman, Jordan, where Hamas' outside leadership was based until its expulsion in September 1999.

- Khalid Mish'al, a/k/a "Khalid Abdulqader," and "Abu Walid;" Abdel Aziz Al-Rantisi, a/k/a "Abu Mohammad," and Imad Al-Alami, a/k/a "Abu Hamman," were all high-ranking members and officers of Hamas who had significant input into the direction and activities of Hamas. Defendant Ashqar had contact with various of

these individuals to discuss Hamas issues and to facilitate these individuals' communication with individuals in the West Bank and Gaza Strip.

- Mohammed Qassem Sawalha, a/k/a "Muhammad Khadhem Sawalha," "Abu Obeida," "Abu Ubada," "Abu Ubaydah," "Abu Ubeida," and "Abu Obadah," was initially a Hamas leader in the West Bank until he relocated to London, England in the early 1990s. Defendant Salah and co-conspirator A met with Sawalha in London while en route from the United States to Israel in 1992 and 1993. During these meetings, defendant Salah and co-conspirator A received instructions from Sawalha regarding particular Hamas-related activities they were to carry out while in Israel, the West Bank, and the Gaza Strip.

- Adel Ahmed Awadallah, a/k/a "Aadil Awadallah" and "The Engineer 3," was a high-ranking Hamas military leader who was responsible for facilitating several deadly terrorist attacks carried out in Israel. During trips to the Middle East in 1992 and 1993, defendant Salah met with Awadallah to discuss Hamas issues and to provide Awadallah funds to be used in furtherance of Hamas activities. On approximately September 10, 1998, Awadallah was killed during a shootout with Israeli defense forces in the town of Hebron in the West Bank.

- Saleh Al-Arouri, a/k/a "Salih Suleiman," and "Salih Dar Sulaiman," was a high-ranking Hamas military leader dating back to his role as a Hamas student cell leader at Hebron University in the early 1990s. In his capacity as a Hamas military leader, Al-Arouri met with and received from defendant Salah tens of thousands of dollars for Hamas-related activities. Al-Arouri used the funds provided by defendant Salah for the purchase of weapons that were to be used in terrorist attacks.

- Sheik Jamil Hamami, a/k/a "Jamil Hamimi" and "Abu Hamza," was a Hamas leader active in the West Bank who, on occasion, traveled to the United States to conduct Hamas business and raise funds for Hamas. In particular, in March 1994, Hamami met with defendant Ashqar in Mississippi to discuss a variety of issues related to Hamas.

- Hassan Salameh was a Hamas member who initially worked under the command of Hamas bomb builder and co-conspirator Yihye Ayash, a/k/a "The Engineer," and "The Engineer 1," until Ayash's death, at which time Ayash's position in Hamas was filled by co-conspirator Adel Awadallah. Salameh, with the assistance of other Hamas co-conspirators, was responsible for a string of bus bombings in approximately February and March 1996 that killed numerous civilians. After his arrest, Salameh continued his work on behalf of Hamas by publicizing his actions carried out for Hamas and Hamas' goal of pursuing terrorist activities to force the State and citizens of Israel to cede physical and political control over the lands comprising Israel, the West Bank, and the Gaza Strip.

- Ismael Selim Elbarasse, a/k/a "Ismael Selim El-barasse," from at least as early as 1990, worked as an assistant to Marzook. Elbarasse maintained a joint bank account with Marzook that was used to transfer substantial sums of money to Hamas members, including defendant Salah.

- Co-conspirator A was a member of Hamas who lived in or around Chicago. Beginning no later than in or about January 1993, co-conspirator A traveled to London and to Israel and the West Bank on behalf of Hamas, meeting with Hamas representatives as well as leaders and members of the Al-Qassam Brigades in support of Hamas members and activities in the Middle East. In approximately May 1993, co-conspirator A was convicted in an Israeli military court of crimes related to his association with Hamas. Nonetheless, co-conspirator A carried on his membership in Hamas. Subsequent to his return to the United States, co-conspirator A briefed Hamas leadership in the United States regarding his mission with defendant Salah, and received compensation for his involvement with Hamas.

- Co-conspirator B was a Hamas member who has lived in Louisiana. Co-conspirator B traveled between the United States and West Bank on numerous occasions over the past 15 years using approximately 14 passports. During the early 1990s, co-conspirator B relayed messages between defendant Salah and high-ranking Hamas military leaders, including Adel Awadallah and Saleh Al-Arouri. On one occasion, co-conspirator B relayed a message and passport photographs from Adel Awadallah to defendant Salah in order for defendant Salah to obtain a false passport for Awadallah so that Awadallah could travel outside of the West Bank without detection by the Israeli government. In addition, in the early 1990s co-conspirator B received approximately $140,000 in a wire transfer from overseas in relation to his Hamas activities.

- Co-conspirators C and D were recruited by defendant Salah during the early 1990s to become members of Hamas. After their recruitment by defendant Salah, defendant Salah and other Hamas members trained co-conspirators C and D in various Hamas methods. After his arrest by Israeli authorities in January 1993, defendant Salah attempted to use consular officials from the U.S. Embassy in Israel, unbeknownst to the consular officials, to pass messages to co-conspirators C and D.

- Co-conspirator E, Co-conspirator F, Co-conspirator G, Co-conspirator H, and Co-conspirator I, among others, received transfers of funds from defendant Ashqar, Marzook and other co-conspirators and disbursed these funds, frequently in smaller amounts, to foreign accounts and individuals, including defendant Salah, for ultimate disbursement to Hamas members in the West Bank and Gaza Strip.

- Co-conspirator J was a Hamas member in the West Bank with whom defendant Salah met in approximately January 1993 and who further traveled to the United States and

20

established bank accounts to hold Hamas funds from co-conspirators Marzook and Elbarasse to be utilized for Hamas purposes.

**B.      Muhammad Salah's Involvement with Hamas During the Early 1990s**

A summary of Salah's participation in and advancement of Hamas is below and is based, at least in part, on the following evidence: Salah's own statements to ISA agents, INP officers, and U.S. consulate officials; Salah's handwritten accounting of his involvement in Hamas; documents found in connection with Salah's arrest in Israel; journalist Judith Miller's account of her observations of a portion of defendant Salah's ISA interrogation; Salah's guilty plea in Israel; documents found in the search of defendant Ashqar' residence; recordings of calls and meetings of other Hamas members; the address books of defendant Salah, defendant Ashqar and co-conspirator Marzook; bank and telephone records; as well as information provided by Individual A, Individual B and other witnesses.

**1.      Salah Begins Working For Hamas**

As referenced above, in August 1988, the Gaza Strip branch of the Muslim Brotherhood (a radical Egyptian-based Islamist organization) issued a charter for Hamas. The organizational charter set forth as its purpose and objective the transformation of Israel into an Islamic state, and specified *jihad*, to include killing Israelis, as a means by which the enterprise's objectives were to be achieved. At this time, Salah, who had moved to the United States in 1971 and become an American citizen in1979, was a member of the Muslim Brotherhood. Co-conspirator Marzook was a fellow member of the Muslim Brotherhood and had also moved to the United States. Salah and Marzook occasionally met in relation to their work with the Muslim Brotherhood.

In about 1990, Salah and Marzook joined a United States based Hamas "security committee." The activities of the security committee included, among other things, the identification of Palestinian men presently studying in the United States for the purpose of recruiting them into Hamas. Acting on behalf of the committee, Salah compiled information on the potential recruits which included their fields of study, the projected completion dates of their study, the projected date of their return to the West Bank and Gaza Strip, and their capacity to participate in terrorist activities against Israel. This process produced numerous names that the security committee sorted based on their knowledge of chemistry, physics, computer science, and military operations.

The individuals identified by the security committee were tested and eventually narrowed down to several individuals who were believed to be candidates for operational roles in Hamas terrorist activities. Those candidates, including co-conspirators C and D, were provided with advanced training in military operations and bomb-making. Around September 1992, to facilitate the training of co-conspirators C and D, Salah purchased airline tickets for travel between the United States and locations in the Middle East for co-conspirators C and D. Both co-conspirators C and D flew to Syria with the tickets Salah provided and received advanced training in bomb-making from, among others, Hamas military operatives who had fought in Afghanistan.

**2.      Salah Travels to Israel in September 1992 on Behalf of Hamas**

In approximately August 1992, Salah met with co-conspirators Marzook and Mohammed Qassem Sawalha regarding the need to revitalize Hamas terrorist operations in the West Bank. During the meeting, Sawalha, who had previously been in charge of Hamas terrorist operations within the West Bank, identified specific Hamas members still residing in the West Bank who could

22

be used to revitalize Hamas' terrorist activities. Among these individuals were co-conspirators Adel Ahmed Awadallah and Salah Al-Arouri.

At the time of this meeting, co-conspirator Adel Ahmed Awadallah was a rapidly rising Hamas military leader in the West Bank. He is believed to be responsible for several deadly terrorist attacks carried out in Israel including a series of suicide bombings of buses in the mid-1990's. On September 9, 1998, Awadallah was killed during a shootout with Israeli defense forces in the West Bank town of Hebron. Co-conspirator Salah Al-Arouri was a high-ranking Hamas military leader dating back to his days as a Hamas student cell leader at Hebron University in the early 1990s.

In early September 1992, after meeting with Marzook, Salah traveled to the West Bank. [13] While there, Salah, who used the name Abu Ahmad (father of Ahmad), met with Awadallah on several occasions. During these meetings, Salah and Awadallah discussed both Hamas terrorist activities and political activities in the West Bank and Gaza. Awadallah informed Salah that he, Awadallah, would need several months to reorganize Hamas' terrorist cells in the West Bank because Awadallah, after an arrest by Israeli authorities, had directed Hamas members to burn Hamas organizational documents containing information about Hamas cells in the West Bank. Salah

---

[13] The money that Salah distributed to Salah Al-Arouri during his August 1992 trip to Israel and the territories, and the money he distributed to various Hamas operatives during his January 1993 trip, came principally from Marzook, Ismael Elbarasse and co-conspirator E. Bank records reflect that much of the Marzook money originated overseas. The Salah money trail is but one example of the operation of a financial network headed by Marzook through which money was raised from domestic and foreign sources (most significantly Arab Gulf state sources), laundered through U.S. bank accounts, and then distributed to select foreign countries for ultimate distribution which, as evidenced by Salah's activities, included the military wing of Hamas, the Izz-Al-Din Al-Qassam Brigades. During this period, Marzook and his confederates in the U.S. laundered well in excess of $5,000,0000 to foreign accounts and individuals based in the Occupied Territories.

and Awadallah also discussed whether Hamas should murder Victim A, a moderate Palestinian leader regarded as a leading proponent of a peace with Israel.

Also while in the West Bank in September 1992, Salah met with co-conspirator Al-Arouri. Al-Arouri informed Salah that Hamas needed money to purchase weapons to carry out terrorist activities. Salah agreed to provide Al-Arouri money for the purchase of weapons and other military apparatus and, thereafter, provided Al-Arouri at least approximately $50,000 for these purposes. Salah was able to provide the money to Al-Arouri by making structured withdrawals from one of his Chicago bank accounts of ten $5,000 checks which were cashed in Israel on or about September 8, 1992.

During his September 1992 trip, Salah met with several other Hamas members. This included co-conspirator Abu Sai'b, who was involved in Hamas terrorist operations in the Gaza Strip. Abu Sai'b informed Salah that he had approximately 53 Hamas recruits who were prepared to carry out terrorist attacks, but that funding was needed to help carry out the attacks. Salah agreed to and did pass on the information provided by Au Sai'b and Abu Sai'b's request for money to Mohammed Qassem Sawalha and others.

### 3. Salah Returns from the Middle East

Within three weeks of Salah's mid-September return from his trip to Israel, he received a $50,000 check from the bank account of Marzook as repayment for funds that Salah provided to Hamas members in the West Bank and Gaza. In approximately December 1992, co-conspirator B, a U.S.-based Hamas member, provided two pictures of co-conspirator Adel Awadallah to Salah so that Salah could have a false passport made for Awadallah. At that time, Awadallah was on the run

24

from Israeli authorities and sought to flee the West Bank. Salah ultimately provided the pictures to co-conspirator Mohammed Qassem Sawalha in order to have a false passport produced.

### 4. The December 1992 Deportation

In December 1992, in a response to escalating violence and the death of several Israeli military personnel at the hands of Hamas, Israel deported approximately 415 radical Islamists (primarily Hamas) individuals out of Israel, the West Bank and Gaza and removed them to a tent camp set up in southern Lebanon. In response to Israel's mass deportation, Marzook contacted Hamas members throughout the Middle East and elsewhere to discuss how to deal with the resulting organizational crisis. Among those individuals Marzook called to discuss the issue of the Hamas deportees was Salah. In addition, in late December 1992 and early January 1993, in response to the mass deportation, Hamas leadership, including Marzook as the chairman of the Hamas delegation, met with leadership of the anti-Israeli Fatah organization. Leadership from Hamas and Fatah discussed how to deal with the deported Hamas members, whether the PLO should break off then ongoing peace discussions with Israel, and whether to limit terrorist attacks to Israeli settlers in the West Bank and Gaza Strip and Israeli soldiers. Discussions also covered changes in organizational structures with the purpose of best promoting "armed struggle against the Zionist enemy."

### 5. Salah Travels to Israel in January 1993 on Behalf of Hamas

In late December 1992, at the request of Marzook, Salah agreed to travel to the West Bank and Gaza Strip to assess the ability of Hamas to function after the mass deportation and to deliver money to Hamas members in the individual regional cells within the West Bank and Gaza Strip. Among other things, Salah was directed to assess Hamas' ability to continue to carry out terrorist attacks. Thereafter, Salah received into his Chicago based bank accounts a series of wire transfers

from accounts associated with Marzook. This money was to be distributed to Hamas members in the West Bank and Gaza Strip.

On January 13, 1993, Salah left the United States en route to the West Bank and Gaza for the purpose of assessing Hamas' ability to function after the deportation, as well as to deliver money to Hamas members. While en route to the Middle East, Salah stopped in London, England and met with co-conspirator Mohammed Qassem Sawalha. Sawalha directed Salah to provide money to various Hamas members in the West Bank and Gaza Strip, and provided contact information for meetings with, among others, co-conspirators Adel Awadallah, Abu Hasam and Abu Majahad.

Between January 17, 1993 and January 19, 1993, after arriving in Israel, Salah had approximately $230,000 of the $300,000 in his Chicago bank accounts transferred to him through a money changer in Ramallah. Salah transferred $30,000 of that amount by executing three $10,000 checks made out to cash and providing them to the money changer. The transfer of the additional $200,000 was effected by means of a wire transfer made by Salah's wife from one of his Chicago accounts directly to a Chicago account associated with the money changer. Salah collected the $230,000 in cash from the money changer for distribution to Hamas members in the West Bank and Gaza Strip.

Salah received the name of a money changer through whom he converted $200,000 from Individual B, who was residing in Chicago. In January 1993, Salah called Individual B at his home in Burbank, Illinois. When Individual B picked up the phone, a woman asked for him by name. When Individual B acknowledged he was on the phone, Salah came on the line and identified himself. Salah informed Individual B that he, Salah, was in the West Bank. Salah asked Individual B to provide the name of a currency exchange in Ramallah where he could have money wired. Salah

26

stated he wanted to deposit money in Chicago and withdraw the money in the West Bank. Individual B informed Salah that an individual named Ribhe Abd Al-Rahman had a bank account on the North side of Chicago and also a currency exchange business in Ramallah. Individual B told Salah that Ribhe could be trusted.

Salah asked how the transaction with Ribhe would work. Individual B explained to Salah that Salah could deposit or wire money to Ribhe's account in Chicago. Once Ribhe saw that the money was in his Chicago account, Ribhe would provide the money to Salah in Ramallah. Individual B provided Salah with the name of Ribhe's bank in Chicago and Ribhe's Chicago bank account number as well as information that would allow Salah to contact Ribhe in Ramallah.

After arriving in Israel, Salah also met with co-conspirator Adel Awadallah. Salah and Awadallah conferred on Hamas personnel issues and specific planned terrorist attacks. Salah arranged for $60,000 to be provided to Awadallah for various Hamas needs. Salah also traveled to the Gaza Strip and met with Hamas member Abu Majahad. Salah provided Abu Majahad money for various Hamas organizational needs. Salah agreed to carry messages from Abu Majahad to Hamas members abroad. Salah again met with Hamas member Abu Sai'b. Salah and Abu Sai'b discussed various terrorist attacks carried out by Hamas and the state of the Izz Al-Din Al-Qassam Brigades in the Gaza Strip. Abu Sai'b informed Salah that Hamas now had eight underground shelters for hiding fugitives and that Hamas members in Rahat had: (1) three M-16 rifles; (2) three Kalishnikov rifles; ad (3) two Uzi machine guns. Abu Sai'b informed Salah that there would be an increase in terrorist activity during the month of Ramadan. Abu Sai'b asked Salah for additional money to continue terrorist activity and to purchase weapons. Salah agreed to provide additional money.

**6.      Salah's Arrest, Confessions, and Continued Work for Hamas**

On January 25, 1993, Salah was arrested at the Ezra checkpoint in Gaza by Israeli authorities based on his involvement in Hamas. On the day of his arrest, Israeli authorities, armed with a search warrant, recovered approximately $97,000 in cash in Salah's East Jerusalem hotel room.  They also recovered several notes related to Hamas activities.  Israel's ISA (Israel Security Agency) took custody of Salah.  Salah was primarily questioned by an ISA agent whose code name was "Nadav." Between January 25, 1993, and February 21, 1993, Nadav was in almost daily contact with Salah.

On January 27, 1993, just two days after his arrest, Salah signed a written statement in the presence of Israeli police officer Meron Sulieman.  On January 30, 1993, approximately five days after his arrest, Salah signed a second written statement in the presence of Israeli police officer Hezi Eliyahu.  On February 21, 1993, Salah provided a third written statement in the presence of Sulieman.  These statements largely mirror the information Salah was providing to the ISA regarding his role (as well as the role of others) in Hamas.[14]

In the course of his interrogation by ISA, Salah attempted to barter the release of various Hamas prisoners in exchange for information of the location of the body of kidnaped and slain Israeli soldier Ilan Sa'doan.  Salah initially attempted to negotiate the release of Hamas founder and military mastermind Salah Shahadah, but the Israelis refused.  The Israelis eventually agreed to release some prisoners in return for the actual discovery of Sa'doan's body.  The agreement between the ISA and Salah was written by Salah in Arabic. Salah was twice taken from prison with ISA agents to attempt

---

[14]The Court has ruled that the government may not introduce the statements made to Meron Sulieman as substantive evidence against defendant Salah.  The statements, however, are proof of the existence of the conspiracy as an Arabic translation of the statements was found among the documents in the search of defendant Ashqar's residence as explained in greater detail below.

to find the body. He was also permitted to call his wife to have her find a map of the body's location that he claimed to have at his home in Chicago. Because his wife could not locate the map, Salah hand drew a map from memory and then accompanied agents who conducted the resulting search. The efforts to find the body proved unsuccessful. A few years later, Sa'doan's body was discovered. Defendant Salah was slightly mistaken about the exit to take to find the body and the confusion seems to have been caused not by misinformation on Salah's part, but rather over a change in the name of the exit that occurred after the kidnap, murder and burial of Sa'doan.

Significantly, the fact that Salah agreed to the exchange and appears to have known the location of a kidnaped and murdered soldier's body is compelling evidence of his involvement in the upper echelon of Hamas. Hamas knows that, for the Israelis, recovering a soldier's body is of supreme importance. Therefore, the location of the body of a kidnaped and murdered Israeli soldier is highly valuable proprietary information that would be known only by those with a need to know and those who are supremely trusted by the Hamas leadership.[15]

Later in the interrogation, the ISA believed that defendant Salah was not providing them with complete and truthful information. ISA decided to temporarily cease their questioning of him and planned a ruse referred to as a "bird drill," in which individuals simulated a terrorist command center in prison. During his time with the birds, Salah wrote a long statement regarding his activities and knowledge of Hamas activities.[16]

_____

[15] All statements made by Salah in negotiating and following through on the agreed exchange are admissible as statements of defendant Salah, evidence of the conspiracy and defendant Salah's membership in conspiracy and also as co-conspirator statements because the statements were made to the ISA for the purpose of securing benefits for Hamas.

[16] Defendant Salah's handwritten statement to the Birds is offered both as proof of the existence of the conspiracy and as a co-conspirator statement because defendant Salah provided the

On March 18, 1993, ISA interrogator Nadav confronted Salah with his handwritten accounting. What ensued was a tape recorded conversation regarding Salah's role with Hamas. Although defendant Salah provided Nadav with new information he had never before revealed and also admitted that certain of the information he had previously provided to ISA was false, there were categories of Hamas information Salah refused to discuss with Nadav. The tapes essentially ended ISA's interrogation of Salah, however, despite his statements to ISA, Salah continued his attempts to assist Hamas. For the first time in the accounting and on the tapes, Salah admitted to his involvement in recruiting and training U.S.-based co-conspirators C and D. On March 19, 1993, the day after Salah met with Nadav and discussed co-conspirators C and D's Hamas involvement (and thus became aware that the Israeli's knew about co-conspirators C and D), Salah met with U.S. consular officials. On this occasion, Salah asked the consular officials to "tell Sharif and Rizek not to go to Louisiana as planned, but to stay in Chicago." Salah was attempting to use the consular official pass messages to his Hamas trainees thought the use of code. Because the Consulate thought the message was odd, they refused to pass it on.

Ultimately, Salah was indicted for his role in Hamas. In January 1995, Salah pled guilty to a revised indictment that charged him with participating in Hamas affairs. Among other things, Salah admitted: (1) he was a member of Hamas from 1988 until the day of his arrest and was a representative for, among others, Sawalha; (2) he was an envoy for Hamas members outside the occupied territories; (3) he was chosen to be the head of military operations in the West Bank at the request of Marzook and Sawalha; (4) he provided Marzook with reports from the occupied

---

statement to individuals whom he believed to be Hamas members for the purpose of furthering the Hamas conspiracy.

territories; (5) he provided information to a particular Hamas member about where weapons were stashed; and (6) he repeatedly met with Adel Awadallah and Salah Al-Arouri regarding Hamas matters. He was sentenced to 5 years in prison, but released in November 1997.

### 7.    Salah's Statements to the U.S. Consulate

Ingrid Barzel, an American citizen and Consular Specialist who was located in Tel Aviv, Israel, met with Salah several times after Salah pled guilty. On September 25, 1996, she met Salah in HaSharon Prison. Salah requested a second Koran, but was informed because he already had been provided with one Koran (which he apparently lost or gave away), the prison would not authorize a second Koran. Salah became upset and informed Barzel that "every Jew should die."

### 8.    Salah's False Affidavit Submitted in Support of Marzook

In August 1995, federal authorities arrested co-conspirator Marzook at Kennedy International Airport as he attempted to re-enter the U.S. with his wife and children. The arrest was made in support of Marzook's extradition to stand trial in Israel for, among other things, murder based on his role as a Hamas political leader. The central pieces of evidence provided by the Israel to support extradition were Salah's statements, namely the three confessions to INP, the handwritten accounting, and the March 18 taped ISA debriefing of Salah based on his handwritten accounting. Marzook challenged the statements as unreliable because they were obtained through torture and mistreatment of Salah (as Marzook also claimed with respect to the confessions of other Hamas members provided by the Israelis to support extradition). To bolster the defense, Marzook's attorney obtained and filed affidavits from Salah and co-conspirator A.

Salah signed and swore out his affidavit on November 8, 1995, while still serving his five year sentence in Israel. Salah stated at the outset that he was providing the affidavit, "on behalf of

31

Dr. Mousa Abu Marzook in response to Israel's request that he be extradited to that country and [he] remain[s] ready, willing and able to testify in the United States or in any other jurisdiction on behalf of Dr. Marzook, subject to full cross-examination by any of the parties to th[e] controversy." Salah Aff. ¶ 2. Salah's willingness to make false declarations in public proceedings concerning the extradition of the political leader of Hamas signals his continuing participation in the conspiracy, or, at a minimum, his non-withdrawal from it. The affidavit also manifests Salah's active involvement in Hamas while in prison in Israel. Since it was offered in an effort to secure the release, or at the very least prevent the extradition of Marzook, the affidavit is also admissible as a co-conspirator statement.

### 9. Salah Returns to the United States

In November 1997, Salah was released from an Israeli prison and returned to the United States as the first United States citizen ever listed as a Specially Designated Terrorist by the Treasury Department. Upon his return, he was subjected to various IEEPA regulations meant to track how he earned and spent money, however, Salah did not cease his involvement in Hamas. During this time, the FBI received information from Individual A, who had developed a relationship with Salah. Individual A reported numerous meetings and conversations with Salah regarding past and on-going Hamas activities.

Further, in October 1999, Salah tasked Individual A with traveling to Israel, the West Bank, and Gaza Strip, to meet with Hamas members (including imprisoned Salah Al-Arouri), to deliver money to Salah Al-Arouri's mother, and to scout locations for possible terrorist attacks. During the trip, Individual A met with Al-Arouri's mother and provided her with $500 from Salah. Al-Arouri's mother provided Individual A with a photograph for Salah of Salah with co-conspirators Al-Arouri

and Adel Awadallah. This photograph shows Salah sitting between Al-Arouri and Awadallah with a model of the Dome of the Rock on Salah's lap. Al-Arouri's mother and Individual A discussed Al-Arouri's imprisonment and how Salah had helped her son while in prison. Individual A also went to two spots Salah asked Individual A to scout for either Hamas bombings or kidnaping. On October 23, 1999, Individual A met with several individuals who knew Salah from prison. Individual A also met with several individuals and discussed Hamas activities. Upon return to the United States, Individual A debriefed defendant Salah regarding his meetings and activities. Salah told Individual A that Individual A had met with members of Hamas' political wing and that during another trip Individual A would meet with members of the Izz Al-Din Al-Qassam Brigades.

**10.     False Statements in the Civil Lawsuit Filed Against Salah and Marzook**

In May, 2000, the parents of David Boim, a student of dual U.S./Israeli citizenship who was gunned down in a Hamas attack on May 13, 1996, filed a civil suit seeking damages under 18 U.S.C. § 2333. *Boim v. Quranic Literacy Institute, et. Al.*, 00 C 2905 (N.D. Ill). That statute provides for civil remedies to any U.S. national injured in an international terrorist attack. The Boims sued, among others, the individual Hamas gunmen, a number of U.S.-based suspected Hamas front organizations including the Holy Land Foundation, the Islamic Association of Palestine, and the United Association for Studies and Research, as well as defendants Mousa Abu Marzook and Muhammad Salah.

The suit alleged that Hamas is supported by a fund-raising and financial network in the United States that funds humanitarian activities as a cover for a core mission of supporting terrorist activities. The suit further alleged that defendants Marzook and Salah are associated with Hamas. The factual underpinnings involve the marrying of the attack on David Boim and the allegations

made in a civil forfeiture action filed by the United States against assets of Salah and the Quranic Literacy Institute. *United States v. One 1997 E-35 Ford Van*, 98 C 3548 (N.D. Ill.) (Andersen, J.). In fact, the verified complaint supporting the civil forfeiture is attached to, and incorporated by reference into, the complaint. Salah filed an answer to the complaint, including the allegations incorporated from the civil forfeiture suit. Salah also provided sworn verified answers to interrogatories propounded on him by the plaintiffs. Both submissions contain material lies.

In or about January 2001, Salah filed false and misleading answers to the complaint in the *Boim* civil action. Among other things, Salah falsely represented that: (1) he was not a member of Hamas, had never assisted Hamas, and was unaware of a Hamas presence in the United States; (2) he was unaware whether he had received money from Marzook or Elbarasse in December 1992 and January 1993; (3) he was unaware the money he provided to Salah Al-Arouri was to be used on behalf of Hamas; (4) he was unaware whether, while in Israel, he executed ten $5,000 checks made out to cash and dated on or about September 3, 1992; (5) he was not contacted by Marzook after the December 1992 deportation of 415 Hamas members from Israel to Lebanon; and (6) he was unaware whether, while in Israel in January 1993, he had withdrawn approximately $200,000 from his Chicago account.

Consistent with the false statements contained in his answer to the complaint, in April 2001, Salah provided sworn answers to interrogatories propounded by the *Boim* plaintiffs. In the sworn answers to the interrogatories, Salah: (1) falsely represented that he never provided or delivered funds for the purpose of supporting Hamas; (2) falsely represented that he had only provided funds to a limited number of individuals and failed to include a variety of fund transfers in which he had participated; (3) failed to disclose he was a member of Hamas; (4) falsely represented he had never

met with Marzook; (5) falsely represented he had never trained or attended training sessions of Hamas members; and (6) failed to disclose he had transferred funds in excess of $1,000 to Marzook and others. The answers are signed by counsel with respect to objections, and signed by Salah, under penalty of perjury, respecting veracity, as called for under Fed. R. Civ. P. 33.

The false statements contained in Salah's answer to the complaint as well as to the interrogatories were made, at least in part, as a means to mask Salah's involvement in Hamas generally, as well as the movement of funds for Hamas and certain members of Hamas. Truthful answers regarding Salah, Hamas and other members of Hamas would have implicated the status of the funds at issue in the civil forfeiture action. Salah's false statements reveal his continued involvement in and work on behalf of Hamas through 2001 and are admissible as evidence of the existence of the conspiracy and Salah's participation in the conspiracy as well as co-conspirator statements made in furtherance of the conspiracy.

### C. Defendant Ashqar's Role in Hamas

From at least as early as 1989, defendant Ashqar functioned as a conduit of money, communications and information for Hamas members both in the United States and abroad. Defendant Ashqar's role in Hamas is summarized below and is based, at least in part on: the cache of documents found in the search of defendant Ashqar' residence; the intercepted and recorded telephone calls and fax communications that occurred over defendant Ashqar's home phone; audio and video recordings of an October 1993 meeting of Ashqar and other high-ranking Hamas

members; the address books of defendant Salah, defendant Ashqar and co-conspirator Marzook; as well as bank and telephone records.[17]

### 1. FISA Wiretap on Ashqar's Phone and Fax Line

From September 1993 through December 1994, the Federal Bureau of Investigation had a FISA wiretap on Ashqar's home telephone, which in part establishes the identity of the principal leaders of Hamas in the U.S. and shows the interconnection between the U.S. and international Hamas leadership. The call activity, which is described in some detail below as part of the discussion of documents found during a search of Ashqar's residence, included direct calls between Ashqar and publicly declared Hamas members located in the U.S., Europe and the Middle East, including co-conspirator Marzook, co-conspirator Rantisi and co-conspirator A. Ashqar also used his phone as a kind of switchboard in which one Hamas operative would call Ashqar to be connected to another Hamas operative, whom Ashqar would conference into the call. If Ashqar was not available, his wife acted as a conduit for connecting Hamas operatives, including Rantisi. (Thus, effectively rendering defendant Ashqar's wife a co-conspirator as well.) Among the topics discussed in conversations and communications captured on the wiretap are the following: Hamas martyrs, including suicide bombers; planning for the October 1993 Hamas meeting in Philadelphia (described in detail below); the transfer of funds between and among Hamas members; calls regarding, with or connecting certain of the Hamas detainees; calls regarding, with or connecting other co-conspirators; the status of Hamas prisoners; the Islamic University; elections; and relations with other radical Palestinian groups. The calls reference the forwarding of information to, from and between the same

---

[17]The documents found in the search, the intercepted communications and the intercepted meetings are all offered as evidence of the existence of the conspiracy as well as co-conspirator statements made in furtherance of the conspiracy.

co-conspirators through Ashqar's home fax machine, which Ashqar's wife singularly operated in defendant Ashqar's absence.

In one series of phone calls, Ashqar discussed demonstrations occurring in the Occupied Territories and an agreement that Hamas would demonstrate until a certain time and that Fatah would then demonstrate thereafter. Defendant Salah is mentioned on several calls as is Salah's detention. In one of these calls, after discussing Salah, the conversation turns to Sheikh Yassin. In another call, Ashqar attempts to connect a co-conspirator with the family of a suicide bomber who was killed before reaching his target so that the co-conspirator could provide condolences to the family. In another call, Ashqar discussed a bus that rammed into an Israeli oil tanker and whether it was intentional. Ashqar stated that it was because of a prior incident in Jericho for which the "brigades," a reference to the military wing of Hamas, claimed responsibility.

### 2. The October 1993 Philadelphia Conference

In early October 1993, Ashqar and a number of other individuals providing support to Hamas met in Philadelphia to discuss a variety of topics (the "Philadelphia Conference"). The meeting was captured by a court-ordered FISA wiretap. The meetings were both audiotaped and videotaped. The meeting was planned by Ashqar from at least early September 1993 and the wiretap revealed numerous conversations in which Ashqar talked to a variety of individuals about the Philadelphia Conference. The topics ranged from whom to invite to what topics to discuss. There are also calls and faxes related to directions to the Philadelphia hotel where the meeting was to occur.

The meeting took place from October 1, 1993 through October 3, 1993, at the Courtyard by Marriot in Philadelphia. Some attendees stayed at the Marriot while others stayed at a local Days Inn Hotel. Among those in attendance were Ashqar, co-conspirator G and Omar Ahmad, as well as

Shukri Abu-Baker, Ghassan Elashi and Mohamed El-Muzein of the Holy Land Foundation, who were immediate Marzook associates.[18] In total, approximately twenty individuals were present for some part of the meeting. FISA intercepts reflect that Ashqar proposed co-conspirator A as a participant in the Philadelphia conference based on co-conspirator A's recent experience in Israel and co-conspirator A's anticipated ascension to a leadership position in a Chicago Muslim organization.

During the course of the meeting, participants referred to themselves as the "movement" and were cautious about saying "Hamas," although at times used the word "Samah" (Hamas inverted) and the phrase "sister Samah." In fact, one participant cautioned against explicitly using the name "Hamas." In a later part of the meeting, another participant, in discussing a recent publicly held conference on terrorism, stated "[w]hen they talked about Hamas they mention it by name. Not like us, who say Samah, and try to disguise our identity."

The range of topics discussed was many. The issue of the PLO-Israel peace accords was a major issue (and was prominently in the news at the time). The members of the meeting were against the peace accords and believed Arafat had been bought by the Israelis, but concluded it would be bad to publicly come out against the peace initiative. Instead, they decided to work to make the peace attempts fail in more subtle ways. Arafat is repeatedly lambasted at the meeting ("we have to clearly define our enemies and our enemies are Arafat and Rabin"). The participants also discussed raising money for charitable purposes. The belief was clear that if Hamas provides

---

[18]Ghassan Elashi was convicted in federal district court in Dallas on fraud and International Emergency Powers Act charges relating to his financial dealings with and on behalf of Marzook after the latter had been listed as a Specially Designated Terrorist. *United States v. Elashi, et. al*, 3:02-CR-052-R (N.D. Tex.)

the Palestinian people with money for education, hospitals, etc., it will curry favor with the people and will help oust Arafat.

During the Philadelphia Conference, defendant Ashqar presented a paper on the relationship between America and the "inside" (occupied lands). According to Ashqar, he wrote about changing the relationship between the United States and the inside for a number of reasons, including the "Mohamed Salah incident." Ashqar noted that, based on Salah's situation, it was necessary to be "more cautious in the inside" than when in the United States. This was a clear reference to defendant Salah's arrest in Israel for delivering money on behalf of Hamas. Ashqar discussed what the inside needed from the United States, including supporting the "families of the martyrs." Ashqar also said that "Sheik Ahmed's" case needed to be raised (a reference to the jailed founder of Hamas, Ahmed Yassin), and that this issue could be raised in the United States even if not in the territories. Ashqar ended his comments by stating, "our actions should continue with great vigor." The search of Ashqar's residence (explained in more detail below) revealed a document titled "America's Connection with the Inside." It states it is necessary to have "another look in light of the new upcoming happenings." There are several listed issues. Number one is "Mohamed Salah – We are not above the law – punctual – cautious." It seems clear that this document was a list of talking points for Ashqar's presentation at a Hamas meeting in Philadelphia.

Certain participants in the Philadelphia Conference discussed how to help the "movement" from the United States. It was noted that the United States "is a secure place for the Movement" and that people must become educated about the Movement. It is clear from the discussion that each of the participants understood that the charitable aspect of their work was related to the violent aspects of Hamas. As one participant stated, "I feel that the most important thing we can offer at this stage

39

is to support the jihad. . . . People who are directly connected to the jihad should get more assistance." Another participant stated: "[A]s far as our goals is concerned, we should make it very clear, resistance against occupation will continue for ever, even in Jericho and Gaza. . . . [W]e can't put on paper our goals is to resist the occupation. This is an American organization, we can't say this, we can't put it officially in writing."

The Philadelphia Conference is strong evidence of the existence of Hamas in the United States and the covert nature of its operations here. In addition, it clearly links defendant Ashqar to other high-ranking Hamas members, links defendant Ashqar to defendant Salah and links defendant Salah to Hamas.

### 3. Search of Ashqar's Residence

In December, 1993, the FBI conducted an Attorney General authorized (pre-FISA) covert search of Ashqar's apartment in Oxford, Mississippi. The search revealed a treasure trove of Hamas-related documents, including: transactional and accounting documentation for millions of dollars in domestic and international wire transfers; Hamas declarations, organizational documents and operational manuals; minutes of meetings between Hamas, the Popular Front for the Liberation of Palestine ("PFLP"), the Democratic Front for the Liberation of Palestine ("DFLP"), the Palestinian Liberation Organization ("PLO"), Sudanese government officials, Hezballah and Iranian government officials; and confessions of Hamas members, including defendant Salah's statements made while in interrogation with the ISA.

In addition, some of the documents clearly link Ashqar to Hamas. For instance, in a lengthy handwritten document Ashqar provides two addresses for correspondence to be sent to him depending upon where from the Occupied Territories the correspondence is coming: "Send all

correspondence to the following address exclusive to 48: A Hasan, P.O. Box 1848, Oxford, MS 38655 U.S.A. Send all correspondence to the following address exclusive to Gaza Strip: Abdelraziq, A. P.O. Box 4257, University, MS 38677 U.S.A." In the same letter, Ashqar notes the need to "[s]end a warning to the Al-Bayader Magazine **for not publishing news of Hamas**"(emphasis added). Ashqar also questions "[t]he financial situation and the best means to transfer money to them."

What follows is a summary of the documents found in the search of defendant Ashqar's residence, broken down by category, and leavened with FISA intercepts related to the category.

### a. Movement of Money

There is a substantial cache of documents regarding the movement of millions of dollars of money, much from overseas, through U.S. financial institutions, some of which includes transactions revealed in the bank records of Marzook, Elbarasse, co-conspirator F and co-conspirator H. The documents include handwritten notes tracking transfers and account information, as well as copies of actual bank documents, including wire transfer reports and checks.

In addition, there are a series of financial documents linking Ashqar, Salah, Marzook and a number of other co-conspirators. For example, in November 1990, co-conspirator H's account received an infusion of $150,000 over four days from accounts associated with Marzook. The three wires to co-conspirator H were immediately followed by a series of smaller denomination checks signed by co-conspirator H and written out either to "Cash" or "J.M. Al-Khatib", all but one of which was negotiated in Israel. The other check was negotiated for the benefit of a foreign entity at a New York bank. The check, a $25,000 check made out to "Cash" by co-conspirator H, was negotiated for the benefit of the account of Mectafinance, SA at American Express Bank in New

41

York. Mectafinance is directly linked to Salah. At the time of his arrest in Israel in January 1993, Salah was in possession of a slip of paper with the handwritten notation for "Mectafinance" and the same account number through which the co-conspirator H check cleared.[19]

In addition to transactional documents, among the documents found in Ashqar's residence were numerous letters, handwritten notations, and faxes related to the movement or distribution of funds reflected in some of the transactional documents found in the search. For example, Ashqar had a wire transfer report reflecting a May 20, 1991 $50,000 wire transfer from a co-conspirator E account to the Chase Manhattan Bank account of an individual by the name of K. Koloti. (Koloti was the direct recipient of hundreds of thousands of dollars in wire transfers from the Marzook/Elbarasse accounts in the early 1990's). Also in Ashqar's possession was a handwritten fax letter to him, dated May 11, 1991, asking that $100,000 be transferred to the same individual at the same bank and account. A post script to the same faxed letter notes the expectation that Ashqar had already arranged a transfer to "Alaa." Another faxed letter from Marzook to Ashqar shortly thereafter directed Ashqar to arrange a $40,000 transfer to co-conspirator H. Soon thereafter, Ismael Elbarasse wire transferred $40,000 to co-conspirator H's Cleveland account.

---

[19]Other documents from the Ashqar search link co-conspirator H with covert and secretive missions. For instance, one document is titled, "Minutes from the meeting with brother Muhamad's messenger [ ]" and specifically lists co-conspirator H by name. The document goes on to list several actions that must be completed: "4-1 Regarding money transfers: Alaa and brother Abu Al Harith will open an account in Chicago. The former will withdraw the amount and give it to brother Muhamad." "4-2 Regarding this arriving and departing, within the propagation youth, a unified **secret password** should be agreed upon (name of the official greets you), with the importance of adopting Abd Al Halim's [Ashqar's] telephone in America, and other telephones in Europe. It should be provided to the individual before his departure." (Emphasis added) The clear connection, given where the money is coming from and the other search documents, is that co-conspirator H is moving money for Hamas and, therefore, must be covert about his actions.

Another report details amounts distributed from January 1991 through March 1992, and specifies the provision of $400,000 to "Brother Mohammed Kadhim," who is Muhammad Qasem Sawalha, who hosted and instructed Salah and co-conspirator A during their January 1993 Israel trip layover in London. In 1991, Sawalha was the Hamas military chief for the West Bank. The movement of money is similarly discussed in numerous conversations on Ashqar's wiretapped phone line.

One handwritten letter, which appears to have been faxed in December 1992, relates to the monetary needs of different Hamas sections. "[W]hen we receive money, we divide them 50% and 50%. The first half is for Hamas and what relates to it in operations and the other half is for all the other calling matters. Even though we recently agreed the percentage for Hamas to be 60% and the other calling's branches to get 40." "Approximately two months ago we asked the brothers in all the regions to supply us with lists of all the martyrs, injured and harmed and ... and we regret to inform you that we have not received them yet." "The field division of **Hamas** needs 3-4 thousand Dinars a month" (emphasis added).

### b. Documents Related to Hamas Claims of Responsibility for Terror Attacks

The Ashqar search documents also include faxes received over his phone line containing declarations or claims of responsibility for terrorist attacks. Included in this category are what appear to be faxes of actual Hamas declarations. Following either an attack or some other significant event, for example a critical turn in the Israel/PLO peace process, Hamas would issue a declaration. These declarations generally included criticism of aspects of various peace accords, calls for the continuation of "the uprising," "jihad," or "the armed struggle," and laudatory claims of

responsibility and gratitude for specific operations, i.e., attacks of the Al-Qassem Brigades. Other faxes contain specific details of Hamas attacks just completed. For example, on October 25, 1993, Ashqar received a fax on Hamas letterhead which stated, "On 10/24/93, one of our units abducted two Israeli soldiers, killed them, and took their weapons, M 6 and their IDs. . . ." International media reports reflect that such an attack did occur on the day and in the manner described in the fax received by Ashqar. Specifically, two Israeli soldiers were kidnaped at gunpoint by individuals who approached them disguised as rabbis. The soldiers were executed and their weapons, IDs and radios taken, along with certain personal effects, photocopies of which accompanied the Hamas claim of responsibility, (which items were identified in the fax received by Ashqar).

### c. Communications Regarding Hamas Operatives In the Territories

One sequence of FISA intercepts from December 1993 reflects intimate involvement of U.S.-based Hamas members in personnel issues in the Occupied Territories. On December 29, 1993, the Ashqar FISA intercepted an extended call between Ashqar and an individual identified on the phone only as "Constantine." Constantine advised Ashqar that Khaled Shaqallah, Saftawi Asad and Maher Khalil were murdered by Ibrahim Khalaf, a rogue Al-Qassem Brigade member operating independently in the field. Constantine urged the leadership on the "outside," i.e., outside the territories, to take some form of action to reign in the activities of the rogue member and stressed that he should be tried and executed. The following day, Ashqar called Emad Al Alami, a/k/a Abu Hamman,[20] in Damascus and relayed the information he had received from Constantine the previous

---

[20] Al Alami has a long, storied career in the upper echelons of Hamas. He has been a member of Hamas Politburo on the "outside" and has served as its representative in Tehran, Iran. In September 1999, Al Alami was expelled from Jordan along with Marzook as part of Jordan's crackdown on Hamas, which included the closing of Hamas Headquarters in Amman. Al Alami is still considered a high-ranking member of Hamas in Damascus.

day. Their discussions covered the need to remove the rogue member from any position of responsibility within the organization and the possibility of needing to have the rogue member killed.

Among the documents found in the search were documents detailing Hamas organizational structure, regional cells or units and their leadership. Other documents discussed the need to appoint, transfer or remove members from cells or specific positions of responsibility. Some documents express concerns about the management or mismanagement of funds that had been directed to the cells or individuals.

### d.     Hamas Martyrs and Prisoners

Abundant in the documents found in the search of Ashqar's residence, as well as in the FISA intercepts, are communications regarding the death or capture of Hamas members. Some of these are faxed Hamas releases, others are faxed handwritten notes from individuals in the Occupied Territories. Other documents list at length Hamas members in Israeli custody at given points in time, the sentences they were serving, or their status otherwise. These materials tie into other lines of communications regarding concerns of the organization. One line of communications reference or address the need to send condolences and to provide money or material support to the families of martyrs or detainees. One example of a fax intercepted was a copy of a short letter of condolence dated September 27, 1993, to a family in the territories "To console them for the death of their son who was killed in the car that was full of explosives. He is a martyr."

A second line of communications involves documentation of or discussion regarding potential prisoner trades. In Ashqar's documents was a lengthy list of jailed Hamas members who should be promoted as the subject of prisoner exchanges with Israel. The list reached the highest

ranks of Hamas, including spiritual leader and founder Sheikh Ahmad Yassin, political bureau member Emad Al Alami, and military apparatus founder and leader Salah Shahadah.[21/]

### e.     The Hamas Deportees

Within the documents found in Ashqar's residence, as well as communications intercepted over Ashqar's wiretapped phone line were numerous communications concerning the tracking of the December 1993 deportees. This action by Israel precipitated a crisis for Hamas and other radical Islamic and Palestinian entities functioning in the Occupied Territories. For example, by Salah's own statements, it is what precipitated the call from Marzook for him to travel to the Occupied Territories. The 415 deportees were not drawn exclusively from the ranks of Hamas, but extended to social and political Palestinian leaders in the territories associated with the PFLP, DFLP, and Palestinian Islamic Jihad ("PIJ"). However, the lion's share of the deportees were drawn from the leadership ranks of Hamas in the territories, including, among other notables, Dr. Abdel Aziz Rantisi, a founding member of Hamas who, at the time of the deportations, was Hamas spokesman in Gaza. Rantisi became the spokesperson for the deportees, later became the main spokesman for Hamas and, after the death of spiritual founder Sheikh Ahmed Yassin, became the leader of Hamas. There are a number of intercepts of Ashqar speaking directly with Rantisi from the Ashqar FISA, many of which appear to have occurred when Rantisi was in the Southern Lebanon camp with the deportees. In addition, in the search documents there is a handwritten letter from Dr. Abdul Aziz stating, "Please receive the five friends and help them on your own expense." The name "Abd Al-

---

[21/]As discussed above, while being interrogated by ISA, defendant Salah attempted to negotiate the release of Hamas prisoners, including Shahadah, in exchange for information regarding the location of murdered soldier Sa'doan.

Azzez Al-Rantissi" with phone and fax numbers is also found in the search documents. Ashqar and his wife also used their home line to act as operators connecting the deportees (including Rantisi), as well as other Hamas members abroad, with Hamas members inside the United States.

In addition to the communications with Rantisi, the deportees were a constant subject of oral and written communications passing through Ashqar. They were regularly touched upon in phone discussions from the onset of the FISA wire in September 1993, and continuing through 1994. When a particular detainee was permitted to return home, it was the subject of an almost immediate round of calls to and through Ashqar's line. Ashqar himself spoke directly with some of the more prominent deportees upon their return. Financial and material support for the families of the deportees was a recurring topic reflected in the documents and in the FISA intercepts.

### f. Hamas-Related Information and Evidence Obtained by Israel

Ashqar's papers include copies of Israeli charging documents against Hamas members (including co-conspirator A) and summaries of confessions or allocutions of arrested and/or convicted operatives, including defendant Salah. The tracking of such information is seen in other communications and documents. For example, a letter dated December 22, 1993 and signed by "Samir," Ashqar's Hamas alias, states in part:

> The person in charge of the strip (Gaza) has been arrested. He made confessions against the security officer, the minors officer and the call officer. He also made confessions against four workers of the library, who were placed under surveillance by the enemy. The name of the confessed person is Ibrahim Al-Zurar. Hamdi Al-Delw confessed he worked with Hamas person Mahmud Shihto, who was then arrested. They found two files in his place. Some of these materials are complete documents. The families appeal for your financial assistance. They are in a very bad financial situation.

47

In addition, Ashqar was in possession of significant portions of defendant Salah's statements to Israel. In fact, the Arabic translation of two of defendant Salah's statements to the INP, originally written by the officer in Hebrew, were among the documents in Ashqar's possession. Other confessions included that of co-conspirator J, who for a short time was in charge of West Bank activities for Hamas (and who, according to bank records, received considerable amounts of money from Marzook). Co-conspirator J's confession includes references to and coordinated activities with Salah Al-Arouri, Adel Awadallah and others with whom Salah interacted in 1992 and 1993. Still another confession outlines aspects of Hamas, including defendant Ashqar's role as a communication and financial conduit.

In addition, among the documents in Ashqar's residence was a several page document that purports to be the summary of an interview with co-conspirator A after co-conspirator A's return to the United States.[22]   According to the document, co-conspirator A and defendant Salah believed they were arrested because of confessions against them and the large amount of money that they took to the money changer. Under a section titled "requests," the document seeks increased financial support. The document also notes that Salah told co-conspirator A that there was still money in his bank account, but when "we" discussed it with Umm Ahmad (Salah's wife) she denied the money was there. Under another section titled "Comments and Recommendations," the following appears:

> The Chicago people are unhappy with choosing Abu Ahmad [Salah] for these tasks. They unanimously agree that he is not as strong mentally as he is physically. If they were consulted, they would never have chosen him. He is naive, and the lacks the ability to take the right steps.

---

[22]The search also revealed a number appointment books, as explained below. The appointment book from August 1993 reveals contact information for co-conspirator A written on the weekend of August 6-7, 1993, which was shortly after his return to the United States.

Saleh Al-Arouri has previously requested not to send Abu Ahmad because he is naive and not witty enough.

It is a mistake to send two persons who know each other at one time.

The people outside are harshly criticized because they have sent Abu Ahmed. They are accused with not knowing the particularities of the inside, they don't sympathize with the people inside, and they don't value the bloodshed.

The fact that defendant Ashqar has these confessions and debriefed co-conspirator A reveals his role as a Hamas archivist and conduit of information, as it was important that Hamas members were aware of the information being relayed by fellow members to the Israelis.

### g. Phone/Address/Appointment Books

Acting as an international communications center for Hamas required the knowledge of considerable number of telephone numbers. Ashqar had them, in a number of address and appointment books found in the search of his residence. In brief, they contain handwritten entries with the names, aliases, phone numbers and addresses of various Hamas members. Included in the books was such information for defendant Salah, co-conspirator Marzook, co-conspirator Elbarasse, co-conspirator Rantisi, co-conspirator A, co-conspirator B, and others. There is significant overlap with names and numbers found in the multiple address books in Marzook's possession at the time of Marzook's arrest at JFK in August 1995, and with Salah's address book taken at the time of his January 1993 arrest.

### h. Hamas Operation manuals

Among the Ashqar search materials are lengthy documents closely detailing policies and procedures for the conduct of Hamas. The manuals address the maintenance of secrecy in communications, written and oral; specify secrecy classifications and the attendant policies for

handling materials at each classification level; and give detailed instructions on what to expect and how to deal with arrest and capture by the Israelis.

These topics are addressed most particularly in one lengthy document setting forth the security procedures of the "Organization."[23] Among the subjects in this security document are the classification system for various types of documents (very private, private, general, etc.), the limitations on the use of fax machines ("faxing documents classified as 'private' and 'very private' is prohibited"), and "the security of finances." This latter section lists seven rules for protecting the security of finances. Among the more salient procedures specified are the following:

1. Increase the number of persons who have bank accounts and distribute those accounts over several branches.

2. Fund transfers may be done among the overt personalities or among corporate names, otherwise, it should be done in cash.

3. Financial dealings between different work levels should be in cash, not through money orders or travelers checks.

4. As a precaution, names and financial activities should be kept in a secure position.

The procedures closely track those employed by Marzook, Ashqar, Elbarasse, co-conspirator F and others involved in the international movement of funds. Moreover, they are consistent with references contained in other documents and FISA intercepts which reflect an extraordinary degree of consciousness regarding security and public perceptions, such as Ashqar's talk at the Philadelphia conference about being cautious given the arrest of Salah.

---

[23] The document is not specifically identified as a Hamas item, but it does make reference to communications with the "outside," which tracks other documents found in the Ashqar search that distinguish the "Inside" (the Occupied Territories) from the "Outside" (everywhere else).

### i. Minutes and Transcripts of Palestinian Summits

Ashqar also had in his possession lengthy transcripts, mostly handwritten, of meeting minutes for a number of high level summits of radical Palestinian organizations in which Hamas participated. The meetings as captioned in the Ashqar documents included:

1. Meeting of Palestinian Leadership, Khartoum, Sudan January 1993
2. "Second meeting of Palestinian leadership, December 25, 1992, Khartoum"
3. "Movements Meeting with Fatah Central Committee"
4. "December 1992, Tunis Meeting of the delegation"
5. An undated meeting between Hamas/PLO
6. "Supreme Palestinian Coordinating Committee" meeting of February 24, 1992
7. "Meeting with Iranian Management" (1992, Teheran)

The minutes of most of these meetings reflect that the Hamas delegation was headed by Marzook. A number of the meetings occurred in the immediate aftermath of, and, based on the discussion reported, appear to have been prompted by the Israeli deportation of the 415 radical Islamists in December 1992. These meetings are consistent with portions of defendant Salah's handwritten accounting explaining that his communications with Marzook in late December 1992 and early January 1993 were limited by Marzook's travels to the summit meetings. Defendant Salah reports, in fact, that Marzook asked Salah to travel to Sudan to meet with Marzook. Defendant Salah states in his accounting that he declined because of potential inquiries by American officials should his passport reflect travel to Sudan.

The minutes reflect direct engagement between Marzook and Yasir Arafat, and leaders of the DFLP, the PFLP, the PLO, and officials from the host countries. One of the Ashqar documents was a declaration Marzook signed at the Popular Arab and Islamic Conference in Khartoum in early January 1993, as well as a transcript of proceedings from that conference. In the signed declaration, released on P.A.I.C. stationary, Marzook and the other signatories agreed "that the dialogue should

result in finding a framework for coordinating the military struggle, and framework for international and Arab communications." The transcript of the conference, also written on P.A.I.C. stationary, reflects specific statements by Marzook regarding his role in Hamas and the continued need for the military struggle against Israel. For example, Marzook is quoted as stating, "[w]e have a military committee. Its function is to provide the facilities and the military leadership in the inside." Later, Marzook states "we are ready to agree to escalate military action." Marzook also proclaimed that he was the leader of Hamas and therefore the resistance, and that there was no one else who had done for Hamas what he had done.

In sum, the documents found in Ashqar's residence in December 1993, the intercepted communications on Ashqar's home telephone line and the Philadelphia Conference are overwhelming evidence of the existence of the Hamas conspiracy, as well as defendant Ashqar's and defendant Salah's involvement in that conspiracy, and are co-conspirator statements made in furtherance of the conspiracy.

### 4. Ashqar's refusal to testify in the Grand Jury.

Since the search of Ashqar's residence, two separate Grand Juries have subpoenaed him to testify. Both times defendant Ashqar has refused. It is the government's position that these refusals reflect Ashqar's continued involvement in and protection of Hamas and his co-conspirators in Hamas.

### a. New York Grand Jury

In 1996, the Southern District of New York (SDNY) opened a grand jury investigation centered on Hamas financial crimes in the United States. The scope of the investigation was fairly broad, and attempted to piece together the financial network of individuals who were moving money

to the West Bank and Gaza Strip for Hamas. The investigation focused on, among others, defendant Ashqar and co-conspirators Marzook and Elbarasse. The SDNY grand jury issued subpoenas for defendant Ashqar and co-conspirator Elbarasse to testify. Despite being granted immunity, both Ashqar and Elbarasse refused to testify and both were held in civil contempt. Defendant Ashqar's refusal to answer questions before the SDNY grand jury reveals his ongoing involvement in the Hamas conspiracy. His refusal to testify furthered the Hamas conspiracy by ensuring that he would not reveal any information regarding the documents recovered in the search, the communications intercepted on the wiretap of his phone line or any other information that defendant Ashqar had regarding Hamas.

### b. Chicago Grand Jury

In June 2003, a grand jury sitting in the Northern District of Illinois (NDIL) issued a subpoena to defendant Ashqar to testify. As with the SDNY grand jury, the NDIL grand jury was investigating the activities of Hamas in the United States, including, among others, defendant Ashqar, defendant Salah, co-conspirator Marzook, co-conspirator A and numerous other Hamas members. Despite being granted immunity, defendant Ashqar refused to testify. Defendant Ashqar was held in civil contempt and that ruling was affirmed by the Seventh Circuit on expedited appeal. As with his refusal to testify before the SDNY grand jury, defendant Ashqar's refusal to testify before the NDIL reveals his ongoing involvement in and support of the Hamas conspiracy as late as June 2003.

IV.    CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that a conspiracy existed involving defendants Salah and Ashqar and their Hamas co-conspirators to commit various crimes.  This Court should find, based upon this proffer, that co-conspirator statements are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:    /s/ Joseph M. Ferguson
       Joseph M. Ferguson

       /s/ Reid J. Schar
       Reid J. Schar

       /s/ Carrie E. Hamilton
       Carrie E. Hamilton

       Assistant United States Attorneys
       219 South Dearborn Street
       Chicago, Illinois 60604
       (312) 353-5300

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 03 CR 978 |
| | ) | Hon. Amy J. St. Eve |
| MUHAMMAD HAMID KHALIL SALAH, | ) | |
| a/k/a "Muhammad Abd Al-'Hamid Salah," | ) | |
| a/k/a "Abu Ahmad," and | ) | |
| ABDELHALEEM HASAN ABDELRAZIQ ASHQAR, | ) | |
| a/k/a "Abu Hasan," | ) | |
| a/k/a "Abu Ali Hasan," | ) | |
| a/k/a "Samir" | ) | |

**CERTIFICATE OF SERVICE**

The undersigned Assistant United States Attorney hereby certifies that in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**GOVERNMENT'S EVIDENTIARY PROFFER SUPPORTING THE
ADMISSIBILITY OF CO-CONSPIRATOR STATEMENTS**

was served pursuant to the district court's ECF system as to ECF filers, if any, and was also sent by by first-class mail on August 18, 2006, to the following non-ECF filer:

William Moffitt
11582 Greenwich Point Road
Reston, VA 20194

/s/ Joseph M. Ferguson
Joseph M. Ferguson

/s/ Reid J. Schar
Reid J. Schar

/s/ Carrie E. Hamilton
Carrie E. Hamilton
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300