UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 03 CR 978-3 |
| v. | ) | |
| | ) | Judge Amy St. Eve |
| ABDELHALEEM ASHQAR | ) | |

GOVERNMENT'S MEMORANDUM IN RESPONSE TO DEFENDANT
ASHQAR'S OBJECTIONS TO PSR AND SENTENCING POSITION MEMORANDUM

The United States of America, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby files its Memorandum in Response to Defendant Ashqar's Objections to the Pre-Sentence Report and Sentencing Position Memorandum. For the foregoing reasons, the findings, conclusions and Guideline applications of the PSR should be applied in the sentencing of defendant Ashqar, including, but not limited to the application of (1) the terrorism enhancement of § 3A1.4; (2) the § 2J1.2(c) cross reference to the § 2X3.1 accessory after the fact Guideline for application of the murder Guideline set forth in § 2A1.1; and (3) the substantial interference with the administration of justice enhancement of § 2J1.2(b)(2).

## I.    Introduction

Defendant has tendered to the Court more than 160-pages of argument that at many junctures is in four-square opposition to binding Supreme Court and Seventh Circuit precedent. Still other arguments rely on cases whose holdings have been overridden or superseded by subsequent developments in the case law. Presumably, and notwithstanding their lengthy articulation, they are offered simply to preserve issues for appeal in the off-chance there is some change in otherwise deeply settled law. A number of the arguments and positions advanced by defendant Ashqar are repeated at multiple junctures in his memorandum. In attempting to fashion a more succinct, user-friendly response, the government offers the following disclaimers. Rather than respond to each iteration or permutation of arguments repeated in various contexts in defendant Ashqar's memorandum, the government will attempt a unitary response intended to apply to any and all iterations and permutations of an argument. Because of the often circular, repetitive and

occasionally internally inconsistent nature of many of the positions advanced by defendant Ashqar, the government requests that any oversight in addressing some facet of one or more such arguments not be construed as agreement or non-opposition. To the contrary, the government supports the findings and application of law and Guidelines set forth in the Pre-Sentence Report of the Probation Office and opposes the objections advanced by defendant Ashqar.

Finally, the government hereby provides notice of its intent to call as a witness at the sentencing hearing currently scheduled for November 8, 2007, an FBI agent who will provide additional details about the terrorism investigation obstructed by defendant Ashqar and the impact of defendant Ashqar's obstruction to the investigation and ensuing criminal legal proceedings in the Northern District of Illinois and elsewhere. Accordingly, this response is fashioned primarily as a response to legal issues, rather than factual issues, understanding, however, that the latter will periodically have bearing on the former, particular with respect to the question of actual obstruction to the extent such a showing may deemed legally required in the context of the § 3A1.4 terrorism enhancement (which the government does not believe to be the case), and to the substantial interference enhancement of § 2J1.2(b)(2).

## II.        The PSR Correctly Applies the Terrorism Enhancement of Guideline § 3A1.4

The Guideline § 3A1.4 terrorism enhancement provides, in relevant part, that where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism" the offense level should be increased by 12 levels, but in no event should the resulting offense level be less than level 32. U.S.S.G. § 3A1.4(a). In addition, where the enhancement applies, the defendant's criminal history "shall be Category VI." U.S.S.G. § 3A1.4(b). Application of the enhancement to "obstruction offenses" such as that at issue here, is informed by Application Note 2 which states in relevant part that "[f]or purposes of this guideline, an offense that involved . . . (B) obstructing an investigation of a federal crime of terrorism, *shall* be considered to have involved, or to have been intended to promote, that federal crime of terrorism. U.S.S.G. § 3A1.4, App. Note 2. The Probation Office correctly applied the enhancement on the basis of the extensive record developed through trial and other pre-trial and post-trial proceedings establishing that the underlying investigation was

directed to ferreting out the operational support network for Hamas in the United States both prior and subsequent to its formal designation as a terrorist organization. *See* PSR at lines 477-522. As a result, the Probation Office increased the Offense Level by 12 levels and assessed a Criminal History Category of VI.[1] *Id*. Defendant Ashqar advances a host of arguments in opposition to the PSR application of the Guideline § 3A1.4 terrorism enhancement, none of which have merit.

### A. Procedural Predicates to Application of the Terrorism Enhancement.

Defendant Ashqar contends that in order for the terrorism enhancement to apply, the government must establish and the court must find that the obstruction occurred with respect to the investigation of a specific federal crime of terrorism, and that the offense conduct actually obstructed that investigation. He further asserts that the burden of proof for these showings and findings should be beyond a reasonable doubt (or in the alternative clear and convincing evidence) and that the enhancement may not be based on conduct underlying acquitted offenses. The government does not dispute that the enhancement applies with respect to the investigation into a specific federal crime of terrorism. Under the Seventh Circuit's holding in *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005), what is required is that the obstructed investigation have as its subject potential violations of a federal crime of terrorism, and not as defendant Ashqar would have it, an investigation of a specific act or acts that constitute federal crimes of terrorism. On the other hand, the government is in complete disagreement with defendant Ashqar's position regarding other procedural parameters and prerequisite for application of the terrorism enhance. Specifically, and for the reasons set forth in the immediately succeeding sections of this brief, it is the government's position that (1) the standard of proof on all factual issues supporting the enhancement (and all others) is preponderance of the evidence; (2) conduct underlying an acquitted offense – here, the racketeering conspiracy – is properly considered for application of the enhancement, and; (3) proof

---

[1] The 12 level enhancement resulted in an offense level of 42 because it was applied to an offense level of 30 based on application of the accessory after the fact cross-reference to the murder Guideline. If accessory after the fact cross reference were deemed not to apply, the indicated offense level under the terrorism enhancement would become Level 32, with the Criminal History Category remaining at VI, which would produce an indicated sentencing range of 210-262 months.

of actual obstruction is not required for the enhancement to apply.

          **a.**     **The Standard of Proof for Sentencing Facts is Preponderance of the Evidence**

Defendant Ashqar asserts that any and all conduct not specifically found by the jury at trial may not be considered by this court at sentencing, including in the court's determination of the application of certain Guidelines provisions, (including the terrorism enhancement), unless established either beyond a reasonable doubt or by clear and convincing evidence. *See*, *e.g.,* PSR Mem. 22-26. The Seventh Circuit has made clear that application of the terrorism enhancement is appropriate where the sentencing court's determinations are supported by a preponderance of the evidence with facts from the record. *Arnaout*, 431 F.3d at 994. *See United States v. Hale*, 448 F.3d 971, 988-89 (7th Cir. 2006) (post-Booker application of sentencing enhancements, including specifically the terrorism need be based on a preponderance of the evidence). *See also United States v. Vitrano*, 495 F.3d 387, 390 (7th Cir. 2007) (rejecting as "entirely without merit" argument that sentencing facts must be proven beyond a reasonable doubt (citing *United States v. Rita*, ___ U.S. ___, 127 S.Ct. 2456, 2466 (2007).

To overcome this binding precedent, defendant Ashqar invokes the occasionally cited but seldom applied "tail which wags the dog" sentencing scenario which the Third Circuit, in *United States v. Kikumura*, 918 F.2d 1084, 1100-01 (3d Cir. 1990), assessed as requiring proof beyond a reasonable doubt for non-offense of conviction conduct applied to sentencing. However, this simply is not the applicable standard under prevailing Seventh Circuit law. *See United States v. Reuter*, 463 F.3d 792 (7th Cir. 2006). In *Reuter*, Judge Posner, writing for the panel in a post-*Booker* opinion, recounted some of the history of the Seventh Circuit's consideration of the *Kikumura* doctrine, noting specifically that while the court has at various times "occasionally expressed sympathy" for the position, that no sentence had ever been reversed on that basis notwithstanding what were characterized as some "awfully high ratios of tail to torso." 463 F.3d at 762-63 (citing *United States v. Rodriguez*, 67 F3d 1312, 1323 (7th Cir. 1995) in which "the tail raised the defendant's sentence from 63 months to life."). However, the opinion also noted, occasional sympathetic soundings

notwithstanding, that the Seventh Circuit had along the way also expressed "skepticism about [the] validity" of the *Kikumura* rule whose reasoning the Court had "castigated." *Id* at 763 (citing cases). *Reuter* put the matter to rest once and for all by holding that *Kikumura*'s application had been rendered "academic" by *Booker*, which freed sentencing courts, on the basis of the statutory sentencing factors set forth in 18 U.S.C. § 3553, to depart from the now advisory Guideline range arrived at through preponderance sentencing findings. *Id.* In short, the law of the Seventh Circuit is that all Guideline sentencing facts are determined under a preponderance standard.[2] *See also United States v. Horne*, 474 F.3d 1004, 1006-07 (7th Cir. 2007)(proof of sentencing facts by preponderance has been the rule since *before* the guidelines (citing, *inter* alia, *United States v. Watts*, 519 U.S. 148 (1997); *McMillan v. Pennsylvania*, 477 U.S. 79, 91-93 (1986)).

Defendant Ashqar attempts to sidestep the binding effect of *Reuter* on this court by suggesting that Judge Posner's rejection of the *Kikumura* rule was based on it having been overturned by the Third Circuit in *United States v. Grier*, 449 F.3d 558 (7th Cir. 2006), and that *Grier* was subsequently vacated. *See* PSR Mem. at 23 & n.20. First, *Reuter* was not predicated on *Grier*.

_____

[2] On a separate but related point, defendant Ashqar also objects to application of various enhancements generally on the ground that they are based on facts not found by the jury and that judicial fact-finding violates his Fifth and Sixth Amendment rights. *E.g.*, PSR Mem. at 63-69. The argument is stated in various ways, for various purposes. For example, he seems to assert that any enhancement that produces a Guideline range above the statutory maximum violates the Sixth Amendment. *See* PSR Mem. at 64-65 (asserting that § 3A1.4 as applied pursuant to Application Note 2 is facially violative of the Sixth Amendment because it increases the sentence beyond the 10 year statutory maximum sentence for obstruction). By its own characterization, the Seventh Circuit has "repeatedly" rejected such arguments, holding that "the constitutionality of judicial fact-finding under the guidelines was resolved when the Supreme Court rendered the Guidelines advisory in the remedial opinion *United States v. Booker*, 543 U.S. 220, 233-34 (2005)." *United States v. Wilson*, __ F.3d __, 2007 WL 2701971 at *2 (7th Cir.) September 17, 2007. Moreover, Guidelines ranges in excess of the statutory maximum do not render the applicable Guidelines unconstitutional. Rather, as the Guidelines themselves address, where the applicable Guidelines produce an indicated range exceeding the statutory maximum for an offense, the statutory maximum becomes the applicable Guideline range and the district court accordingly may impose a sentence up to but not in excess of that statutory maximum. U.S.S.G. § 5G1.1 (b) and (c); *accord United States v. Arnaout*, 431 U.S. 994, 1002 (7th Cir. 2005) (post-*Booker* decision).

Indeed, in citing the *Grier* ruling, the *Reuter* court expressly notes that the Third Circuit had already withdrawn that panel opinion. *Reuter*, 463 F.3d at 793. Second, the Seventh Circuit has since re-affirmed its holding in *Reuter* independent of reference or regard to the evolution of the issue in the Third Circuit. *See, e.g., United States v. McMahan*, 495 F.3d 410, 424 (7th Cir. 2007). Finally, since defendant Ashqar filed his Memorandum, the Third Circuit has itself overruled *Kikumura*, specifically on the basis of the Seventh Circuit's holding in *Reuter*. *United States v. Fisher*, ___ F.3d ___ 2007 WL 2580632 at *13-14 (3rd Cir) September 10, 2007. Accordingly, this court's sentencing findings are governed by a preponderance of the evidence standard.

> **b.     Acquitted offense conduct is appropriately considered in sentencing.**

Defendant Ashqar also contends at various junctures that reliance for sentencing purposes on the conduct underlying the racketeering conspiracy offense on which he was acquitted is inappropriate. Seventh Circuit law is manifestly to the contrary. The proposition, in all of its various modes of articulation by defendant Ashqar, is mired in the fundamentally incorrect and jurisprudentially disdained notion that an acquittal constitutes a jury finding that the defendant did not engage in the conduct alleged. However, as the Seventh Circuit has articulated many times over, "[a]ll an acquittal means is that the trier of fact, whether judge or jury, did not think that the government had proved its case *beyond a reasonable doubt*." *United States v. Horne*, 474 F.3d 1004, 1006-07 (7th Cir. 2007) (emphasis supplied). Accordingly, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1998). This practice is grounded in the statutorily-enshrined directive that "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for purposes of imposing an appropriate sentence. 18 U.S.C. § 3661. Accordingly, there are no restrictions based on the gravity or nature of the acquitted conduct. *See, e.g., United States v. Fonner*, 920 F.2d 1330 (7th Cir. 1990)(countenancing consideration of acquitted murder in sentencing on unrelated offense).

Defendant Ashqar, employing snippets from the government's closing argument, strains to shoehorn the verdict into a framework that necessarily meant that the jury deemed him not merely not guilty, but innocent of the conduct alleged. But as this court noted in denying defendant Ashqar's post-trial motion asserting, among other things that the jury's racketeering acquittal reflected that the evidence was insufficient to convict on the obstruction and contempt charges:

> [A]n acquittal could be based on any number of 'reasons other than a determination of innocense, such as mistake, compromise, or lenity.' *United States v. Castillo*, 148 F.3d 770, 774-75 (7th Cir. 1998) . . . . There is no way to determine why the jury acquitted on the RICO count, *see Castillo*, 148 F.3d at 774-75 ("an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake")

*United States v. Ashqar*, Docket # 982 at 2. Defendant Ashqar's attempt to spin the jury verdict to his benefit is as inappropriate for sentencing purposes as it was for post-trial motions.

### c. Actual Obstruction is Not a Prerequisite to Application of the Terrorism Enhancement

Defendant Ashqar contends that application of the § 3A1.4 terrorism enhancement requires that the court first find that his offense conduct *actually* obstructed the investigation of a federal crime of terrorism. The basis for the importation of this requirement found nowhere in the Guidelines is two recently minted district court opinions out of the Eastern District of Virginia – *United States v. Biheiri*, 356 F.Supp.2d 589 (E.D. Va. 2005) and *United States v. Benkahla*, ___ F.Supp.2d ___ , 2007 WL 2254657 (E.D. Va. 2007).[3] For the following reasons, the government respectfully submits that *Biheiri* ruling incorrectly imports an actual obstruction requirement into the terrorism enhancement.

Application Note 2 does not contain any provisions for how obstruction is to be defined for purposes of Section 3A1.4. Aside from the *Biheiri* decision, the government is unaware of any other precedent directly addressing this issue. Accordingly, the issue is a matter of first impression in this

---

[3]   *Benkahla*, without analysis, simply adopts the "actual obstruction" requirement imported by the *Biheiri* court. Thus discussion here will be focused on the ruling in *Biheiri*.

jurisdiction. In the absence of binding or persuasive, the government submits that the most analogous guidepost for the Court is the obstruction of justice statute, 18 U.S.C. § 1503. In order to prove obstruction under 18 U.S.C. § 1503, the government need not demonstrate that justice was in fact obstructed, but must prove only that the defendant intended to obstruct justice. *See United States v. Aguilar*, 515 U.S. 593, 599 (1995) ("This is not to say that the defendant's actions need be successful; an 'endeavor' suffices.") (citation omitted); *United States v. Macari*, 453 F.3d 926, 940 & n.17 (7th Cir. 2006 )(§ 1503 makes it a crime to endeavor to obstruct and "does not require that the defendant actually obstructed justice" (citing *Aguilar*)).

The *Biheiri* court came to a different conclusion first by noting that § 3A1.4 was unique among all other Guideline provisions relating to obstruction in that it was the only one that did not make explicit mention of "attempt to instruct." *Biheiri*, 256 F.Supp.2d at 598. To draw out the point, the court referenced to Guideline § 3C1.1 which provides for a two-level enhancement for a defendant who "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice . . . ." U.S.S.G. § 3C1.1. The court reasoned that the Sentencing Commissions explicit inclusion of "attempt to obstruct" in § 3C1.1 makes clear that the absence of explicit attempt language in § 3A1.4 and Application Note 2 was not accidental and indicated the Commission's intention that the terrorism enhancement apply only to "actual obstruction." *Biheiri*, 356 F.Supp.2d at 598. The analysis carries a number of critical conceptual flaws.

First, contrary to the *Biheiri* court's observation, § 3A1.4 is *not* the only obstruction-related Guideline provision to make no reference to attempt. Section 2J1.2 – the provision that governs obstruction offenses – likewise makes no mention of attempts to obstruct. The absence of such explicit reference in § 2J1.2 is easily explained – one is not needed because it applies to the offense of obstruction, and thus *implicitly* is co-extensive with the scope of § 1503. Section 3C1.1, on the other hand, does not apply to an offense, but rather to non-offense *conduct*. Simply, it is enhancement for *additional* actions or conduct beyond the offense conduct that is undertaken in the context of the pursuit of the case at bar. That it applies to obstructive *conduct* and does not apply to offense conduct is reflected in the fact that under § 2J1.2, which governs obstruction *offenses*, the

8

Chapter Three, Part C obstruction enhancement – § 3C1.1 – "does not apply, *unless* the defendant obstructed the investigation, prosecution, or sentencing of the obstruction of justice count" itself. U.S.S.G. § 2J1.2 Application Note 2 (A). Concomitantly, § 3C1.1 does not apply to offenses governed by § 2J1.2 – including obstruction – unless "further obstruction" occurred during the investigation, prosecution or sentencing of the obstruction offense itself. U.S.S.G. § 3C1.1 Application Note 7; *accord United States v. Roche*, 321 F.3d 607-11 (6th Cir. 2003). Because § 3C1.1 operates without reference to the obstruction statute, and indeed is, per directive of the Sentencing Commission, not to be applied to obstruction *offense* conduct, it necessarily requires explicit reference to "attempt" in order to so apply.

A more apt point of comparison is found in the question of whether actual obstruction is required for the § 2J1.2(c) accessory after the fact cross-reference to apply. That Guideline provision applies where "the *offense involved obstructing the investigation* or prosecution of a criminal offense . . . ." U.S.S.G. § 2J1.2(c) (emphasis added). Notably, that language closely mirrors the terminology set forth in § 3A1.4 Application Note 2, which provides that the terrorism enhancement applies to "an *offense that involved . . . (B) obstructing an investigation* of a federal crime of terrorism . . . ." Both provisions apply to an "offense" as compared to non-offense conduct as in the case of § 3C1.1. Both apply to an offense[4] that "involved obstructing an investigation" into a criminal offense, with the terrorism enhancement more *limited* in scope. While there is almost no authority construing the language as it appears in § 3A1.4, there is an abundance of appellate authority applying nearly *identical* language that appears in § 2J1.2(c); *all* of it holding that actual obstruction is not a prerequisite to application. *United States v. Gallimore*, 491 F.3d 871, 876-77 (8th Cir. 2007); *United States v. Giovanelli*, 464 F.3d 346, 354 (2d Cir. 2006); *United States v. Flemmi*, 402 F.3d 79, 97 (1st Cir. 2005); *United States v. Roche*, 321 F.3d 607, 611 & n.2 (6th Cir. 2003); *United States v.*

---

[4] The Seventh Circuit in *Arnaout* noted that the Guidelines "define 'offense' as 'the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context.'" *Arnaout*, 431 F.3d at 1001 & n.2, *quoting* U.S.S.G. § 1B1.1 Application Note 1). There is no alternative meaning to offense specified or otherwise indicated in § 3A1.4 and Application Note 2.

*Brenson*, 104 F.3d 1267, 1284 (11th Cir. 1997); *United States v. Aragon*, 983 F.3d 1306, 1315 (4th Cir. 1993). Each of these appellate rulings is grounded in the basic observation that a requirement of actual obstruction is at odds with the § 1503 obstruction statute itself, which prohibits "endeavors" or conduct that is part of an "effort" to obstruct and does not rise and fall on the success of the endeavor or effort. *See, e.g., Giovanelli*, 464 F.3d at 354. *See United States v. Aguilar*, 515 U.S. 593, 599 (1995)("This is not to say that the defendant's actions need be successful; an 'endeavor' suffices.") This reasoning applies equally to consideration of the question of whether actual obstruction is required for application of the § 3A1.4 terrorism enhancement. In the absence of contrary intent reflected in the text of § 3A1.4 or Application Note 2, it is nothing short of odd to impose a *more* demanding obstruction standard on the government at *sentencing* than the government confronts in trying to establish criminal liability for obstruction in the first instance. And it is logical to believe that the Sentencing Commission intended for obstruction to be defined in a manner consistent with 18 U.S.C. § 1503.

The Sentencing Commission chose all but identical language in its phrasing of 2J1.2(c) and 3A1.4 as applied in application Note 2. It would be illogical to conclude they differed in their intentions regarding the import of the language. This court should follow the overwhelming weight of authority holding that this carefully chosen paralleling language of the Sentencing Commission does not evince a requirement of proof of actual obstruction.[5] Indeed, it is *Biheiri*'s importation of an actual obstruction requirement sets the terrorism enhancement in stark contrast to the construction and application of every other use of obstruction as found or referenced in the Guidelines.

Finally, concerns about the "draconian" or serious nature of the sentencing impact of the

---

[5] The analysis of *Biheiri* employed by Ashqar here also fails to account for the language of § 3A1.4(a) which apples more generally to offenses aside from obstruction offenses referenced specifically in Application Note 2. Section 3A1.4(a) states that enhancement applies where "the *offense* is a felony that involved, *or was intended* to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). The term "intended' has almost no meaning if read to preclude application of the enhancement attempt offenses, including obstruction. *See Arnaout*, 431 F.3d at 1001 ("Guidelines must be interpreted . . . so no words are discarded as meaningless, redundant or surplusage (citation omitted)).

terrorism enhancement used to justify the otherwise baseless importation of an actual obstruction requirement do not withstand scrutiny when viewed in comparison to the accessory after the fact or aiding and abetting cross-reference. *See Biheiri*, 356 F.Supp.2d at 598. Courts applying (and upholding application of) the accessory after the fact cross-reference have done so without restraint, enhancing sentences for an otherwise base level 14 obstruction offense by orders of magnitude by cross-reference to serious drug and violent crime Guidelines, including murder. *See, e.g., Giovanelli*, 464 F.3d at 352-53 (affirming application of § 2A1.1 murder enhancement to § 1503 obstruction of grand jury by 73 year old witness); *United States v. Small*, 175 Fed. Appx. 765 (7th Cir. 2006) (Nonprecedential Disposition) (affirming 108 month sentence based on accessory after the fact cross-reference of the obstruction Guideline for defendant who played what appellate court characterized as a "relatively small role" in a drug conspiracy by lying during his brief appearance as a trial witness). *United States v. Brady*, 168 F.3d 574, 580-81 (1st Cir. 1999) (affirming as lawful and appropriate sentence of "87 months for a then-19 year old with an otherwise clean record and a good many touching letters in his favor" for refusing to provide immunized testimony to grand jury investigating an armored car robbery). The First Circuit's decision in *Brady* strikes a note with great resonance to this case. While characterizing the 87 month sentence for the recalcitrant grand jury witness as a "severe one," the court noted that noted that the stiffness of the sentence could always be relieved by a Rule 35(b) motion whenever the defendant chose to relinquish the evidence he had affirmatively chosen to withhold, so long as the information was still relevant to the government. *Id.* The same applies here – we are at this moment because Ashqar has chosen it for himself, and it remains exclusively within his power to alter the landscape by providing the information lawfully required of him. Application of the terrorism enhancement on its own is no more or less "draconian" than other cross-references under the Guidelines and thus does not warrant any greater standard than is applied in other comparable cross-reference provision of the Guidelines.

B.       **The Terrorism Enhancement Properly Applies To Defendant Ashqar**

a.       **The Terrorism Enhancement Applies to Defendant Ashqar's Contumacious Refusal To Testify**

Defendant Ashqar asserts that the terrorism enhancement does not or should not apply to obstruction constituted of mere refusals to testify. This argument is advanced by way of comparison to a variety of cases in which the defendants directly engaged in (and typically were convicted of) violent terroristic activities. *See* PSR Mem. at 12-17. However, the Guideline neither admits of such a distinction, nor does defendant Ashqar point to any provision of the Guidelines that embraces the proposed distinction. Moreover, the argument paints with too broad a brush. Obstruction of justice, in whatever form, is a serious offense. Just how serious is in significant part a function of two factors – the form the obstruction takes, and what is being obstructed. Defendant Ashqar focuses on the former, but not the latter, describing his conduct as passive, and comparing it to those who obstructed through violence and direct threats of violence. Killing a witness would obviously constitute a more grave form of obstruction than lying. However, a "mere" lie to obstruct efforts to bring a serial murderer to justice would be a grave matter both on its own terms, as well as in comparison to lying to allow a jaywalker to escape bar.

b.       **Defendant Ashqar Obstructed an Investigation Into Federal Crime of Terrorism**

Defendant Ashqar contends that the PSR finding that he promoted a federal crime of terrorism through his offense conduct is not supported by the evidence. As noted at the outset, at sentencing, the government will put on evidence in the form of testimony from an FBI agent familiar with the obstructed investigation to further detail the investigation, its subjects, its objectives, the criminal offenses under exploration and so on. A number of observations, nevertheless, warrant immediate discussion.

First, Ashqar argues that the government is obligated to establish that his obstruction (1) was of an investigation of a federal crime of terrorism, and (2) that he intended that his conduct promote such a crime. He is incorrect. It is true that the terrorism enhancement generally requires proof of an intent to promote a federal crime of terrorism through the offense (and relevant) conduct at issue.

12

That makes sense generally for offense that are not themselves federal crimes of terrorism. *See Arnaout*, 431 F.3d at 1001-02 (specifying that where the "offense" is a federal crime of terrorism, the enhancement applies, i.e., there is no requirement of separate proof of intent to promote.) But Application Note 2 constitutes a narrow, and specific carve-out for two types of offenses that do not themselves constitute federal crimes of terrorism. One, of course, is obstruction. Specifically, Application Note 2 provides that the "offense" of obstructing an investigation of a federal crime of terrorism "*shall be considered* to have involved, or *to have been intended to promote*, that federal crime of terrorism." § 3A1.4 Application Note 2. There is only one construction here – strict liability under the terrorism enhancement for obstructing an investigation of a federal crime of terrorism. No separate proof of intent to do so is required. That intent is supplied by the intent to obstruct that supported the conviction itself.[6] Intent to obstruct necessary for conviction, is the same as intent to promote under 3A1.4 so long as the investigation was of a federal crime of terrorism. Ashqar has been found guilty of obstructing. The only question is whether the investigation he obstructed was in some fashion of a possible federal crime of terrorism.

Second, by artificially bifurcating the elements – making two where there is only one, Ashqar opened the door to the further argument that the government is obliged not only that he intended to promote a federal crime of terrorism, but that it was his sole and unitary purpose, for which he cites *Arnaout*. *See, e.g.*, PSR Mem. at 29-30. *Arnaout* requires no such thing. *Arnaout* specifies with respect to the analysis of non-terrorism underlying offenses that the "defendant's felony conviction

---

[6]  Among the elements the needed to convict defendant ashqar was that he acted corruptly, on which this court specifically instructed as follows:

> When determining whether a defendant's acts were done corruptly, that is, *with the purpose of wrongfully impeding the due administration of justice*, it is not necessary for the government to prove that a defendants' only or even main purpose in his actions was to wrongfully impede the due of administration of justice.

In short, in convicting defendant Ashqar had to expressly find, beyond a reasonable doubt, that he acted with the intent to wrongfully impede the grand jury in its work. Having so found, all that is left to determine for purposes of the terrorism enhancement is whether the grand jury was conducting an investigation of a federal crime of terrorism.

or relevant conduct has *as one purpose* the intent to promote a federal crime of terrorism. *Arnaout*, 431 F.3d at 1002. Ashqar's reading of "as *one* purpose" to require sole or unitary purpose defies commonsense, commonly understood meaning, and all linguistic conventions.

Third, defendant Ashqar contends that the government proffered not a scintilla of evidence to support its position that one of Ashqar's purposes in obstructing was to promote a federal crime of terrorism. Two observations – grand jury transcripts constitute evidence. Indeed, they were central to convicting Ashqar in the first place. Taking those transcripts at face value, which the government appreciates Ashqar does not, although the jury clearly did, there can be no doubt from that Ashqar was fully informed of numerous specific criminal offense being explored by the grand jury, including through specific citation and description of federal crimes of terrorism, including most notably, 18 U.S.C. § 2339B, as well as the central subject – the Hamas terrorist organization and a number of its leaders and operatives, including at least members who the United States had designated as Specially Designated Global Terrorists – Muhammad Salah and Mousa Abu Marzook. Indeed, the transcript reflects that Ashqar was informed on the record in the grand jury that the grand jury was investigating potential violations of the following sections of Title 18, United States Code: (a) "Section 956(a)(1) which makes it a crime to conspire, to kill, kidnap, maim, or injure persons or damage property in a foreign country"; (b) "Section 1203 which relates to hostage taking"; (c) "Section 2332 which makes it a crime to kill a United States national while the national is outside of the United States"; (d) "Section 2339[A] which makes it a crime to provide material support and resources to terrorists"; (e) "Section 2339[B] which makes it a crime to provide material support and resources to terrorist organizations including, among other organizations, Hamas"; and (f) "Section 2339[C] which makes it a crime to finance terrorists and terrorist organizations including, among others, Hamas." *Id*. at 34-35. Each of these statutes are included within the definition of "federal crime of terrorism" as that term is defined in Title 18, United States Code, Section 2332b(g)(5) and Guideline §3A1.4. Ashqar was repeatedly informed throughout his obstructive grand jury appearance that the grand jury was investigating terrorism and his conduct was obstructing the grand jury's investigation into terrorist activity. *See Id*. at 37 ("[T]he grand jury is investigating a wide

variety of criminal conduct encompassed by terrorist laws."); *Id*. at 37 ("You should assume that the grand jury will be interested in every little thing that you know about Hamas or individuals that we ask about and that everything you know is important and material to this grand jury's investigation"); *Id*. at 49 ("Are you aware that the Hamas organization is a specially designated terrorist organization, pursuant to executive order of the president?"); *Id*. at 50 ("And are you aware, sir, that the Hamas organization which I just mentioned has publicly taken responsibility for suicide bombings and other terrorist attacks in which Americans have died?").

At one point, Ashqar was specifically informed his obstructive behavior was actively impeding the grand jury's ability to investigate federal crimes of terrorism:

> [T]his is an extremely important grand jury investigation into a variety of different acts both in the United States and overseas, some of which have potentially led to the death of many individuals including American citizens. It is a broad-ranging investigation under the various terrorist laws. Your continuing refusal even with a grant of immunity to answer these questions is seriously impeding the ability of this grand jury to investigate the different acts that have occurred both in the United States and aborad.
>
> Whether you think the information you have will be used against friends or otherwise, do you understand you are making it extremely difficult for this grand jury to investigate various federal terrorism laws of great importance to people in the United States?

*Id*. at 52; *see also Id*. at 53 ("[I]t is believed that the information that you have is critically important to this grand jury's investigation into Hamas and other terrorist acts."); *Id*. at 58 ("You understand now that you're refusing to answer questions of grand jurors who [are] . . . simply inquiring to assist their investigation into matters of terrorism?"). The math here really is not difficult. The transcript admitted into evidence at trial, upon which the jury based its obstruction verdict, makes abundantly clear and on its own supports an inference supported by a preponderance, that the investigation was of federal crimes of terrorism, that Ashqar knew as much, and that he willfully obstructed that investigation by refusing to answer any substantive question put to him in the grand jury. The government submits that no more is required.

Of course, that is not all that the evidence supporting application of the terrorism enhancement. Other voluminous evidence introduced at trial included Ashqar's documents, financial

records and other forms of communications and information relating specifically to the Hamas terrorist organization, and its operations members and leaders in the United States and abroad. Those materials extensively reflect Ashqar to be a central actor in the affairs of those parties. Adding these to the mix makes eminently reasonable, if not compelling, the inference that Ashqar understood and therefore intended that he was serving and protecting his Hamas brethren by shielding them through the withholding of evidence, from possible prosecution under the statutes specifically recited to him in the grand jury. Indeed, Ashqar repeatedly expressed his belief and understanding that his testimony would be used to prosecute his Hamas brethren.[7]

### c. Defendant Ashqar's Obstruction and Contempt Constituted Actual Obstruction

As established above in Section II.A.c, the terrorism enhancement does not call for or otherwise require a demonstration of actual obstruction. But even if it was required, it is amply demonstrated in the instant case. The government has already made a substantial showing to support such a finding, if deemed necessary. It intends to add to that substantial showing by putting on testimony of an FBI agent at the sentencing hearing. For present purposes, it bears mention that the issue of actual obstruction significantly overlaps the similarly disputed issue of the application of the "substantial interference with the administration justice enhancement under Guideline § 2J1.2(b)(2). Accordingly the government refers the court to Section IV below which address that issue at some length. But before moving on, a couple of observations are warranted.

First, Ashqar's commentary about whether the grand jury was really investigating federal

---

[7]     Defendant Ashqar makes special mention of the Holy Land Foundation as "the elephant in the courtroom" and acknowledges that organization and its leaders to be one of the subjects, if not targets of the Chicago grand jury investigation." *See* PSR Mem. at 50-51. He is right. And as Ashqar correctly details, the Holy Land Foundation and its principals, including a number of attendees of the secret Hamas Philadelphia summit organized by Ashqar in October 1993, was charged in July 2004 – one year after Ashqar's Chicago grand jury appearance - in a case presently with a federal jury in the Northern District of Texas. *See id*. What Ashqar omits to mention is that the lead charge in the case is material support of terrorism in violation of 18 U.S.C. § 2339B. His frank acknowledgment of "the elephant in the room" thus qualifies on its own terms as an admission that the grand jury he obstructed was conducting an investigation of a federal crime of terrorism.

crimes of terrorism and his ruminations of how or why his withholding of testimony did not actually obstruct amounts to nothing more than an effort to divert, by means of filibuster, the court's attention from the obvious. But what renders them remarkable is that they essentially require perfect knowledge of what the grand jury was doing. Ashqar of course does not have such knowledge, thus his observations are highly speculative, and warrant no consideration at this juncture.

Second, Ashqar asks the court to draw conclusions about the import of his withheld testimony and its impact on the investigation without ever disclosing precisely what information he holds. This court should not permit Ashqar the benefit of sentencing inferences that are rooted in his continued withholding of information that he was lawfully obligated to produce to the grand jury.

Third, Ashqar's commentary on actual obstruction is advanced in complete disregard of the nature of grand jury proceedings generally. As generally enumerated by the Second Circuit in *United States v. Suleiman*, 208 F.3d 32 (2d Cir. 2000):

1.  The issues before a grand jury are not predetermined;
2.  Its function is to investigate *possible* crimes so that it can make a judgment whether a trial on specific charges is necessary;
3.  The scope of its legitimate inquiry is therefore broad;
4.  Its investigation of a conspiracy does not cease simply because certain participants have been charged or convicted;
5.  The grand jury can still call witnesses to achieve a complete investigation even "where its inquiry is directed at persons suspected of no misconduct but who may be able to provide links in a chain of evidence related to the criminal conduct of others."
6.  To perform its function, "the grand jury must be able to probe witnesses for information about knowledge or conduct relevant to the criminal offense being investigated," even where possession of that knowledge or engagement in that conduct is not necessarily unlawful in and of itself;
7.  Each question need not always specifically refer to the underlying offense "*and would sometimes be ineffective if it did.*"[8]
8.  A witness informed of the generally of the subject of the inquiry may not avoid sanction for lying or refusing to testify because the question did not alert him to the precise link between the question and the offense under inquiry.

---

[8]  Ashqar argues that it is apparent from the questions asked of him that his withholding of testimony did not actually obstruct the grand jury. *See* PSR Mem. 43-52. In other words, the grand jury should have disclosed to him precisely what it was interested in through direct, specific questions clearly linked to a criminal offense even though it became immediately apparent that Ashqar would be offering nothing in return. This is absurd.

*Suleiman*, 208 F.3d at 39-40 (addressing application of § 2J1.3(c) accessory after the fact cross reference to witness lied in a grand jury investigation he was expressly informed was about a plot to bomb the World Trade Center). Ashqar's arguments ignore these and other fundamental precepts to the function of the grand jury. He artificially, and without basis, attempts to force limits on the grand jury's function, the matters under investigation, and the proper scope of its activities and interests. In a very real sense, Ashqar is now, by different means, simply carrying on with the work he began when he obstructed in the first place – defining for the grand jury how far its investigation might go.

### C.     Other Constitutional Objections

#### a.     The Terrorism Enhancement Does not Violate Double Jeopardy

Defendant argues that application of the § 3A1.4 Terrorism Enhancement offends the bar against Double Jeopardy Clause of the Fifth Amendment which prohibits successive prosecution or multiple punishments "for the same offense." *See* PSR Mem. at 77-89. However, the case law is all but universal that sentencing determinations formulated on the basis of other criminal conduct, i.e., non-offense conduct – whether charged, uncharged, the subject of prior conviction and sentence, or even prior acquittal, the Double Jeopardy Clause is not violated because the sentence is regarded, for constitutional purposes, as being solely for the offense of conviction. *See Witte v. United States*, 515 U.S. 389, 401-03 (1995); *see also United States v. Hall*, 109 F.3d 1227, 1239 (7th Cir. 1995).

#### b.     Application of The Terrorism Enhancement Does Not Violate the Eighth Amendment Cruel and Unusual Punishment Clause

.

Defendant Ashqar asserts that application of the terrorism enhancement is violative of the Cruel and Unusual Punishment Clause of the 8th Amendment. PSR Mem. at 89-98. This argument is based on the construction of the PSR as recommending a sentence of life imprisonment. The government does not read the PSR to such effect. Rather the PSR merely sets forth the applicable Guidelines and the resulting indicated Guidelines range. To the extent that defendant Ashqar may be contending that the Terrorism Enhancement does not apply because the resulting sentence would be cruel and unusual, it is without legal basis. The court does not have the discretion to disregard

or refuse to apply any particular Guideline in carrying forth with its obligation to calculate the sentencing range indicated under the advisory Sentencing Guidelines. *See* Section II. To the extent defendant Ashqar is asserting that the court should sentence below the indicated Guidelines range – which, the government submits the PSR has correctly calculated as life imprisonment – his position runs contrary to basic 8th Amendment principles.

The Eighth Amendment prohibits punishments which involve the unnecessary and wanton infliction of pain, are grossly disproportionate to the severity of the crime for which an inmate was imprisoned, or are totally without penological justification. *Whitman v. Nesic,* 368 F.3d 931, 934 (7th Cir.2004). In non-capital felony convictions, a particular sentence that falls within legislatively prescribed limits is not deemed disproportionate unless the sentencing court abuses its discretion. *United States v. Olsen*, 450 F.3d 655, 686 (7th Cir. 2006); *Henry v. Page,* 223 F.3d 477, 482 (7th Cir.2000); *United States v. Beckham*, 968 F.2d 47, 54 (D.C. Cir. 1992). The statistical analysis employed by defendant to suggest that a within Guideline range within statutorily prescribed limits would be an abuse of discretion is flawed in a number of respects.

First, defendant draws on an adjusted average of all sentences imposed in administration of justice cases in Seventh Circuit jurisdictions for the last ten years. PSR Mem. at 95-97. This calculus is inapposite because it does not focus on such offenses occurring in comparable circumstances – i.e., terrorism investigations. Employing an average drawn from cases of a broad variety results in an artificially depressed statistical point of comparison that does not inform the issue of disproportionality. Second, the only case arising from somewhat comparable facts on which defendant does focus – *United States v. Alwan* – played out *prior* to the November 2002 promulgation of Application Note 2 which made express that the terrorism enhancement was to be applied to cases of obstruction of terrorism investigations. Thus the *Alwan* sentence is not an appropriate reference point because it did not arise from the same applied Guideline matrix. Moreover, Alwan was a more limited and marginal figure in the Hamas enterprise as compared to defendant Ashqar who, the evidence adduced at trial abundantly established, was directly engaged with the upper tier of Hamas leadership domestically and abroad. The absence of a comparable

Sentencing Guideline matrix is even more of a problem with defendant's invocation of appellate cases resulting in reductions of sentences imposed by district courts in contempt cases. *See* PSR Mem. at 97-98. All of the cases he cites pre-date the Sentencing Guidelines, and none therefore involve assessment of sentences imposed on the basis of the terrorism enhancement, nor even a single case involving an investigation of designated terrorist organizations or individuals.[9]

Defendant Ashqar obstructed an investigation into the workings and operation of an American-based support network for a designated terrorist organization, as well as the activities of certain designated terrorists who were part of that organization. Accordingly, the § 3A1.4 terrorism enhancement is properly applied to the Guideline Sentencing calculations which the court must consider. The resulting indicated sentence is within legislatively prescribed limits for contempt/obstruction sentencing. The indicated Guideline range further is commensurate with the gravity of the offense in light of the subject matter of the underlying investigation and the defendant's unique position to provide critical information about matters central to the matters under investigation, which the government will detail through the proffer of agent testimony at the sentencing hearing (and subject to cross-examination by defense counsel).

### c. Application of the Terrorism Enhancement Does Not Violate the First Amendment.

Defendant Ashqar contends application of the terrorism enhancement violates his 1st Amendment associational rights. PSR Mem. at 98-99. This argument appears to be a thankfully truncated rehash of one defendant Ashqar's post-trial motion arguments, which itself was more an attack on the obstruction and contempt *charges* than the verdicts themselves. In any event, this court denied the motion. *See* Docket # 982 at pp. 3-6. The mere fact that the defendant is proceeding to sentencing under the advisory Guidelines does not render the Guidelines or any portion of them violative of the First Amendment. For the reasons stated in the court post-trial motion ruling,

---

[9] Throughout these proceedings, defendant Ashqar has maintained that an entity is not a terrorist organization unless and until designated as such by the United States government. It is somewhat ironic that he would now cite *United States v. Gracia*, 755 F.2d 984, 900 (2d Cir. 1985), an opinion that pre-dates the terrorist designation program by a decade, as an example of sentence for obstruction of an investigation relating to a "terrorist" organization.

defendant Ashqar's renewed First Amendment claim should be denied.

    **D.**    **The Court Should Not Depart Downward From the Guideline Range Indicated as a Result of the Application of the Terrorism Enhancement**

Defendant Ashqar variously urges this court to "disregard," "ignore" or "depart downward" from the Guideline range indicated by application of the terrorism enhancement because this case is outside the heartland of cases envisioned by the Sentencing Commission. Obviously, the law is clear that this court may not "disregard" or "ignore" the Guidelines. Rather, a sentencing court *must* use the Guidelines as its starting point. *See, e.g., United States v. Orozco-Vasquez*, 469 F.3d 1101, 1107 (7th Cir. 2006)(sentencing post-*Booker* requires sentencing judge to calculate the advisory guidelines range and then "make a discretionary decision whether to sentence the defendant within the advisory range or outside it in light of the very broadly stated sentencing factors set forth in § 3553(a).") Additionally, the Seventh Circuit has on numerous occasions noted that the concept of departures "has been rendered obsolete in the post-*Booker* world." *E.g.*, *Arnaout*, 431 F.3d at 1003. In effect, consideration of factors that in the past would be argued in the form of requests for downward departures devolve to consideration within the context of the broader parameters of the court's consideration of § 3553(a) factors. However, in the off-chance that the concept of departures maintain some vitality, the government will briefly address the arguments raised by defendant Ashqar.

Defendant Ashqar asserts that departure from the indicated range under the terrorism enhancement is warranted because the imposition of a Criminal History category VI pursuant to § 3A1.4 substantially over-represents the serious of the defendant's criminal history or the likelihood that the defendant will commit other crimes. PSR Mem. at 101-104. The government could not disagree more and submits that defendant Ashqar's bases this claim on an inappropriately crabbed view of criminal history that looks only to prior felony convictions. In fact, the evidence introduced at trial abundantly established that defendant Ashqar has engaged in numerous violations of federal law over the course of a decade, all in the service of a terrorist organization and its leadership which, individually and collectively over the years were designated as such by the United States government. Those actions include, aiding and abetting murder and murder conspiracy, as most

dramatically reflected in the wiretap calls and transcripts received into evidence in which he is heard engaging in and then later relaying information from communications concerning the need to kill a rogue Hamas operative. The evidence similarly reflected that he was a critical hub in a communications and financial network designed to serve and support Hamas, its leaders, and various aspects of its operations. His meeting with unindicted co-conspirator Muhammad Jarad a mere two weeks after Jarad's release from Israeli prison, resulting in the "Samir" memo, and followed by his provision of resettlement funds to Jarad, constitute aiding and abetting the manifestly unlawful activities transpiring during co-defendant Muhammad Salah's abortive Hamas military mission in January 1993. And, of course, there simply can be no dispute that defendant Ashqar engaged in uncharged acts of criminal contempt and obstruction of justice in 1998 when he refused to provide immunized testimony to a New York grand jury seeking to peel back the layers of the Hamas support structure operating from the United States. Indeed, the record replete with instances not merely of prior criminal conduct, but prior criminal conduct *specifically* in the service of a terrorist organization that indisputably conducted itself through horrific terrorist acts specifically intended to influence governments and governmental entities.

Defendant Ashqar further argues that he is not a risk of recidivism or insusceptible to rehabilitation, which, citing *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003), is an animating factor behind the severity of the terrorism enhancement.[10] Any implied claim of susceptibility to rehabilitation is severely strained by Ashqar's serial contumacy and obstruction. He comes to bar unrepentant, still unheeding of his legal obligations, in still in exclusive possession of the evidence sought by the grand jury. Obstruction is charged as a discrete action or set of actions, but having opted to keep to himself the information he withheld from federal grand juries on multiple occasions, he comes to sentencing as, in essence, a *continuing* violator of the law. Because the information he maintains relates to the operations of a terrorist organization, he is an embodiment of the very

---

[10]     *Meskini* itself speaks of "prior criminal behavior" rather than prior criminal convictions, and specifically rejected a downward departure for over representation of criminal history request asserted on the basis of an absence of prior criminal convictions in the United States. *Meskini*, 319 F.3d at 92.

concerns that animated the Sentencing Commission in imposing a serious increase in the Criminal History level attending application of the terrorism enhancement.

## III.     The PSR Correctly Applies the § 2X.1 Accessory After the Fact Cross Reference

### A.     The Cross-Reference Applies to Defendant's Failure to Testify

Sentencing Guideline Section 2J1.2(c), governing obstruction of justice offenses, directs that "if the offense involved obstructing the investigation of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than the determined" under the standard obstruction Guideline provisions of § 2J1.2. The cross-referenced accessory after the fact provision set forth in Guideline § 2X3.1 states in part that the base level for the offense is "6 levels lower than the offense level for the underlying [i.e., cross-referenced] offense" but not less than level 4 or more than level 30. The PSR correctly assessed that a preponderance of the evidence supported the conclusion that defendant Ashqar participated extensively in a Hamas racketeering conspiracy whose methods and means included murder and murder conspiracy. Myriad of forms of evidence introduced at trial established specifically that the conspiracy embraced an agreement that the affairs of Hamas would be conducted through murder and murder conspiracy. It appears not to be disputed any longer that Hamas engaged in various forms of violent terrorist actions from its earliest days, including the 1989 kidnaping and murder of off-duty soldier Ilan Sa'adon whose body co-conspirator Salah traded on in return for benefits to the enterprise being one of the more prominently featured incidents at trial. The government presented through demonstrative exhibits and extensive testimony (of its own expert as well as through testimony elicited in cross-examination of the defense's Hamas expert, Khaled Hroub) of largely unrefuted evidence of Hamas' bloody history of terrorist strikes on civilian and other targets, resulting in the deaths of hundreds, including tens of Americans; strikes that were undertaken by Hamas terror cells, sanctioned in broadbrush by Hamas leadership and then claimed by all as the purposeful and strategically directed work of the organization. Aside from the sad march through the endless string of horrific attacks, the evidence amply reflected that co-conspirator Salah directly engaged in and furthered discussions about the murder of civil engineers and a Palestinian peace

proponent as well as the funding of individuals and cells engaged in such activities. The evidence further reflected defendant Ashqar's work with and for those for directing, financing and otherwise facilitating Salah's military activities. The links in common included Hamas leader Mousa Abu Marzook, who was directing Salah's activities, and unindicted co-conspirators Ismail Elbarasse and Nasser Al-Khatib who funneled money to Salah for his Hamas activities. Ashqar bank records reflected him to be centrally linked to the same network of Marzook-linked accounts and associates. Beyond transactions reflected in his own bank records, the Ashqar search documents reflected Ashqar to be deeply involved in the tracking and facilitation of transfers of millions of dollars through this network originating overseas, hop-scotching in concealing fashion through U.S.-accounts. The evidence also reflected that in August 1993, Ashqar personally conducted the substantive debriefing of Salah's fellow traveler, unindicted co-conspirator Muhammad Jarad, a mere two weeks after the latter was released from an Israeli prison and returned to the United States. The evidence amply demonstrated that the connection between Ashqar and Jarad was not fleeting, as (1) they were regular communicants on the phone in the months that followed the meeting, (2) with Ashqar promoting Jarad for attendance at the Philadelphia meeting of the U.S. Hamas leadership in October 1993, and with (3) Ashqar arranging the transfer of thousands of dollars to Jarad from overseas to help the latter purchase a home in the Chicago area as part of his resettlement to life in Chicago. While these types of evidence are highly probative of Ashqar's involvement in a racketeering conspiracy on behalf of a murderous enterprise, they pale when compared to wiretap calls from Ashqar's home telephone line in which defendant Ashqar is captured himself personally and directly engaged in discussions with an unidentified Hamas military operative about the need to murder a rogue Hamas operative, followed by further calls in which defendant Ashqar communicates the information and recommendation on to higher-ups in Hamas.

In refusing to provide legally obligated and compelled testimony to the Chicago grand jury (as well as the New York Grand Jury in 1998), defendant Ashqar *to this day* harbors information about those who directed, sanctioned and engaged in murders by the Hamas enterprise. The foregoing types of evidence – all a matter of public record, part of the trial proceedings, and through

24

this avenue fully available to the Probation Officer, are noted as merely examples of the body of information and evidence that amply supports, as a factual matter, the Probation Officer's cross-reference application of the Guideline applying to first degree murder to defendant Ashqar.

> **B.     The Record Amply Reflects that the Government was Investigating Numerous Specific, Serious Criminal Offenses**

Defendant Ashqar contends that there is no evidence proving that the government was investigating a specific criminal offense when it put Ashqar in the Grand Jury. PSR Opp. at 106-110. This claim is willfully myopic. The government prefaced its grand jury questioning of defendant Ashqar with a list of *specific* statutory offenses the grand jury was investigating. Defendant Ashqar apparently does not regard the transcribed words of the prosecutors -- officers of the court -- engaged in court proceeding – grand jury session – with an associate of a designated terrorist organization to be sufficient. So be it. Confirmation is found in the indictment the *grand jury* returned, that included not merely the offenses of conviction – criminal contempt and obstruction of the grand jury proceedings – but a racketeering conspiracy which the grand jury alleged to include a host of the individual predicate crimes, including first degree state murder and murder conspiracy, which were specifically enumerated by the prosecutors before putting substantive questions to defendant Ashqar.[11]

Ashqar offers various arguments in counter. Ashqar would have it that the absence of convictions means that the crimes did not occur, but as the Seventh Circuit has repeatedly noted (and as this court has itself noted in denying Ashqar's post-trial motions), such is not the legal import of a not guilty verdict.[12] *See* Section II.A.b. above. Moreover, Ashqar, himself concedes that the case

---

[11]     It bears mention that the subject of the investigation included material support of terrorism violations – indeed, the grand jury returned a material support charge under 18 U.S.C. § 2339C against defendant Salah and included the conduct giving rise to the charge as acts demonstrative of the Hamas racketeering conspiracy alleged in Count One against defendant Ashqar among others. That the government decided not to proceed to trial with that charge in no way diminishes its presence as a specific offense under investigation by the grand jury before whom defendant Ashqar appeared.

[12]  This court itself noted at the sentencing of defendant Salah in July, 2007 that the jury concluded that the racketeering conspiracy and underlying predicate components reflected in acts

law  (as cited by the Probation Officer) holds that the underlying offense need not be provable.  *See, e.g.*, *United States v. Arias*, 253 F.3d 453 (9th Cir. 2001); *United States v. Russell*, 234 404, 410 (8th Cir. 2000).  Ashqar further asserts that the prosecutor's own words – that the government was not investigating  whether violent acts of murder were committed by Hamas as that was well known – means that first degree murder (and presumably murder conspiracy) was not under investigation. PSR Opp. at 109-110.  That it was common knowledge that such heinous acts were committed by Hamas over and again does not in the least detract from the notion that the government was looking to uncover and prosecute wherever and however possible the U.S. support structure that aided and abetted those murders.  And the government's characterization of the investigation as "broad" does not preclude the notion of it lacking specificity, as Ashqar suggests.  *Id.*  Again, the prosecutors cited specific statutory violations to Ashqar, many of which were the later specified as methods and means of the racketeering conspiracy charged in Count One of the second superseding Indictment returned by the grand jury.

> **C.**     **Actual Obstruction is Not Required For Application of the § 2J1.2(c) Cross-Reference**

Ashqar contends that actual obstruction must be proven by the government in order for the § 2J1.2(c) cross-reference to be applied.  This argument warrants almost no comment because *every* appellate court to consider the issue – six and counting – has rejected Ashqar's position.  *See United States v. Gallimore*, 491 F.3d 871, 876-77 (8th Cir. 2007); *United States v. Giovanelli*, 464 F.3d 346, 354 (2d Cir. 2006); *United States v. Flemmi*, 402 F.3d 79, 97 (1st Cir. 2005); *United States v. Roche*, 321 F.3d 607, 6XX (6th Cir. 2003); *United States v. Brenson*, 104 F.3d 1267, 1284 (11th Cir. 1997); *United States v. Aragon*, 983 F.3d 1306, 1315 (4th Cir. 1993).  Ashqar asks this court to look past these decisions and rule to the contrary on the basis of the analysis of the court in *Biheiri*.  As discussed above, *Biheiri* is fundamentally, indeed fatally flawed, particularly when matched up against the above-cited appellate opinions.  The court should follow the overwhelming weight of

---

of the defendants proved at trial was established but that the jury did not render a guilty verdict for other reasons.

appellate precedent and hold that actual obstruction is not a prerequisite to the application of the 2J1.2(c) cross-reference.

### D. The PSR IS Correctly Cross-Referenced to the Murder Guideline

Ashqar objects to the PSR cross-reference to the § 2A1.1 guideline for murder on a number of grounds, all of which require only brief rejoinder. First he contends that the court should look to the offense of conviction, here obstruction. Had Ashqar obstructed merely an obstruction offense, this would make sense. Otherwise, and the facts and evidence of this case are very much otherwise, his positions results in turning the § 2J1.2(c) obstruction cross-reference back in on itself, effectively rendering it a nullity. Putting the absurdity of this outcome to the side, even Ashqar acknowledges that the case law requires no such outcome and, to the contrary, expressly countenances looking beyond the offense of conviction to determine what underlying offense (under investigation) should be applied by cross-reference. *See United States v. Arias*, 253 F.3d 453, 461 (9th Cir. 2001); *United States v. Dickerson*, 114 F.3d 464, 468 (4th Cir. 1997).

Turning to Ashqar's justifications for this generally absurd result, he proceeds by process of elimination. First he says RICO is not an appropriate "underlying offense" under investigation because Ashqar's own immunized testimony could not have been used against him, meaning his refusal to provide immunized testimony could not have obstructed a RICO case against him, thus leaving only the obstruction case against Salah. PSR Mem. at 115. Second, Ashqar references a stray, speculative slice of *dicta* from *Dickerson* that application of the cross-reference to the "underlying offense" under investigation might be limited to the offense of conviction where the case or investigation is being conducted "not in good faith" but instead was employed "as a harassing or coercive device." He then contends that this must be such a case because many of the statutes the prosecutors stated as under investigation entailed conduct occurring in the Middle East that therefore could not be the subject of prosecution in the United States and thus leading to, in his grandiose, yet myopic view of the law and facts, the conclusion that his appearance in the grand jury was really coercive. PSR Mem. at 115-16. Finally, Ashqar contends the offense for which he was charged cannot be the underlying offense for cross-reference purposes because he can't be an

27

accessory to a crime for which he was charged as a principle.  PSR Opp. at 116-17.

There are any number of responses here, but for the sake of space and simplicity, the government refers Ashqar (and the court, of course), to the indictment *returned* by the *grand jury*. It makes explicit reference to a host of Hamas co-conspirators.  Information locked in Ashqar's head to this day had the potential of turning the status of any of a number of them from unindicted co-conspirator to defendant.  It also certainly would have provided testimony and leads relating to the other defendant in the dock – Muhammad Salah, about whom co-conspirator Muhammad Jarad extensively briefed Ashqar -- as well as fugitive defendant Marzook.  There are still other material supporters of Hamas not directly referenced in the indictment who were of interest to the grand jury as reflected as Ashqar himself suggested at various junctures in his filing.[13]  Any question about the legal viability of U.S. prosecutions for actions occurring in the Middle East was resolved in pre-trial motions practice.

E.      **Ashqar's Has Not Established that His Failure to Testify Is Outside the Heartland of Cases Contemplated by the Accessory After the Fact Cross-Reference**

Defendant Ashqar contends that his failure to testify is outside the heartland of cases contemplated by application of the accessory after the fact cross-reference.  At core, this argument is advanced based on an observation in *dicta* in by the Seventh Circuit in *United States v. Ortiz*, 84 F.3d 977 (7th Cir. 1996).  In *Ortiz*, the panel overturned a contempt sentence imposed via 2X5.1 cross-reference to the obstruction of justice Guideline as the most analogous offense, with the

---

[13]      A short list would include everyone attending the Philadelphia Conference with Ashqar, many of whom are in the United States, some of whom, as detailed in the testimony at trial of FBI SA Robert Miranda, have been or are being prosecuted for a variety of crimes, including material support of terrorism and violations of the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*, (IEEPA)for the provision of financial support to Hamas and engaging in financial transactions with designated terrorists and terrorist organizations. Among those in attendance were Shukri Abu Baker and Ghassan Elashi who in 2005 were convicted of IEEPA violations for their financial dealings with Marzook and who are on trial with still others directly associated with Ashqar in the pending material support of terrorism case filed in the Northern District of Texas in 2004 – one year *after* Ashqar's Chicago grand jury appearance – relating to the operation of the Holy Land Foundation for Relief and Development. *United States v. Holy Foundation et al.*, 304CR240G (N.D. Tex).

obstruction Guideline, in turn, triggering the district court's accessory after the fact cross-reference. In remanding, the court in *dicta* observed that the 37 month sentence imposed by the district court was "a mighty stiff sentence to impose on someone who has sinned as [the defendant] has," *Ortiz*, 84 F.3d at 982. That *dicta* is particularly void of traction here because the conduct of defendant *Ortiz* was deemed not to even warrant application of the obstruction Guideline generally because the defendant was deemed not to have had any intent to obstruct. Here, *Ashqar* is *convicted* of obstruction for the conduct that also undergirds his contempt conviction. Far more instructive is the holding in *United States v. Brady*, 168 F.3d 574 (1ˢᵗ Cir. 1999), in which a witness refused to provide immunized testimony to a grand jury investigating an armored car robbery. The witness was charged with and convicted of criminal contempt and sentenced under the cross-reference to the obstruction of justice Guideline. Because the underlying investigation was a robbery in which a guard was killed, the application of the obstruction of justice Guideline led to application of the accessory after the fact cross reference. *See Brady*, 168 F.3d at 576-77. The resulting sentence: "87 months for a then-19 year old with an otherwise clean record and a good many touching letters in his favor" was characterized by the court as a "severe one" but lawful and appropriate. *Id.* at 580-81. In short, the case law directly supports application of the accessory after the fact cross-reference to case in which a defendant has failed to testify under a grant of immunity.

## IV. The § 2J1.2(b)(2) Enhancement for Substantial Interference With The Administration of Justice Properly Applies to the Instant Offenses.

Defendant Ashqar objects to the PSR assessment of a three level enhancement for substantial interference with the administration of justice set forth in Guideline § 2J1.2(b)(2). The government submits the enhancement is properly applied. By its terms, § 2J1.2(b)(2) applies "if the offense resulted in a substantial interference with the administration of justice," which is defined in Application Note 1 to "include[] a premature or improper termination of a felony investigation; an indictment, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2(b)(2) and Application Note 1. "In order to warrant a substantial interference with justice enhancement, the government need not particularize a specific number of hours expended by

government employees." *United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999) (internal quotation omitted); *United States v. Tankersley*, 296 F.3d 620, 623-24 (7th Cir. 2002) (finding enhancement applied where "many weeks" of work went into tracking down and determining what happened to improperly sold assets). "[I]n some cases, when the defendant has concealed evidence and is the only known source of information, substantial interference with the administration of justice may be inferred." *United States v. Bradach*, 949 F.2d 146, 1463 (7th Cir. 1991) (quoting *United States v. Jones*, 900 F.2d 512, 522 (2d Cir. 1990)); *United States v. Tackett*, 193 F.3d 880, 887 (6th Cir. 1999) (same)*; United States v. Barnhart*, 889 F.2d 1374, 1379-80 (5th Cir. 1989) (same).

As set forth in the Government's Version, the preponderance of the evidence – indeed, just the evidence admitted at trial in this case – amply demonstrates and supports the inference that Ashqar's refusal to testify resulted in a substantial expenditure of time and money by the government. Among other things, because Ashqar refused to provide information about Hamas financial dealings within the United States and abroad, the government had to have investigators organize and analyze voluminous financial records to determine relationships and connections among Hamas co-conspirators as well as the origin and final destination of significant monetary sums. Ashqar contends that this must have been done long before he ever sat in front of the grand jury. This is pure speculation on his part and fails to respond to the manifest logic that he knew details about the genesis, purpose and participants in such transactions that the financial records, on their face, would not reflect.

Likewise, because Ashqar refused to testify regarding his knowledge of Hamas members who had operated in the United States, the government was forced to spend significant hours and financial resources reviewing thousands of pages of documents, including those recovered during a search of Ashqar's home, in an attempt to piece together the relationships of Hamas members in the United States. Ashqar myopically regards all of the search documents admitted into evidence at trial as self-explanatory. He also baldly takes issue with notion and Probation Office finding that he was uniquely situated and was among the best, if not the best, source of the information sought by the grand jury, further noting that his information could not have resulted in the charging of any number

30

of Hamas members who had died before he was called to the grand jury room. PSR Mem at 130 & n. 67. Dead Hamas leaders and operatives obviously cannot talk. Where Ashqar was in communication with a Hamas member since deceased, he is the *only* one in a position to discuss those dealings. Where Ashqar drafted reports – for example the Jarad debriefing memo for which he used his Hamas alias "Samir" – it was *only* Ashqar who could explain, among other things: (1) why he wrote the report; (2) for whom he wrote it for; (3) to whom he transmitted it; (4) with whom he discussed it; (5) what actions ensued on the basis of it; (6) why he wrote it over an alias; (7) under what circumstances he used that alias; (8) the aliases of those with whom he treated when engaged in such secret matters, and so on. For every scrap of paper found among his documents reflecting transmissions of millions of dollars from abroad, through the United States, and back abroad; for every search document notation of his tracking the distribution of funds to various Hamas members and purposes in the United States and abroad, it was only Ashqar who could explain, where he had it, why he had it, and what the notations were referencing. The same applies to all of the "confessions" he maintained. Who provided and how and why Ashqar came to have a series of non-published confessions concerning not Palestinian politics, but the sub rosa machinations of the military wing of Hamas and its supporting elements likewise could have been answered only by Ashqar himself. This, of course, is not an exhaustive list. Suffice to say, however, every truthful answer would have turned up names, activities, initiatives, and objectives likely related to Hamas and its support structure in the United States and abroad. Only Ashqar alone could explain many of the documents found in the search of his home and his refusal to testify frustrated government efforts to understand those documents and the full scope of the Hamas conspiracy. This alone justifies an inference of substantial interference.

Defendant Ashqar takes issue with the sufficiency of the government's attorney proffer as a basis for the enhancement. In so doing, he disregard of the various modes by which his substantial interference is reflected in the existing record in this case. Defendant Ashqar also argues that the government must prove a "premature or improper termination of a felony investigation." PSR Mem. at 128. For him the simple fact that the grand jury issued an indictment means that the investigation

31

was not improperly or prematurely terminated. There is no basis for this claim. As noted elsewhere however, a simple review of that indictment reflects a roster of unindicted co-conspirators – some named, some not. Had defendant Ashqar provided the testimony legally required of him, some of those co-conspirators would likely have been moved to the ranks of defendants. Without commenting on the legal merits of the objection as t the form of the government's proffer to date, the government will address these and other matters through the sentencing hearing testimony from an FBI Special Agent involved in the investigation to detail the consequences visited on and additional expenditures incurred in pursuing the investigation as a result of defendant Ashqar's obstruction.

The Seventh Circuit upheld application of the 2J1.2(b)(2) substantial interference enhancement in *Alwan*, in which Alwan, like Ashqar, refused to testify in the grand jury, although he was charged solely with criminal contempt. *United States Alwan*, 279 F.3d, 431, 440-41 (7th Cir 2002). In *Alwan* , which for other purposes Ashqar treats as closely analogous to this case, the district court found "in no uncertain terms that what we have here is an effort to obstruct an ongoing criminal investigation by the Department of Justice into potential criminal activities conducted by various individuals and various organizations." 3/7/01 Alwan Sent. Tr. at 8, appended to Gov. Version. In considering whether Alwan's refusal to testify supported a "substantial interference" adjustment, the district court made clear that the "criminal investigation ha[d] been substantially impeded" and that it was established by a preponderance of the evidence that Alwan had "enough information that could potentially have led to indictments in this case for activities that occurred in this district." *Id*. at 9. The district court further found that, within the context of the *Alwan* grand jury proceedings, "both the government and the court system have expended substantial resources, both in terms of time and money, which could have been saved if Mr. Alwan had testified as required by the court orders." *Id*. In considering the district court's conclusion in *Alwan*, the Seventh Circuit stated "[t]he record fully justifies the district court's findings as to the enhancement." *Alwan*, 279 F.3d at 440.

Ashqar quarrels with reliance on *Alwan* on the grounds that Alwan's refusal to testify fully

satisfied the substantial interference threshold requirements because it resulted in a termination of grand jury proceedings. PSR Mem. at 129. That is too simple. As reflected in the second superseding indictment returned by the grand jury in this case, Alwan's refusal to testify was part of a longer sequence of contumacious obstruction extending – including two instances by Ashqar himself, that was among the predicate means by which the Hamas racketeering enterprise conducted itself. As established through the testimony of former prosecutors Steven Chanenson and Kenneth Karas, the government over a period of years, working through a succession of grand juries, was involved, in a near continual effort to develop evidence of the Hamas support network in the United States. Alwan's unlawful refusal to testify foreclosed certain investigative and prosecutorial options and defendant Ashqar still others, and in some respects, the consequences of their respective violations significantly overlapped. It merits mention that Alwan paled in significance to defendant Ashqar when it came to the scope of his activities with and for Hamas and its ranking leadership. The military role for which Alwan was in training under the auspices was highly significant, but as fact and expert testimony adduced from both government and defense witnesses made clear, Hamas and its military in particular, operated in a highly compartmentalized fashion in part to minimize leadership exposure. Within this operational rubric, Alwan was trained to be a mission oriented military field operative compartmentally removed from the ranking leaders. Ashqar, on the other hand, served and served with the leadership directly.

The evidence at trial made clear the amount of time and resources spent by the government, grand jury, and court system based on Ashqar's refusal to testify in the grand jury. The evidence further made clear the distinct possibility that others individuals would have been indicated had Ashqar testified truthfully in the grand jury. Accordingly, the "substantial interference" enhancement applies in the instant case was properly assessed by the Probation Office.

## V. Other Sentencing Guidelines Issues

### A. The PSR Correctly Applies the Obstruction of Justice Guideline as the Most Analogous for Criminal Contempt Sentencing Purposes

The Guideline governing contempt offenses, § 2J1.1, cross-references to Guideline § 2X5.1

which directs application of the Guideline for the offense most analogous to the conduct underlying the offense of conviction. U.S.S.G. §§ 2J1.1 & 2X5.1. The PSR logically cross-referenced to the obstruction of justice Guideline as defendant Ashqar's contempt conduct significantly overlapped his obstruction of justice offense conduct. PSR at lines 372-385. Defendant Ashqar objects, contending that the § 2J1.5 Guideline for "failure to appear" is the better analog. In so arguing, he fails to reckon with Application Note 1 of the contempt Guideline, which states:

> Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific Guideline for this offense. *In certain cases, the offense conduct will be sufficiently analogous to § 2J1.2 (Obstruction of Justice) for that guideline to apply.*

U.S.S. G. § 2J1.1 Application Note 1. While leaving the field wide open based on context, nature and consequence, the Sentencing Commission specified obstruction of justice as a likely analog for contempt cases. Where the contempt occurs, as here, in a context and with the consequence such as to constitute obstruction of justice or the administration of justice, the Sentencing Commission's lead is compelling. Ashqar contends that failure to appear before the grand jury is a closer fit because the "victim" is the court. PSR Mem. at 136-37. First, he appeared. Second, the grand jury which stands convicted of obstructing is a creature of and derives its authority from the court. Obstructing a grand jury in the exercise of its duties is thus an action against an organ of the court. Ashqar's distinction is illusory. His citation to *United States v. Ortiz*, 84 F.3d 977 (7th Cir. 1996). In *Ortiz*, the Seventh Circuit held that the 2J1.5 failure to appear Guideline better fit the circumstances of the defendant's contempt specifically because the defendant "did not intend to obstruct justice[; h]e simply did not wish to testify." 84 F.3d at 982. That certainly is not this case, as defendant Ashqar stands *convicted* of obstruction of justice stemming from the same conduct underlying his contempt conviction.

Defendant Ashqar has looked past maybe the most obvious of reference points. In *Alwan*, the defendant engaged in the similar conduct to Ashqar here, in the context of an inquiry investigation into a small portion of the larger conspiracy at issue in this case, and for which the

34

obstruction of justice Guideline was applied as most analogous. *Alwan*, 279 F.3d at 440-41. Notably, the Seventh Circuit expressly rejected the defendant's bid for sentencing under the failure to appear Guideline, as Ashqar seeks here, holding that it was "not applicable" on the closely analogous facts. *Id.*

**B.      Downward Departures from the Applicable Guidelines Ranges.**

Defendant Ashqar advances a more general arguments for departure from the otherwise applicable Guidelines range than that addressed above respecting the terrorism enhancement. *See* PSR Mem. at 101-105 (departure from terrorism enhancement) and 137-38 (departure from overall Guideline Sentencing Range). The Seventh Circuit's repeated observation of relative obsolescence of the concept of downward departure noted above applies equally here. In his second bite at the departure apple, however, defendant Ashqar does little more than recite Guideline departure provisions he believes apply, but without any explanation or substantiation. He therefore has not, to this time, met his burden. *See, e.g.*, *United States v. Sierra-Castillo*, 405 F.3d 932, 938 (10th Cir. 2005) (defendant bears burden of proving entitlement to a downward departure).

**VI**.      **A Sentence Within the Indicated Guidelines Range as Calculated in the PSR, is Sufficient, But Not Greater than Necessary, to Meet the Sentencing Goals Articulated in 18 U.S.C. § 3553(a).**

The Sentencing Guidelines are but one of the considerations that must be factored into the the court's sentencing determination. However, the government urges that this Court should give serious consideration to the advisory Guidelines range in order to minimize unwarranted sentencing disparities. The very purpose of the *Booker* remedial opinion's exercise in excision was to effectuate, without running afoul of the Sixth Amendment, Congress's primary intent in enacting the Sentencing Reform Act: to minimize unwarranted sentencing disparities. 543 U.S. at 250 ("Congress' basic statutory goal – a system that diminishes sentencing disparity"); *id.* at 253 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity"); *id.* at 267 (rejecting other remedial alternatives because they were inconsistent with the "basic objective of promoting uniformity in sentencing"). The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction,

helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Id.* at 264-65.

The Sentencing Guidelines are the *sole* factor in § 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities. The "nature" of the offense, § 3553(a)(1), the "history" of the defendant, § 3553(a)(1), the "need" to provide "just punishment," § 3553(a)(2)(A), none of these or the other factors, except for the Guidelines, provide a means for effectuating the Congressional goal of minimizing unwarranted disparities. *Cf. United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *United States v. Jimenez-Beltre*, 440 F.3d 514, 519 (1st Cir. 2006) (en banc) ("To construct a reasonable sentence starting from scratch in every case would defeat any chance at rough equality which remains a congressional objective.").

It is true that there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 127 S. Ct. at 2465, and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). In *Demaree*, the Seventh Circuit held that there is no *ex post facto* violation where the district court consults an advisory Guidelines range that is higher than the range that would have applied at the time of the offense conduct. *Id.* at 795. The court in *Demaree* explained that the advisory nature of the Guidelines system is such that post-offense changes to the Guidelines do not so substantially disadvantage the defendant that the changes have an *ex post facto* effect. *Id.* at 794-95. However, the opinion in *Demaree* did not, of course, purport to undermine the *Booker* remedial opinion's holding that it was creating an advisory system in order to effectuate Congress's fundamental goal of moving away from sentencing disparity. 543 U.S. at 263-65. Nor did the *Demaree* opinion undermine the principle that the farther the sentencing judge deviates from the advisory range, the more compelling the justification must be. *Dean*, 414 F.3d at 729; *United States v. Wallace*, 458 F.3d 606, 609 (7th Cir. 2006); *United States v. Wachowiak*, ___ F.3d ___ 2007 WL 2189561 at *5 (7th Cir. August 1,

36

2007).[14]

Indeed, the opinion in *Demaree* refers to the other reason, aside from the goal of minimizing sentencing disparity, why the advisory Guidelines range should be given serious consideration in the sentencing process: the Sentencing Commission is "a body expert in criminal punishments," so much so that its rationale "is entitled to the serious consideration of the sentencing judge." 459 F.3d at 795.[15] To be sure, there is no "presumption" that the advisory Guidelines sentence is the "correct" sentence. *Id.* at 794-95. And it is true that assessing whether a sentence is "reasonable" constitutes the *appellate* standard of review. The district court in the first instance selects "the particular sentence," § 3553(a), to impose based on the factors in § 3553(a)(1)-(7). There is an overall statutory command that the district court choose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2)(A)-(D), which are generally purposes that tend to call for longer sentences, 1984 USCCAN 3182, 3258-59, with the exception of the need for rehabilitation, § 3553(a)(2)(D).[16] Although there is no presumption that the Guidelines sentence is the correct sentence, it remains true after *Rita* that the Guidelines deserve serious consideration: "the Sentencing Commission sets and adjusts the guidelines ranges with the

---

[14]The Supreme Court has granted *certiorari* to consider whether this principle is consistent with *Booker* and the Sixth Amendment. *Gall v. United States*, No. 06-7949, 75 U.S.L.W. 3661 (June 11, 2007).

[15]Furthermore, the Guidelines is the only § 3553(a) factor that accounts for all of the other § 3553(a) factors. As the First Circuit has explained, "the guidelines cannot be called just 'another factor' in the statutory list," because "they are the only integration of the multiple factors" in § 3553(a). *United States v. Jimenez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc). Congress specifically directed the Sentencing Commission to formulate Guidelines that "assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2)." 28 U.S.C. § 991(b)(1)(A); *see* 28 U.S.C. § 994(f), (m).

[16]This rehabilitation purpose "is a particularly important consideration" when setting conditions of probation, rather than when considering the length of an imprisonment sentence. S. Rep. 98-225, 1984 USCCAN 3182, 3257-3260. Thus, the prefatory language of § 3553(a), although "often cited by defendants as if it were an admonition to be lenient," *United States v. Navedo-Concepcion*, 450 F.3d 54,58 (1st Cir. 2006), merely directs the district court to impose a sentence that is consistent with the factors in Section 3553(a)(2), most of which "hardly connote less punishment," *id.*

37

specific objective of achieving proportionality in sentencing for crimes of differing severity. *Rita*, 127 S.Ct. at 2464. The Commission is 'a respected public body with access to the best knowledge and practices of penology'; its judgments should not lightly be disregarded." *Wachowiak*, 2007 WL 2189561 at *9 (citation omitted).

Finally, deviations from the Guidelines range are also more likely to be unreasonable if the grounds for the deviation are "overstated mitigating factors," "normal incidents" of the offense, or simple "disagreement with the culpability assumptions built into the guidelines." *Wachowiak*, 2007 WL 2189561 at *10. The Seventh Circuit has repeatedly admonished that "factors that are common to offenders with like crimes" are less likely to be substantively reasonable, and that "particularized" factors are needed to justify nonguidelines sentences. *Id.* at *6. As the government explains below, a sentence within the advisory range is appropriate in this case because the § 3553(a) factors weigh in favor of such a sentence.

**A.      Defendant Ashqar Fails to Identify Unwarranted Sentencing Disparities Among Similarly Situated Defendant Sufficient to Justify A Sentence Below the Indicated Guidelines Range.**

Defendant Ashqar asserts that the 24 month sentence imposed in the case of unindicted Hamas co-conspirator Sharif Alwan renders the life sentence indicated under the Guidelines in his own case as unwarrantedly disparate. As noted previously, Alwan and Ashqar, as a matter of positions and the scope of activities within the Hamas organization were *not* similarly situated. *See* pp. 19 and 33. That much is clear from the Ashqar search documents and other materials introduced into evidence at trial. Equally important, however, is the fact that *Alwan* pre-dated the promulgation of Application Note 2 of § 3A1.4 clarifying and mandating the application of the terrorism enhancement to offenses involving obstruction of an investigation into a federal crime of terrorism.[17]

---

[17]      Similar analytical shortcomings defeat Ashqar's reference to other cases on the same point, specifically *United States v. Gracia*, 755 F.2d 984 (2d Cir. 1985), *United States v. Gomez*, 553 F.2d 958 (5th Cir. 1977), and *United States v. Leyva* 513 F.2d 774 (5th Cir. 1975). *See* PSR Mem. at 149-151. Those case variously predate (1) most of the provisions of the Terrorism chapter the Title 18 of the United States Code; (2) the Sentencing Guidelines; and (3) the Terrorism Enhancement of the Guidelines and thus are instructive points of comparison.

**B.** **The Suggested Guidelines Sentence Is No Greater than that Necessary to Satisfy the Sentencing Objectives of 18 U.S.C. § 3553(a)(2).**

In closing Defendant Ashqar persists in the mantra he carried through the grand jury and at trial – he was a conscientious objecting freedom fighter. This did not play with either the Chief Judge or the Seventh Circuit during civil contempt proceedings, nor did it play with the jury who looked past this obvious nullification pitch to hold Ashqar to account for his blatant violations of federal law; violations that were merely the last in a long string of unlawful acts he undertook in the service of a terrorist organization and the leaders and operatives of that organization who directed, facilitated and glorified a more than decade long string of horrific terrorist assaults on innocent civilians in an avowed effort to intimidate a foreign government with which the United States is closely allied – to walk away from the peace table and cede its very sovereign existence. As he appears for sentencing before this court, defendant Ashqar remains defiant, and to this day keeps locked within himself information and evidence directly relating to the domestic and international support network through which the Hamas terrorist organization perpetuated its long reign of terror, and in the process has allowed the directors and facilitators of that reign of terror to evade to evade legal sanction. That defiance reflects defendant Ashqar to be a continuing threat who is not capable of rehabilitation. Accordingly, the indicated Guideline sentence is precisely responsive to the § 3553(a) sentencing factors. A light sentence further will promote disrespect for the law, as his offense conduct was a direct affront to the justice system in its pursuit of grave criminal conduct.

**VII. Conclusion**

For the foregoing reasons, as well as the reasons stated by the government in its submission to the Probation Office, the evidence adduced at trial, and evidence further presented in the sentencing hearings to date, all of which will be supplemented by testimony an argument at the sentencing hearing currently scheduled for November 8, 2007, the government respectfully submits that the objections to the PSR and the sentencing position of defendant Abdelhaleem Ashqar be

---

Ashqar's invocation of *Biheiri* for the same purpose, (PSR Mem. at 149-50), falls short for analytical purposes because the sentence there ensued from a finding that the § 3A1.4 terrorism enhancement did not apply.

rejected and that the court adopt the findings or the PSR and impose a sentence within the Guidelines range calculated by the Probation Office, which is commensurate with the sentencing factors of 18 U.S.C. § 3553.

Respectfully submitted,
PATRICK J. FITZGERALD
United States Attorney


BY:     s/ Joseph Ferguson
JOSEPH FERGUSON
REID SCHAR
CARRIE HAMILTON
Assistant United States Attorney
United States Attorney's Office
219 S. Dearborn St., 3rd Floor
Chicago, Illinois  60604


October 3, 2007