**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 03 CR 978 |
| | ) | Hon. Amy St. Eve |
| ABDELHALEEM ASHQAR, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT ABDELHALEEM HASAN ABDELRAZIQ ASHQAR'S REPLY TO THE**
**GOVERNMENT'S RESPONSE TO HIS SENTENCING MEMORANDUM**

NOW COMES, Abdelhaleem Hasan Abdelraziq Ashqar, by and through undersigned counsel,

respectfully replying to the Government's Memorandum in Response to Defendant Ashqar's

Objections to PSR and Sentencing Position Memorandum ("Government's Response").  Dr. Ashqar

replies as follows:

**DR. ASHQAR'S REPLY MEMORANDUM OF LAW AND ARGUMENT**

*If the machine of government is of such a nature that it requires you to be the agent of injustice to another, then, I say, break the law.* - Henry David Thoreau

*I submit that an individual who breaks a law that conscience tells him is unjust, and who willingly accepts the penalty of imprisonment in order to arouse the conscience of the community over its injustice, is in reality expressing the highest respect for law.* - Martin Luther King, Jr.

**I.      ANY SENTENCE OF DR. ASHQAR THAT IS GREATER THAN NORMALLY APPLIED TO A FAILURE TO TESTIFY WOULD NOT ONLY BE AGAINST THE 3553(a) SENTENCE FACTORS, BUT WOULD ALSO VIOLATE THIS COUNTRY'S ADHERENCE TO PRINCIPLES OF LIBERTY AND JUSTICE**

> [T]he choice Judith Miller made is a brave and principled choice, and it reflects a valuing of individual conscience that has been part of this country's tradition since its founding.

> [Miller] acted in the great tradition of civil disobedience that began with this nation's founding, which holds that the common good is best served in some instances by private citizens who are willing to defy a legal, but unjust or unwise, order.

> Judy is an honorable woman adhering to the highest tradition of her profession and the highest tradition of humanity.  She has chosen at no benefit to herself and with no desire to be in prison, a confidentiality.  She should be honored for that and she will be.

Buzz Portune, <u>Media Relationships in the Post 9-11 World- Have Changes Impacted Newsgathering and Reporter Privilege?</u>, 32 Ohio N. U. L. Rev. 529 (2006). These are some responses concerning Judith Miller's refusal to testify pursuant to a court order and subsequent civil contempt confinement. Ms. Miller refused to testify to protect a freedom that this country is well-versed in, the freedom of speech and press.

Dr. Ashqar's choice displayed more bravery and principle than Judith Miller's choice.  The principles that all men regardless of race, religion, or national origin must be free to establish their own destiny and should be free from genocidal oppression at the hands of a foreign occupation are supposedly enshrined in our own constitution.  Our veterans have gone to all ends of the globe and have died to establish these principles.

There is not one soul in this court process who has lived in an occupied country, besides Abdelhaleem Hasan Abdelraziq Ashqar.  There is not one soul in this court that has been jailed,

1

beaten and tortured based upon his or her ethnicity. There is not one soul in this court that has had a foreign military raze his or her home, destroy his or her farm land, or refuse to provide him or her with the basic necessities of civilized society, including sanitation, employment, freedom to travel, education or health care. There is not one soul in this court that has seen his homeland completely decimated by an occupational force in an attempt to ethnically cleanse his or her homeland's inhabitants.

Every person in this court has been influenced by perception and mythology and kept ignorant through the hegemonical myth that Israel is the victim, defending itself against the barbaric Palestinians. This is not to say that the persons involved in this process are mean-spirited, but rather it means that they are *ignorant*, influenced by the mythology surrounding the Israeli/Palestinian conflict, perpetuated by the leaders of the United States and Israel. These myths formed the theory of the government's RICO prosecution that resulted in an acquittal, and now they form the basis of the government's attempt to punish Dr. Ashqar.

> Israel is said to be deserving of unprecedented United States support because:
>
> 1) it is weak and surrounded by enemies dedicated to destroying it; 2) it is a democracy, which is a morally preferable form of government;... 3) Israel's conduct has been morally superior to its adversaries' behavior, especially compared to the Palestinians; and 4) the Palestinians rejected the generous peace offer that Israel made at [Oslo in 1993 and] Camp David in July 2000 and opted for violence instead.....

John J. Mearsheimer and Stephen M. Walt, The Israel Lobby 79 (2007). However, this

> conventional wisdom about how Israel was created and how it has subsequently behaved toward the Palestinians as well as neighboring states is wrong. It is based on a set of myths about past events that Israeli scholars have systematically demolished over the past twenty years. While there is no question that Jews were frequently victims in Europe, in the past century they have often been the victimizers in the Middle East, and their main victims were and continue to be the Palestinians."

Id.

According to Israeli historian Benny Morris, "one of the most tenacious myths" is that Israel has always been the underdog against the Arab armies and Palestinians, that are seeking to destroy

Israel. Id. at 81. However, according to the Tel Aviv University's Jaffee Center for Strategic Studies "the strategic balance" had always "decidedly favor[ed] Israel," and "[t]oday, Israel is the strongest military power in the Middle East.... The Palestinians barely have effective police, let alone a military that could threaten Israel's existence, and they are furthered weakened by profound internal divisions." Id. at 83.

The next myth underlying U.S. support for Israel, is that Israel is a fellow democracy, upholding the highest standards of civil and human rights. However, "Israel's 1.36 million Arabs are de facto treated as second-class citizens" and the Palestinians are treated much worse, not even dignified as fellow human beings by Israel. Id at 88.

> Menachem Begin once said that 'Palestinians are beasts walking on two legs, ' while former IDF Chief of Staff Rafael Eitan referred to them as 'drugged roaches in a bottle' and also said that 'a good Arab is a dead Arab.' Another former chief of staff, Moshe Ya'alon, referred to the Palestinian threat as like a 'cancer' on which he was performing 'chemotherapy.'

Id. at 89. Furthermore, 75% of Israeli high school students referred to Arabs as 'uneducated' and uncivilized, while 74% referred to Arabs as 'unclean.' Id. Such a study compelled an Israeli commentator in the Jerusalem Post to rebuke that "[t]o say Arabs are unclean is an expression of racism in about its purest most virulent form." Id. at 90.

Most of all, the myth that Israel upholds democratic ideals is undermined by its continued illegal military control of the Occupied Territories. "Israel at present controls the lives of about 3.8 million Palestinians in Gaza and the West Bank [violating all international standards], while colonizing lands on which they have long dwelt.... Specifically, Israel controls air, sea, and land access, which means that the Palestinians are effectively prisoners within Gaza, able to enter or leave only with Israeli approval." Id. at 91. Thus, a Swedish foreign minister has referred to the Palestinians as "'living in a cage,' which naturally has had devastating effects on their economy as well as their mental and physical well-being." Id.

Ironically, the next myth that is widely accepted and was the theory of the prosecution here is

that it is the Palestinians who will not accept Israel's existence, not vice versa. It should be noted that from the very creation of Israel, "the leading Zionists were determined to create a Jewish state that covered virtually all of Palestine, and even parts of Lebanon and Syria." Id. at 92. The Zionist leader, David Ben-Gurion, made this point clear in 1937 when he said, "After the formation of a large army in the wake of the establishment of the state, we will abolish partition and expand to the whole of Palestine," and "Erect a Jewish State at once, even if it is not in the whole land. The rest will come in the course of time. It must come." Id. at 93. In 1947, Ben-Gurion still held firm to this view, stating that "We want the Land of Israel in its entirety. That was the original intention." Id. Thus, because the "Arabs heavily outnumbered Jews in Palestine and [because] the Zionists were bent on conquering as much territory as feasible, they had little choice but to expel large numbers of Arabs from the territory that would eventually become Israel." Id. at 94. Ben-Gurion stated of this ethnic cleansing that "it is impossible to imagine general evacuation [of the Arab population] without compulsion, and brutal compulsion." Id. at 95.

Israel effectuated this brutal compulsion in 1948, "when Jewish forces drove up to seven hundred thousand Palestinians into exile." Id. at 95. At least "531 Arab villages were destroyed and eleven urban neighborhoods emptied of their inhabitants." Id. at 96. The former Israeli Defense Minister Moshe Dayan explained that:

> Jewish villages were built in the place of Arab villages. You do not even know the names of these Arab villages, and I do not blame you because geography books no longer exist, not only do the books not exist, the Arab villages are not there either... There is not a single place built in this country that did not have a former Arab population.

Id. In acknowledgment of this injustice, Ben-Gurion stated that:

> If I was an Arab leader I would never make terms with Israel. That is natural: we have taken their country. Sure, God promised it to us, but what does that matter to them? Our God is not theirs. We come from Israel, it's true, but two thousand years ago, and what is that to them? There has been anti-semitism, the Nazis, Hitler, Auschwitz, but was that their fault? They only see one thing: we have come here and stolen their country. Why should they accept that.

Id.

4

The next myth widely propagated in the United States is that of the 'virtuous Israelis' and the 'evil Arabs,' with Israel always seeking peace and showing noble restraint. This myth does not comport with historical evidence. In 1948, Ben-Gurion wrote that "There is a need now for strong and brutal reaction. We need to be accurate about the timing, place, and those we hit. If we accuse a family- we need to harm them without mercy, women and children included. Otherwise, this is not an effective reaction." Id. at 99. Relying on such policy from the leadership, "[b]etween 1949 and 1956,... Israeli security forces and civilian guards, and their mines and booby-traps, killed somewhere between 2,700 and 5,000 Arab infiltrators,... the vast majority of those killed were unarmed." Id.

The list of atrocities continue.

The IDF murdered hundreds of Egyptian prisoners of war in both the 1956 and 1967 wars. In 1967, it expelled between 100,000 and 260,000 Palestinians from the newly conquered West Bank and drove 80,000 Syrians from the Golan Heights. When the victims of these ethnic cleansings tried to sneak back to their homes, often unarmed, Israelis sometimes shot them on sight. Amnesty International estimates that between 1967 and 2003, Israel destroyed more than ten thousand homes in the West Bank and Gaza Strip. Israel was also complicit in the massacre of innocent Palestinians by a Christian militia at the Sabra and Shatila refugee camps following its invasion of Lebanon in 1982. An Israeli investigatory commission found Defense Minister Ariel Sharon to bear personal responsibility for these atrocities by allowing the Phalangists to enter the camps.

Id.

At this date, Israel, after controlling the West Bank and Gaza for forty years, has ran "the longest official military occupation of modern history." Id. at 100. Even though Israelis' have tried to categorize the occupation as "benign," this simply is not true.

Like all occupations, Israel's was founded on brute force, repression and fear, collaboration and treachery, beatings and torture chambers, and daily intimidation, humiliation, and manipulation. During the First Intifada... the IDF distributed truncheons to its troops and encouraged them to break the bones of Palestinian protestors. The Swedish branch of the Save the Children organization... estimated that 23,600 to 29,900 children required medical treatment for their beating injuries in the [first] intifada.

Id. Furthermore, during the Second Intifada, which lasted from 2000 to 2005, Israel's response was even more brutal with "the Israeli newspaper Ha'aretz... declar[ing] that 'the IDF... is turning into a

5

killing machine whose efficiency is awe-inspiring, yet shocking.'" Id. During the first days of the uprising, "[t]he IDF fired one million bullets,... [and] [o]ver the course of that uprising, Israel killed 3,386 Palestinians, while 992 Israelis were killed by Palestinians...." Id.

In response to this overt and brutal violence, "former Prime Minister Barak once admitted, had he been born a Palestinian, he 'would have joined a terrorist organization.' If the situation were reversed and the Israelis were under Arab occupation, they would almost certainly be using similar tactics against their oppressors, just as other resistance movements around the world have done." Id. at 102.

One of the biggest myths held by a majority of the American public and expounded repeatedly at trial by the government was that during the Oslo peace process, the Israelis had offered the Palestinians "almost everything they wanted," but the militaristic and criminal Palestinians sought to derail the process and destroy Israel. Id. at 103. Of course, the vast majority of the American public and the government fail to realize that this version of the Oslo process is not correct, and that there were well-founded reasons to be against the process. Former Prime Minister Rabin stated in reference to the effect of the Oslo Accords:

> I seek peaceful coexistence between Israel as a Jewish state... [and] next to it, a Palestinian entity, less than a state, that runs the life of Palestinians... This is my goal, not to return to pre-Six Day War lines but to create two entities, a separation between Israel and the Palestinians who reside in the West Bank and the Gaza Strip.

Id. at 97. Furthermore, the Palestinians experience in reality led them to reject any promises made by Israel.

> Between the start of the Oslo peace process in September 1993 and the outbreak of the Second Intifada..., Israel confiscated more than forty thousand acres of Palestinian land, built 250 miles of bypass and security roads, established thirty new settlements, and increased the settler population in the West Bank and Gaza by almost one hundred thousand. The Israelis also... created a system of checkpoints that sharply reduced the Palestinians' freedom of movement and badly damaged their economy. The Palestinians were primed to explode by 2000, and when they did, the Israelis unleashed their superior firepower with scant restraint.

Id. at 106.

6

These myths have been at play in the government's version of Dr. Ashqar's crime. Beholden to these myths, the government cannot fathom why Dr. Ashqar would refuse to testify against fellow Palestinians struggling against the oppressive conditions of the world's longest military occupation.

Just as the government attempted to introduce the "glory record" of the Hamas suicide bombings at trial as proof of the atrocities against Israel, the following list consists of some of the occupier's activities which comprises Israel's glory record:

1) 1948 - Hundreds of Thousands of Palestinians displaced from their homes and made refugees;
2) 1948 - Over 500 Palestinian villages and 13 Palestinian urban areas demolished and replaced with Israeli villages;
3) 12,000 Palestinian homes destroyed since 1967; 700 Palestinian homes destroyed during the Oslo process;
4) Today there are over 4.2 million Palestinians in refugee camps;
5) Between 20,000 and 30,000 Palestinian children savagely beaten during the First Intifada;
6) Close to 4,000 Palestinians killed during the Second Intifada;
7) Checkpoints that severely restrict freedom of movement;
8) Economic devastation with a 20 to 30 percent unemployment rate in Gaza and the West Bank;
9) Unquantifiable psychological harm from over many decades of military occupation;
10) A successful ethnic cleansing of Palestinians from their homeland.

See Attachment 1, Occupation 101 DVD.

The government's theory in this case and its prosecutions of the Holy Land Foundation and Dr. Sami Al-Arian is not that the Palestinian-defendants were engaged in terrorist attacks or even that these Palestinians supported terrorist attacks. Rather, in all of these cases the government's theory has been that providing support to the oppressed and powerless Palestinians, in social, charitable, and political contexts, is a form of terrorism because it makes Hamas more popular. The self-described expert, Dr. Levitt, has testified to this theory in all of these cases, arguing not that the defendants directly support terror, but that the defendants make terrorists groups look good by helping the Palestinian people. Now, in the government's farcical argument for a life sentence, this theory becomes even more attenuated. Dr. Ashqar is a 'terrorist' because he refused to testify, allowing other Palestinian-Americans to continue to provide much-needed support to the Palestinian people, which in

7

turn allowed Hamas to gain political leverage with the Palestinian people.

The fact is that Dr. Ashqar's refusal to testify was a refusal to support the mythology propagated by the government in its conspiracy prosecution, which was designed from its inception to support a bankrupt, racist foreign policy..

There was no choice for Dr. Ashqar when subpoenaed in front of the grand jury. He could either join with his oppressors, reject his countrymen, forsake everything he believes, and never return to his beloved Palestine, or he could be labeled a terrorist. There is a special nobility in such a choice. It is the only decision that a patriot could ever make. It has been suggested over and over again that Dr. Ashqar owed a duty to the United States. This belief is unconscionable in as much as the United States aids and abets Israel's illegal oppression of 3.8 million people. By this twisted logic, Dr. Ashqar had a duty to betray his country. Instead, he chose his country over his own well-being. If asked to do the same thing about the United States, who in this courtroom would have made a different choice than Abdelhaleem Ashqar? Would Mr. Ferguson be willing to agree to a change of his name in exchange for a betrayal of the United States? How about Mr. Schar or Ms. Hamilton? If faced with the same choice of either breaking a law that requires a betrayal of their beloved country or complying with such an unjust law, I am willing to bet that everyone representing the government would choose the honorable choice and would not betray the United States. Why should Dr. Ashqar's decision be viewed any differently? For fear of upsetting the United States' political and strategic ally, Israel? Justice should not be based upon the United States' foreign policy. Justice should not only be available to the strong and unavailable to the weak. What is it about the Palestinian people that deprives them of their right to fight for their freedom? Must the oppressed always play and bargain for their rights by rules established by the oppressor? By that logic the United States would still be a colony of Great Britain and apartheid would still hold sway in South Africa.

Dr. Ashqar broke a law and willingly accepts his punishment for breaking the law. However,

Abdelhaleem Ashqar requests that this Court is mindful, when sentencing him, that to comply with the law would have resulted in a greater injustice against the Palestinian people. Any sentence of Dr. Ashqar that is greater than normally applied to a failure to testify would not only be against the 3553(a) sentencing factors, but would also be contrary to the principles of liberty and justice that this country was founded upon. Thus, Dr. Ashqar suggests to this Court that whatever the correctly calculated guideline range may be, the circumstances of this case are far outside the heartland of the sentencing guidelines. The Court has presided over this trial, has heard all of the evidence, is aware of the jury's acquittal, is aware of the unusual nature of this case, and probably has a good bearing on the true, loyal, and peaceful nature of Dr. Ashqar and his morally justifiable, yet unlawful reasons for refusing to testify. Dr. Ashqar requests that the Court sentence him accordingly.

## II. DEFINING THE CONSTITUTIONAL LIMITS OF DR. ASHQAR'S SENTENCE

In its response, the government never explicitly states that it is seeking a life sentence, but nevertheless, the government states that the Court should adopt the sentencing range suggested by the probation officer, which is life imprisonment. The government does not mention life imprisonment specifically, but only alludes to it, because it knows the Kafkqesque farce of such a punishment for the crime of failure to testify.

Therefore, the constitutional limits of Dr. Ashqar's sentence must be set forth to demonstrate that life imprisonment is not a constitutionally permissible punishment. Dr. Ashqar avers to this Court that the highest sentence that he can receive, that does not run afoul of the Sixth Amendment and Apprendi v. New Jersey, 530 U.S. 466 (2000), is ten years. Ten years, which is the statutory maximum for a violation of 18 U.S.C. § 1503, is the maximum sentence authorized by the jury's verdict of guilty for Dr. Ashqar's failure to testify. The jury has not found beyond a reasonable doubt any facts other than that Dr. Ashqar endeavored to influence, obstruct, or impede, the due administration of justice. Thus, this Court cannot enhance Dr. Ashqar's sentence beyond ten years

because the jury has not found any of the facts beyond a reasonable doubt that the government relies upon in attempting to enhance Dr. Ashqar's sentence. The jury did not find that Dr. Ashqar obstructed the investigation of a federal crime of terrorism. The jury did not find what crimes the grand jury was investigating. Nor did the grand jury find that Dr. Ashqar actually obstructed justice.

Furthermore, conveniently but wisely ignored by the government in its response was the ploy to try to use the conviction for criminal contempt to skirt Dr. Ashqar's Sixth Amendment Apprendi rights. While no statutory maximum has been enacted by Congress in 18 U.S.C. § 401, criminal contempt sentencing is limited by an abuse of discretion standard. See United States v. Ray, 683 F.2d 1116, 1122 (7th Cir. 1982). Courts have uniformly found that any sentence over five years for criminal contempt represents an abuse of discretion. See Dr. Ashqar's Sentencing Memorandum at 71-72. Moreover, criminal contempt punishment is left to the discretion of the court because it is "essential to ensuring that the Judiciary has a means to vindicate its own authority without complete dependence on other Branches." Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 796 (1987). "A criminal contempt charge is... 'a separate and independent proceeding at law' that is not part of the original action." Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 396 (1990) (quoting Bray v. United States, 423 U.S. 73, 75 (1975)). See also Roe v. Operation Rescue, 919 F.2d 857, 869 (3d Cir. 1990). Therefore, looking to the sentencing guidelines implemented by Congress and looking to the underlying grand jury investigation to determine a sentence may be a violation of judicial autonomy over criminal contempt. Without a doubt, though, any sentence over ten years would be overturned as an abuse of discretion for punishment for violating a court order.

Because the criminal contempt and obstruction charges stem from the same act, Dr. Ashqar's failure to testify, the court cannot punish Dr. Ashqar with consecutive sentences. Thus, the maximum sentence that Dr. Ashqar can receive is ten years.

## III. APPLICATION NOTE 2 OF THE TERRORISM ENHANCEMENT IS UNCONSTITUTIONAL

10

Dr. Ashqar urges the Court to find Application Note 2 of § 3A1.4 as a facially unconstitutional amendment to the sentencing guidelines. It should be noted that all of the courts that have dealt with Application Note 2 have been extremely uncomfortable about using it and have described it as 'draconian.' See United States v. Biheiri, 356 F.Supp.2d 589, 598 (E.D. Va. 2005). Thus, courts have parsed the language of Application Note 2 or have granted variances and departures from the sentencing ranges enhanced by Application Note 2 to vitiate the reach of Application Note 2. To this date, no court has endeavored to deal with the myriad of constitutional quandaries raised by Application Note 2.

Undoubtedly, Application Note 2 was amended to the terrorism enhancement hastily and haphazardly as a knee jerk reaction after the 9/11 terrorist attacks. In the record of the Sentencing Commission's deliberation over the amendment, there is no evidence of careful consideration of the effect or scope of such an amendment.

While ideally, Congress would have recognized the plethora of problems with the wording of Application Note 2 and would have blocked or repealed such an amendment, the truth is that no one in Congress wants to appear weak against terrorism. Even if the amendment was fraught with problems, no one in Congress would risk offending his or her constituency and speak out against it, either then or now.

Throughout history, after national crises, laws have been enacted in the name of national security that in hindsight are unconstitutional encroachments on citizens' civil liberties. In such times, courts have been called upon to use their judicial power to temper these unconstitutional, draconian laws. As our founding fathers foresaw, it is up to the judiciary to keep check on these problematic laws and to ensure that such laws do not trample the Constitution. Application Note 2 is no different. Dr. Ashqar urges this Court to declare Application Note 2 unconstitutional and relegate it to its proper place in history, as a footnote to the paranoia and fear that blossomed following the 9/11 attacks.

Dr. Ashqar hereby asserts that Application Note 2 has no place in a legal system that places value on fairness and justice and no place in a nation that ostensibly holds freedom and liberty in the highest esteem. As stated in Dr. Ashqar's Sentencing Memorandum, Application Note 2 violates the Fifth, Sixth, and Eight Amendments.

The government attempts to save Application Note 2 from being declared as unconstitutional by relying on the 'advisory' nature of the guidelines. The government argues that because the guidelines are advisory, the Court may choose to grant a variance or depart downward. Furthermore, the government argues that when the sentencing range is unconstitutionally high, the guidelines state that the sentence should be the statutory maximum. Thus, the government argues that it is only when the Court actually sentences a person based upon a guideline that any constitutional concerns kick in.

Such an argument should fail. While the advisory nature of the sentencing guidelines has saved many sentences from constitutional challenges, in this case, the advisory nature of the guidelines cannot save Application Note 2.

Such an argument would make immune from attack or review a guideline section that 'advised' courts that a person that disobeys a court order shall be put to death. Based on the government's argument, the guideline is not unconstitutional until a judge actually sentences the person to death for disobeying the court order.

This *reductio ad absurdum* example is not far from the real situation facing Dr. Ashqar. The government admits that the Court cannot sentence Dr. Ashqar to the full extent 'advised' by Application Note 2. If the court sentences Dr. Ashqar to the advised sentence range, the sentence will run afoul of the Sixth Amendment. This is true of any and every defendant who is convicted of criminal contempt, perjury, obstruction of justice, or making false statements. The sentence 'advised' by Application Note 2 will *always* be in violation of the Sixth Amendment, i.e. always greater than the maximum sentence authorized by the jury's verdict. Compare 18 U.S.C. § 1001 (authorizing a

12

maximum sentence of 5 years), and 18 U.S.C. § 1621 (authorizing a maximum sentence of 5 years), and 18 U.S.C. § 1503 (authorizing a maximum sentence of 10 years), with U.S.S.G. § 3A1.4 (indicating that the minimum sentencing when Application Note 2 applied would 17.5 years, based upon a offense level of 32 and a criminal history category of VI).

Just because Application Note 2 is advisory, should not mean that it stands untouchable against challenges of unconstitutionality. If the 'advice' that a guideline gives is always unconstitutional, why should such advice be eternally etched in the guidelines, and why should it be mandated that a court consider such constitutionally infirm advice? After Booker, courts are not allowed to ignore the sentencing guidelines, but rather must consider them in fashioning a sentence. See United States v. Mancari, 463 F.3d 590, 597 (7th Cir. 2006). Thus, under the current law, when Application Note 2 applies to a defendant, the court must consider an unconstitutional sentencing range. Such a result is absurd- it basically tells a judge that 'we know that a guideline is unconstitutional, but you must consider it anyway in making your sentence.' Under such a rubric, the Sentencing Commission could adopt any far-fetched and unconstitutional punishments as it wishes, and stand immune from judicial inquiry.

Because Application Note 2 always advises the sentencing court to impose a sentence that is greater than the sentence authorized by the jury's verdict in violation of the Sixth Amendment, the Court should hold that Application Note 2 was an unconstitutional amendment to the terrorism enhancement.[1]

**IV.  THE COURT SHOULD FIND THAT APPLICATION NOTE 2 OF THE TERRORISM ENHANCEMENT DOES NOT APPLY TO DR. ASHQAR'S FAILURE TO TESTIFY**

---

[1] Nor does the government's argument that the savings clause of the sentencing guidelines protect Application Note 2 from constitutional scrutiny. While the guidelines state that when any sentencing range is greater than the statutory maximum, the sentence shall be the statutory maximum, such a rule transforms the statutory maximum obstruction of justice offenses into the statutory mandatory sentence. In such cases, the defendant lacks notice that punishment for his failure to testify in a terrorism investigation will automatically will result in a mandatory sentence of 10 years, and would be a violation of due process.

**A.** **In Arguing for Strict Liability Attachment of the Terrorism Enhancement, the Government Elides The Differences Between Perjury and Remaining Silent**

In making the argument that the terrorism enhancement should apply to Dr. Ashqar's decision to remain silent, the government glosses over the differences between perjury and remaining silent when compelled to testify. Dr. Ashqar chose to remain silent in front of the grand jury. He did not choose to lie and mislead the grand jury in its investigation.

In United States v. Benkahla, 501 F.Supp.2d 748, 750 (E.D. Va. 2007), the court found actual obstruction and applied the terrorism enhancement because there was an obvious intent to mislead, as demonstrated by the convictions for making false statements to the grand jury and the FBI. There was no such intent to mislead by Dr. Ashqar. Dr. Ashqar merely decided to remain silent.

In this country there is a vast difference between remaining silent and perjury. There is a long history of silence being used as a form of civil disobedience and protest, when oppression is at issue. Silence has been used as a powerful tool of the oppressed in the labor movement, the civil rights movement, and every anti-war movement. There is no such tradition for perjury.

Even the case law in this country holds silence to be a less culpable reaction than committing perjury. See Bryson v. United States, 396 U.S. 64, 72 (1969). Any sentence of Dr. Ashqar and application of the sentencing guidelines should consider the vast difference between Dr. Ashqar's principled choice to remain silent and the act of actively misleading a grand jury.

**B.** **The Government Cannot Demonstrate that Dr. Ashqar Actually Obstructed the Grand Jury's Investigation of a Specific Federal Crime of Terrorism**

*1.* *Actual Obstruction is the Correct Test for Application Note 2*

The government suggests that Application Note 2 is a strict liability enhancement and that proof of actual obstruction is not required. The government relies upon cases that interpret the accessory after the fact cross reference, which contains similar language to Application Note 2 of Section 3A1.4. However, the government should recognize that these cases were all based upon the

14

commentary of the Sentencing Commission which stated that "because the conduct covered by § 2J1.2 is frequently part of an effort... to assist another person to escape punishment for an offense...." United States v. Gallimore, 491 F.3d 871, 876-77 (8th Cir. 2007) (quoting U.S.S.G. § 2J1.2 cmt. background). See also Government Response Memorandum at 9-10. Application Note 2 does not have any commentary defining the meaning of obstruction. Thus, as the Biheiri court held, without any reference to an effort to obstruct, the plain meaning of 'obstruction' should apply, and thus the government is required to prove the actual obstruction of an investigation into a federal crime of terrorism.[2] 356 F.Supp.2d at 598.

> 2. *The Government Cannot Demonstrate Actual Obstruction Where the Grand Jury Succeeded in Finding Probable Cause to Indict the Defendants*

The operative question then becomes how should actual obstruction of a grand jury investigation by the failure to testify of a witness be determined. Dr. Ashqar suggests to this Court that the only fair way to judge actual obstruction of a grand jury proceeding is to determine if the grand jury terminated prematurely as a result of a witness' failure to testify. Thus, this is a two-step process. First, a court should look to determine if the grand jury proceedings terminated prematurely. If the grand jury proceedings terminated prematurely, then a court should look to whether the premature termination was the result of the witness' failure to testify.

The government cites to a long list concerning the *scope* of a grand jury's investigation. See Government Response Memorandum at 17-18. However, the government does not cite to the overarching goal of *every* grand jury investigation- the determination of whether probable cause exists

---

[2] Furthermore, the commentary by the Sentencing Commission in enacting Application Note 2 suggests that it is not a strict liability enhancement. The Sentencing Commission reasoned that "[t]he amendment adds an application note to § 3A1.4 regarding harboring and concealing offenses to clarify that § 3A1.4 *may* apply in the case of offenses that occurred after the commission of the federal crime of terrorism (e.g., a case in which the defendant, in violation of 18 U.S.C. § 2339A, concealed an individual who had committed a federal crime of terrorism)." U.S.S.G., Supp. App. C, Amendment 637 at 244 (2002) (emphasis added). The inclusion of the term *may* indicates that the Sentencing Commission did not believe that all obstruction or harboring offenses that relate to terrorism would receive the terrorism enhancement.

to issue an indictment. The Supreme Court has held that a grand jury serves the "dual function of determining if there is probable cause that a crime has been committed and of protecting citizens against unfounded criminal prosecutions." Branzburg v. Hayes, 408 U.S. 665, 686-87 (1972). Therefore, when the grand jury has determined that probable cause exists to issue an indictment, the grand jury investigation has not been obstructed.

To hold otherwise would lead to untenable results, as we have seen from these sentencing proceedings. Any other standard of actual obstruction invites the government to create a series of hypothetical questions that they may have asked Dr. Ashqar if Dr. Ashqar had cooperated and to create a series of hypothetical investigations that the grand jury was undertaking. Any other standard of actual obstruction compels the government to guess what the contumacious witness' testimony would have been, if he had answered the hypothetical questions. Such an inquiry is simply impossible.

Support for such an approach is implied in the procedures of the Biheiri and Benkahla courts. Biheiri involved the defendant lying to federal agents who were investigating Hamas. 356 F.Supp.2d at 598. In determining whether the defendant's false statement caused actual obstruction of the terrorism investigation, the court looked no further than the question asked of the defendant. Id. at 599. Because "the agents who interviewed Biheiri had actual knowledge that Biheiri's statement regarding his relationship with Marzook was false," there was no actual obstruction. Id. Even though the government claimed that had Biheiri not falsely answered that one question, it "would have made additional inquiries of Biheiri and thus learned sooner about Marzook's infusion of money into BMI... a determination that would have been significant in the government's investigation of fundraising for Hamas," the court did not allow the government to pursue these hypothetical claims. Id. Instead, the court centered the analysis on the actual question asked and the false statement given.

This framework for determining actual obstruction of a grand jury investigation is more

16

evident from the Benkahla case. Benkahla was convicted of making false statements to a grand jury and obstructing the grand jury's investigation. Benkahla, 501 F.Supp.2d at 750. The grand jury that Benkahla appeared before did not indict anyone under substantive counts of conviction, but instead only found probable cause that Benkahla made false statements. The court found that the defendant's false statements about the identity of individuals involved in a jihad training camp had brought the FBI's and the grand jury's investigation of these verified terrorists to a dead end. Id. at 757.

In this case, the grand jury found probable cause that a RICO conspiracy existed and probable cause to indict Dr. Ashqar, Muhammad Salah, and Mousa Abu Marzook as co-conspirators. Because the grand jury did not terminate prematurely, but instead successfully was able to find probable cause, there was no actual obstruction caused by Dr. Ashqar's failure to testify.[3] As such, the government should be precluded from presenting testimony regarding actual obstruction by the FBI agent at the sentencing hearing, as such testimony will be irrelevant and superfluous.

Finally, one last point needs to be made regarding actual obstruction of a grand jury investigation by failing to testify. This standard above obviously applies to grand jury investigations of substantive crimes. For example, if a grand jury is investigating a murder and the grand jury indicts a suspect, a witness' failure to testify obviously did not obstruct the grand jury's proceedings. The government will argue that a grand jury investigation of a conspiracy is different, in that the grand jury would have been able to indict additional co-conspirators had Dr. Ashqar been willing to testify.

---

[3] Such a framework also resolves the weird paradox between perjury and false statements and failing to testify. When looking at perjury and false statements, the Biheiri and Benkahla courts did not look past the questions actually asked and falsely answered by the defendants. Here the government was attempting to use hypothetical questions that it would have asked Dr. Ashqar had he not refused to testify, making the terrorism enhancement more applicable to not testifying rather that testifying falsely. In such a scheme, a witness in a terrorism investigation who does not want to testify would have an incentive to testify falsely, as the terrorism enhancement would be much harder to apply. Such a weird outcome is wholly against precedent and common sense that dictates that lying is a more serious infraction than not testifying at all. See Bryson, 396 U.S. at 72 ("Our legal system provides methods for challenging the Government's right to ask questions- lying is not one of them. A citizen may decline to answer the question or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood."); Brogan v. United States, 522 U.S. 398 (1998) ("Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very *purpose* of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function.").

17

However, the difficult part in finding probable cause of a conspiracy is the determination of whether a conspiracy actually existed. Finding probable cause to indict a person as a co-conspirator in an already proven conspiracy is easy. Even the most tenuous connection to a conspiracy supports a finding of probable cause.

Moreover, any argument about unindicted co-conspirators ("UCC") being charged as actual conspirators had Dr. Ashqar testified is without merit. By the very nature of being a UCC, the government must have probable cause that the UCC is involved in the conspiracy. See United States v. Briggs, 514 F.2d 794, 805 (5th Cir. 1975) ("[T]he indictment may make such additional [UCC's] defendants if there is probable cause to believe that they participated in the alleged conspiracy."). Thus, if a person is labeled as a UCC, the government, if it desires, could bring an indictment against that person, but has chosen not to for strategical reasons. Thus, there is nothing to suggest that the government can claim actual obstruction of a grand jury investigation that found probable cause of the existence of a conspiracy based upon the possibility of indicting other co-conspirators.

**C.     The Government Cannot Demonstrate That It Was Investigating a Specific Federal Crime of Terrorism**

To satisfy this element of Application Note 2, the government must demonstrate that the grand jury was investigating one of the enumerated federal crimes of terrorism from 18 U.S.C. 2332b(g)(5) and that the enumerated crime that the grand jury was investigating satisfies the motivational element, that the crime was calculated to influence or affect the conduct of government by intimidation or coercion. Benkahla, 501 F.Supp.2d at 752.

Thus, the first part of this test is easy, as the government merely has to show that the grand jury told Dr. Ashqar that it was investigating possible violations of 18 U.S.C. §§ 956, 1203, or 2339, which the grand jury transcript indicates. See id. However, the second part is much more difficult because to be able to demonstrate the motivational element, the government must point to a specific violation of one of these statutes, and it must be a violation that Dr. Ashqar had knowledge

18

concerning.  See id.[4]

The government can do no such thing here.  The government cannot point to one instance of a specific conspiracy or the actual act of killing a foreign national or hostage taking that Dr. Ashqar had knowledge concerning.  Furthermore, the government cannot point to a specific violation of material support to a terrorist organization, because all of Dr. Ashqar's conduct occurred before Hamas was designated as a terrorist organization.  Thus, the government cannot point to a specific federal crime of terrorism that satisfies the motivational element of the terrorism enhancement.

## V.     THE COURT SHOULD FIND THAT THE CIRCUMSTANCES OF DR. ASHQAR'S FAILURE TO TESTIFY ARE OUTSIDE THE HEARTLAND CONTEMPLATED BY THE ENHANCEMENTS ENACTED BY THE SENTENCING COMMISSION

Dr. Ashqar asserts that his failure to testify is outside the heartland of the sentencing guidelines' enhancements for obstruction of justice.  Specifically, the cross-reference provision to accessory after the fact, the substantial interference with the administration of justice, and the terrorism enhancement were not envisioned by the Sentencing Commission as applying to Dr. Ashqar's failure to testify.

The sentencing guidelines did not envision enhancing a person's sentence for obstruction of justice where the person in refusing to testify did so as an act of civil disobedience.  Nor did the Sentencing Commission envision a case that was so fraught with political implications when implementing the enhancements.  The guidelines could not take into account Dr. Ashqar's fear of retaliation by Israel after he would be deported.  Nor could the guidelines take into account the attenuated way in which the government created a potential terrorism crime through the RICO statute.

---

[4] "For investigations into specific offenses, such as a plot to bomb a government building with explosives, they are detailed by a discrete set of facts and circumstances.  Such facts and circumstances could include: who specifically was being investigated, what offense or offenses were the subject of the investigation, and what was the motivation for committing the offense.  In the context of an investigation into specific, discrete offenses, the Government would be able [sic] meet its burden by pointing to specific facts and circumstances to demonstrate that the particular offenses subject of the investigation were 'calculated to influence of affect the conduct of government.'" Id.

19

Nor did the Sentencing Commission contend with the fact that Dr. Ashqar had been acquitted of the substantive charges and that the government would use these acquitted charges as a basis to enhance Dr. Ashqar's sentence. As the Court is aware, this has been an extremely complex and sensitive case. There is no way that the appropriate sentence in this case can be reduced to a mathematical formula. As such, Dr. Ashqar suggests to this Court that his conviction is outside of the heartland of the sentencing guidelines and that the guidelines substantially over-represent the sentence that Dr. Ashqar should receive in accordance with the § 3553(a) factors.

## CONCLUSION

The government may argue that part of committing a civil disobedience is the willingness to accept punishment. But, in this case, has not Dr. Ashqar been punished enough. For standing up for the Palestinian cause, Dr. Ashqar has already lost everything. He has spent almost a year in a jail cell, enduring one of the longest hunger strikes in American history. He has lost his job as a college professor, after working tirelessly to receive his doctorate. Dr. Ashqar has been under house arrest for over three years. Most of all, though, at the conclusion of these legal proceedings, Dr. Ashqar will be deported, in all likelihood tearing him away from his wife and young nephew. Dr. Ashqar has sacrificed and lost everything that he has loved, worked for, and dreamed of, all for the sake of patriotism toward his oppressed people. Dr. Ashqar has lost everything because he had the moral conviction to stand up against an unjust situation. Thus, Dr. Ashqar respectfully asks this Court to sentence him leniently and let him attempt to get on with what life he has been left.

Respectfully Submitted,

/s/ **William B. Moffitt**
WILLIAM B. MOFFITT
Moffitt & Brodnax, Ltd.
The Mills Building
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Phone: (703) 834-0204

Fax: (703) 834-0206
Email: wbmoffit_esq@yahoo.com